No. 25-3826

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CITY OF HUNTINGTON BEACH, a California Charter City, and Municipal Corporation; PARENT, 1A, 2A, 3A, 4A, 5A, 6A, 7A, 8A, 9A, 10A,

*Plaintiffs-Appellants,*

v.

GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROB BONTA, in his official capacity as Attorney General of the State of California; TONY THURMOND, in his official capacity as California State Superintendent of Public Instruction,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 8:24-cv-02017-CBM-JDE (Hon. Consuelo B. Marshall)

## BRIEF FOR THE APPELLANTS

Michael J. Vigliotta
  City Attorney
OFFICE OF THE CITY ATTORNEY
2000 Main Street, P.O. Box 190
Huntington Beach, CA 92648
Telephone: (714) 536-5555
mvigliotta@surfcity-hb.org

*Counsel for Plaintiff-Appellant*
*City of Huntington Beach,*
*a California Charter City, and*
*Municipal Corporation*

***Additional counsel on next page**

Gene C. Schaerr
Stephanie L. Freudenberg
Justin A. Miller
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

Donald M. Falk
SCHAERR | JAFFE LLP
One Embarcadero Ctr., Ste. 1200
San Francisco, CA 94111
Telephone: (415) 562-4942

*Counsel for Plaintiffs-Appellants*

Nicholas Barry
Ian Prior
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. S.E., #231
Washington, DC 20003
Telephone: (202) 964-3721

*Counsel for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form34instructions.pdf

**9th Cir. Case Number(s)**  | 25-3826 |

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

| City of Huntington Beach, a California Charter City, and Municipal Corporation; Parents 2A, 3A, 4A, 5A, 6A, 7A, 8A, 10A |

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes      ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   | |

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes      ◉ No

---

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

   ◯ Yes     ◉ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

◯   this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

◯   the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

◉   I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** | /s/ Gene C. Schaerr | **Date** | 07/16/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 34**                                    ii                                    *New 12/01/24*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ................................................ vi

INTRODUCTION ........................................................ 1

JURISDICTION ........................................................ 3

ISSUES PRESENTED .................................................... 4

PERTINENT AUTHORITIES .............................................. 5

STATEMENT OF THE CASE .............................................. 5

    A.    Factual Background ............................................. 5

        1.    Gender incongruence and dysphoria are medical conditions. ................................................ 5

        2.    Social transition is a controversial treatment option for gender incongruence and dysphoria. ............. 6

        3.    Social transition has significant effects on children's health and wellbeing. ....................... 10

        4.    Children potentially suffering from gender dysphoria and comorbidities benefit from parental involvement in their treatment. ...................... 11

        5.    AB 1955 and the Huntington Beach Ordinance ............. 12

    B.    Procedural History ............................................ 13

SUMMARY OF ARGUMENT ................................................ 18

ARGUMENT ........................................................... 22

    I.    Plaintiffs Have Standing To Challenge AB 1955 ................... 25

        A.    The additional Parent Plaintiffs have standing. ............ 25

            1.    The additional Parent Plaintiffs adequately pleaded injury-in-fact. ........................... 25

        2.    The additional Parent Plaintiffs' injuries would be redressed by an injunction.......................33

    B.    The City of Huntington Beach has standing. ..................34

II.    Plaintiffs Adequately Pleaded and Are Likely to Succeed On the Merits of Their Constitutional Claims..........................37

    A.    The Challenged Provisions violate parents' fundamental due process right to direct their children's medical care. ......................................38

        1.    The parental right to direct children's medical care is deeply rooted and essential to liberty..........40

        2.    The Challenged Provisions enable school staff and children to socially transition children in school without parental consent. ............................45

        3.    Social transition is medical and mental health care with significant effects on children's health and wellbeing. ...............................48

    B.    The Challenged Provisions violate parents' fundamental due process right to information about their children's health. ....................................56

        1.    The parental right to information about their children's distress and symptoms of mental illness is deeply rooted and essential to liberty......56

        2.    The Challenged Provisions enable school staff to keep parents in the dark regarding their children's distress and symptoms of mental illness. ....................................................60

    C.    The Challenged Provisions do not survive strict scrutiny. ............................................................63

III.   Plaintiffs Established the Additional Factors Entitling Them to a Preliminary Injunction ............................................ 66

    A.   The Parents Will Be Irreparably Harmed If Relief Is Denied ................................................................. 66

    B.   The Balance of Equities and Public Interest Sharply Favor An Injunction .................................................... 71

CONCLUSION ....................................................................... 74

STATEMENT OF RELATED CASES ................................... 76

CERTIFICATE OF COMPLIANCE ...................................... 77

ADDENDUM

    Table of Contents ............................................................. A-1

    United States Constitution Amendment XIV, § 1 ......... A-2

    California Assembly Bill 1955, § 2 .................................. A-3

    California Education Code § 220.3 [AB 1955, § 5] ......... A-6

    California Education Code § 220.5 [AB 1955, § 6] ......... A-7

    California Education Code § 48200 .................................. A-8

    California Education Code § 48293 .................................. A-9

    City of Huntington Beach Municipal Ordinance No. 4326 ............ A-10

      Section 1.23.10 ............................................................. A-10

      Section 1.23.20 ............................................................. A-13

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra,*
901 F.3d 1166 (9th Cir. 2018) .............................................................24

*Abbott v. City of Los Angeles,*
326 P.2d 484 (Cal. 1958) ....................................................................35

*Alliance for Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ......................................................23, 24

*Angelotti Chiropractic, Inc. v. Baker,*
791 F.3d 1075 (9th Cir. 2015) ......................................................22, 23

*Anspach v. City of Philadelphia,*
503 F.3d 256 (3d Cir. 2007).....................................................43, 44, 59

*Arc of Cal. v. Douglas,*
757 F.3d 975 (9th Cir. 2014) ..............................................................22

*Bellotti v. Baird,*
443 U.S. 622 (1979) ...........................................................................58

*Benavidez v. County of San Diego,*
993 F.3d 1134 (9th Cir. 2021) ............................................................40

*Berger v. City of Seattle,*
569 F.3d 1029 (9th Cir. 2009) ......................................................63, 65

*Cent. Delta Water Agency v. United States,*
306 F.3d 938 (9th Cir. 2002) ..............................................................36

*City of South Lake Tahoe v. Cal. Tahoe Reg. Plan. Agency,*
625 F.2d 231 (9th Cir. 1980) ..............................................................35

*City of Stamps v. Alcoa, Inc.,*
No. 05-1049, 2006 WL 2254406 (W.D. Ark. Aug. 7, 2006) .................36

*Deanda v. Becerra,*
96 F.4th 750 (5th Cir. 2024)........................................................26, 31

vi

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ............................................................ 24

*Doe v. Heck*,
   327 F.3d 492 (7th Cir. 2003) ............................................................ 47

*Doe v. Horne*,
   115 F.4th 1083 (9th Cir. 2024).................................................... 49, 71

*Ecological Rts. Found. v. Pac. Lumber Co.*,
   230 F.3d 1141 (9th Cir. 2000) ................................................ 27, 28, 29

*Elrod v. Burns*,
   427 U.S. 347 (1976) ......................................................................... 66

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ......................................................................... 26

*Fields v. Palmdale Sch. Dist.*,
   427 F.3d 1197 (9th Cir. 2005) ................................................ 42, 58, 59

*Fields v. Palmdale Sch. Dist.*,
   447 F.3d 1187 (9th Cir. 2006) .................................................... 42, 59

*Foote v. Ludlow Sch. Comm.*,
   128 F.4th 336 (1st Cir. 2025) ...................... 17, 39, 43, 49, 50, 51, 52, 59

*Galanti v. Nev. Dep't of Corr.*,
   65 F.4th 1152 (9th Cir. 2023)............................................................ 23

*Glucksberg v. Washington*,
   521 U.S. 702 (1997) ......................................................................... 38

*Gruenke v. Seip*,
   225 F.3d 290 (3d Cir. 2000).............................................................. 44

*Haytasingh v. City of San Diego*,
   286 Cal.Rptr.3d 364 (Ct. App. 2021)............................................ 35, 36

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ............................................................ 72

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ......................................................................... 36

*In re Zappos.com, Inc.,*
   888 F.3d 1020 (9th Cir. 2018) ..............................................27

*Inland Empire Waterkeeper v. Corona Clay Co.,*
   17 F.4th 825 (9th Cir. 2021) ...............................................27

*Isaacson v. Mayes,*
   84 F.4th 1089 (9th Cir. 2023) .............................................25

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
   78 F.4th 622 (4th Cir. 2023) .........................................32, 58

*Johnson v. Bradley,*
   841 P.2d 990 (Cal. 1992) ...................................................36

*Johnson v. Texas,*
   509 U.S. 350 (1993) ...........................................................67

*Kaltenbach v. Hilliard City Schs.,*
   No. 24-3336, 2025 WL 1147577 (6th Cir. Mar. 27, 2025)...................46

*Kennedy v. Bremerton Sch. Dist.,*
   597 U.S. 507 (2022) ...........................................................63

*Krottner v. Starbucks Corp.,*
   628 F.3d 1139 (9th Cir. 2010) ...........................................27

*Mahmoud v. Taylor,*
   145 S.Ct. __, 2025 WL 1773627
   (U.S. June 27, 2025) .......................30, 31, 33, 44, 45, 47, 48, 57, 60, 67

*Mann v. County of San Diego,*
   907 F.3d 1154 (9th Cir. 2018) ............................39, 40, 55, 58

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) .........................................66, 71

*Mirabelli v. Olson,*
   761 F.Supp.3d 1317 (S.D. Cal. 2025) .............................57, 58, 64

*Nken v. Holder,*
   556 U.S. 418 (2009) .......................................................24, 71

*Nunez v. City of San Diego,*
    114 F.3d 935 (9th Cir. 1997) .............................................................. 42

*Otis v. City of Los Angeles,*
    126 P.2d 954 (Cal. Ct. App. 1942) ..................................................... 35

*Parents for Privacy v. Barr,*
    949 F.3d 1210 (9th Cir. 2020) ..................................................... 43, 58

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ............................................................................. 32

*Parham v. J.R.,*
    442 U.S. 584 (1979) ............................................ 40, 41, 53, 55, 57, 72

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925) ............................................................................. 37

*Recycle for Change v. City of Oakland,*
    856 F.3d 666 (9th Cir. 2017) .............................................................. 24

*Regino v. Staley,*
    133 F.4th 951 (9th Cir. 2025) ............................................... 38, 57, 63

*Ricard v. USD 475 Geary Cnty. Sch. Bd.,*
    No. 5:22-cv-4015, 2022 WL 1471372 (D. Kan. May 9, 2022) .............. 71

*Robins v. Spokeo, Inc.,*
    867 F.3d 1108 (9th Cir. 2017) ............................................................ 32

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) ............................................................ 71

*Roper v. Simmons,*
    543 U.S. 551 (2005) ............................................................................. 67

*Santosky v. Kramer,*
    455 U.S. 745 (1982) ............................................................................. 41

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ............................................................................. 25

*Troxel v. Granville,*
    530 U.S. 57 (2000) ..................................................... 37, 41, 48, 66, 72

ix

*United States v. Skrmetti*,
  145 S.Ct. 1816 (2025) .................................................................. 70, 74

*Wallis v. Spencer*,
  202 F.3d 1126 (9th Cir. 2000) ..................................................... 42, 65

*Waln v. Dysart Sch. Dist.*,
  54 F.4th 1152 (9th Cir. 2022) ............................................................ 63

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................. 24

## Constitutional Provisions

U.S. Const. amend. XIV ........................................................................ 19

Cal. Const. art. V, §13 .......................................................................... 15

## Statutes

28 U.S.C. § 1291 .................................................................................... 3

28 U.S.C. § 1331 .................................................................................... 3

28 U.S.C. § 1343 .................................................................................... 3

Assembly Bill 1955 (Cal. 2024) ........................................... 1, 12, 13, 64

Cal. Educ. Code § 220.3 .................................................................. 12, 34

Cal. Educ. Code § 220.5 ...................................................................... 13

Cal. Educ. Code § 33302 ..................................................................... 15

Cal. Educ. Code § 33303 ..................................................................... 15

Cal. Educ. Code § 48200 ..................................................................... 67

Cal. Educ. Code § 48293 ..................................................................... 67

HB Mun. Code 1.23.020 ...................................................................... 13

## Regulation

HB Ordinance No. 4326 ....................................................................... 13

## Rules

Fed. R. App. P. 4 .................................................................... 3

Fed. R. Evid. 801 ................................................................. 51

## Other Authorities

Am. Psych. Ass'n,
  *Diagnostic and Statistical Manual of Mental Disorders*
  (5th ed. Text Revision 2022) ............................................. 5

WPATH,
  *Standards of Care for the Health of Transsexual,*
  *Transgender, and Gender Nonconforming People,*
  *Version 8*, 23 Int'l J. Transgender Health S1 (2022) ........................ 52

## INTRODUCTION

This case raises vital questions about the rights of parents to direct the upbringing and treatment of their children. Under Sections 5 and 6 of California Assembly Bill 1955 (the "Challenged Provisions"), California teachers may socially transition children in school to the gender identity opposite their sex—but cannot be compelled to tell the parents about it unless the child consents. Indeed, without such consent, the Challenged Provisions *prohibit* schools and districts from requiring teachers to tell parents anything related to their child's "gender identity" or "gender expression"—including their child's public behavior reflecting gender-related distress.

Plaintiffs brought this action because the Challenged Provisions violate Plaintiffs' fundamental parental rights under the Due Process Clause (1) to direct the medical (including psychological) treatment of their children and (2) to obtain school-related information about their children's symptoms of psychological distress that Plaintiffs require to perform their parental role. The blanket prohibitions in the Challenged Provisions make it impossible for parents even to *know* whether schools are violating those fundamental rights. And the prohibitions effectively

put the State's imprimatur on such violations by preventing them from coming to light.

The district court erroneously dismissed Plaintiffs' claims and then denied their requested preliminary injunction as moot. That court improperly dismissed several Plaintiffs for want of standing even though they faced individualized and redressable threats of imminent harm. And the court brushed aside Plaintiffs' ample pleading—and ample evidence—that the secret social transitioning permitted by the Challenged Provisions amounts to medical treatment that the Parent Plaintiffs have a constitutional right to control and direct. The district court further erred by holding that Plaintiffs' established right to direct their children's upbringing gives parents no right to be informed of their children's school-time behavior manifesting potential signs of psychological distress. On this record, Plaintiffs are entitled to proceed with their claims—and to a preliminary injunction in the meantime.

This Court should therefore reverse the district court's erroneous dismissal and grant Plaintiffs their requested preliminary injunction— and do so before the new school year begins in each of the jurisdictions where Plaintiffs' children attend California public school.

2

## JURISDICTION

The district court had jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 because it presents federal questions arising under the Constitution of the United States and Plaintiffs seek relief for deprivation of federal rights under color of state law. This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from final judgments issued June 16 and 17, 2025. 1-ER-3; 1-ER-37. The notice of appeal was timely filed on June 17, 2025. 4-ER-717–23. *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1. Whether Plaintiffs who

    a. have a child at heightened risk of gender dysphoria in California public school subject to the Challenged Provisions; or

    b. in the case of the City, assert associational standing on behalf of affected residents

have Article III standing to bring suit against the Challenged Provisions.

2. Whether Plaintiffs adequately pleaded

    a. that social transition is medical and mental health treatment implicating parents' fundamental right to direct their children's treatment; and

    b. a fundamental right to information about symptoms of their child's psychological distress,

and whether Plaintiffs' evidence establishes a likelihood of success proving the Challenged Provisions impermissibly infringe those rights.

3. Whether Plaintiffs demonstrated their entitlement to the other factors necessary for a preliminary injunction.

## PERTINENT AUTHORITIES

The pertinent constitutional provision, statutes, and ordinance are included in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Gender incongruence and dysphoria are medical conditions.

According to Plaintiffs' pleadings and the evidence presented below, gender incongruence and gender dysphoria are psychiatric diagnoses. 4-ER-664 ¶222; 3-ER-414–15; 3-ER-417; 3-ER-523; 3-ER-526–28. Gender incongruence is a perceived mismatch between sex and gender identity; gender dysphoria occurs when that perceived mismatch causes clinically significant distress for at least six months. 4-ER-664 ¶222; 3-ER-414–15 (quoting DSM-5-TR); 3-ER-417; 3-ER-419; *see also* 3-ER-526–28.

Gender dysphoria "must be treated on a case-by-case basis." 4-ER-677 ¶286. And it is the role of mental health professionals to (1) determine whether a diagnosis of gender dysphoria or gender incongruence is appropriate; and (2) "attend to the mental health of the child or adolescent." 3-ER-417; 3-ER-530–31. Gender incongruence and dysphoria often present with other psychiatric comorbidities, including

5

but not limited to autism, ADHD, depression, anxiety, and suicidal ideation, and the distress associated with gender dysphoria may be caused or exacerbated by one or more of these comorbidities. 3-ER-411; 3-ER-415–17; 3-ER-444; 3-ER-446; 3-ER-456; 3-ER-530–32; 3-ER-542; 3-ER-552.

Diagnoses of gender dysphoria have rapidly increased among minor children in recent years, far outpacing expected prevalence. 3-ER-432–24; 3-ER-515–18; 3-ER-529–30. One driver of the massive increase is "rapid-onset gender dysphoria," 3-ER-434; 3-ER-528–30, because gender dysphoria often spreads through social groups, 3-ER-434. A particularly strong risk exists among siblings; having a sibling with gender dysphoria increases a child's risk of gender dysphoria 3.88 to 4.48 times. 3-ER-433. In addition to social influences from siblings and friends, other factors such as influences by internet videos and social media, maladaptive coping mechanisms, and psychiatric conditions may contribute to rapid-onset gender dysphoria. 3-ER-528–29; *see also* 3-ER-418.

## 2. Social transition is a controversial treatment option for gender incongruence and dysphoria.

Most children with gender dysphoria will eventually become comfortable with their biological sex. 4-ER-674 ¶272. As studies have

6

shown, without intervention, most children with gender dysphoria accept their sex by late adolescence. 3-ER-434–36; 3-ER-539–40. And there are no known tests to determine whether a particular child's gender dysphoria will persist into adulthood. 4-ER-673 ¶268; *see also* 3-ER-420; 3-ER-434–35; 3-ER-597. But social transition may "lock … in" a child's gender dysphoria. 4-ER-675 ¶277. Indeed, such a transition is a "psychotherapeutic intervention," and it has been shown to "dramatically change[] outcomes." 3-ER-441; *see also* 3-ER-536; 3-ER-539–42. A recent study, conducted after the "widespread use of social transition for young children," reported much lower desistance rates: fewer than 20 percent of boys who transitioned before puberty desisted by late adolescence. 3-ER-441–42.

Moreover, there is no evidence-based standard of care for gender dysphoria. 3-ER-425. Instead, there are four competing therapy models for children with that condition. 3-ER-419–25. *First*, a "watchful waiting" model focuses on treating other psychological comorbidities. 3-ER-420. *Second*, a "hands-off approach" involves no treatment at all, except for regular follow-up appointments. *Id. Third*, a psychotherapy model focuses on identifying and alleviating the causes of distress. 3-ER-421–

7

23. *Fourth*, an affirmation therapy model promotes the "unquestioning affirmation" of a child's claim of "transgender identity," and includes social transition. 3-ER-423–24.

Social transition "begins with new names, pronouns, presentation (clothing, hair, make-up, nail polish etc.), [and] use of opposite sex bathrooms." 3-ER-537; *see also* 4-ER-669 ¶252; 4-ER-671 ¶261. Whether to undergo social transition is "a complex decision." 4-ER-669 ¶254. Dr. Erica Anderson, a psychologist who identifies as transgender, called social transitioning "one of the most difficult psychological changes a person can experience." 3-ER-532; 3-ER-555.

That is but one reason why experts disagree about whether affirmation therapy or something less intrusive is the "best therapeutic response" for a child or adolescent suffering from gender dysphoria, and about whether social transition is appropriate for children or adolescents at all. 3-ER-425–28; *see* 3-ER-520; 3-ER-541–52. Further, mental health professionals should advise "on the risks and benefits of social transition as a planned intervention," and this role cannot "be taken by staff without appropriate clinical training." 3-ER-463; 4-ER-670. Likewise, "parents should be actively involved in decision making unless there are

8

strong grounds to believe that may put the child or young person at risk."
4-ER-670. Indeed, social transition "without the involvement of parents
or carers can create complex difficulties within families and is not
recommended." 3-ER-556; 4-ER-679.

Social transition is inherently an experimental treatment: it
remains controversial and is, at best, an unproven medical and mental
health intervention. 3-ER-427–28; 3-ER-443–44; 3-ER-446; *see also*
3-ER-537–42. No long-term control studies exist supporting the use of
social transition as a treatment for gender dysphoria in children. 3-ER-
445–46. In fact, the only systematic review of evidence to date reports an
"absence of robust evidence of the benefits or harms of social transition
for children and adolescents." 3-ER-447–48; *see also* 3-ER-543–44.
Indeed, no statistically meaningful studies show that social transition of
children or adolescents "reduces suicide, prevents suicidal ideation, or
improves long-term outcomes" in those who suffer from gender
dysphoria. 3-ER-449–50. Moreover, suicide rates are similar across all
stages of transition, "from pre-treatment assessment to post-transition
follow-up." 3-ER-451–52.

### 3. Social transition has significant effects on children's health and wellbeing.

Social transition also "may have significant effects" on children's "psychological functioning and longer-term outcomes." 3-ER-442; 4-ER-670. In particular, "[p]ersistent social transitioning leads to chemical and then surgical transitioning." 4-ER-671; *see also* 3-ER-440; 3-ER-443; 3-ER-537; 3-ER-543; 3-ER-546.

The first chemical intervention is typically puberty blockers. 3-ER-546. The safety and efficacy of puberty blockers on gender incongruent children and adolescents has not been tested in clinical research trials. 3-ER-599. But research does show that a child placed on puberty blockers as treatment for gender dysphoria will almost inevitably begin synthetic cross-sex hormones—and that he or she must stay on those hormones for the rest of his or her life to maintain the cross-sex cosmetic effect. 3-ER-605–06.

If the child later elects to undergo surgical transition—including the removal of testes or ovaries—he or she must remain on synthetic hormones until death, even if he or she later detransitions, *i.e.*, resumes identifying with his or her sex. 3-ER-605–06. And the health risks associated with chemical and surgical transition cannot be understated:

10

shortened lifespan, sterility, infertility, loss of sexual function, increased risk of suicide, brain development issues, cancers, heart disease, heart attacks, strokes, and osteoporosis. 3-ER-606–07.

In short, treatment by social transition is very often a critical stage in the health-care history of a gender-confused child.

### 4. Children potentially suffering from gender dysphoria and comorbidities benefit from parental involvement in their treatment.

It is also true that "a child or adolescent who expresses a desire to adopt a name and pronouns typically associated with the opposite sex or one that is culturally unusual is inherently expressing discomfort with his or her natal sex." 2-ER-95. For this reason, a child's expressing "a desire to adopt a transgender name and pronouns" is a "yellow flag" for gender dysphoria that "calls for a comprehensive psychiatric evaluation" by a mental health professional. 3-ER-456. The professional should also evaluate the child for any mental health comorbidities. 3-ER-456; 3-ER-459–60; 3-ER-530–35.

Parental involvement is medically necessary for a child to seek treatment with a mental health professional, 3-ER-454, as well as for the diagnostic process, because parents generally have "unique insight" into

their children on which the mental health professionals will rely. 3-ER-458–59; *see also* 3-ER-533–34. Parental involvement is also necessary and important for any treatment to be effective. 3-ER-461–62.

In contrast, schools are not equipped to diagnose and treat gender dysphoria and related comorbidities. 3-ER-463–65; *see also* 3-ER-534–36. Because teachers and counselors are not mental health professionals, they do not know how to seek and obtain informed consent or to weigh the risks and benefits of various treatment options. 3-ER-463–64; 3-ER-537 ¶69.

### 5. AB 1955 and the Huntington Beach Ordinance

These realities did not deter the drafters of California Assembly Bill 1955 ("AB 1955" or the "Act"), which was enacted on July 15, 2024, and went into effect on January 1, 2025. 4-ER-661 ¶205. In pertinent part, Section 5 provides that California public school employees "shall not be required to disclose any information related to a pupil's … gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." AB 1955, § 5 (adding Cal. Educ. Code § 220.3). And Section 6 provides, in pertinent part, that California public schools and school districts "shall not enact

12

or enforce any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's … gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." AB 1955, § 6 (adding Cal. Educ. Code § 220.5).

In response to the Act, the Huntington Beach City Council enacted Ordinance No. 4326, adding Chapter 1.23 to the Huntington Beach Municipal Code. The Ordinance declares that "Huntington Beach is a 'Parents' Right to Know' City" and provides, in relevant part, that "[n]o educators in the City of Huntington Beach … shall withhold any information related to a child's sexual orientation, gender identity, or gender expression to Parents of said children with or without the child's consent." HB Mun. Code 1.23.020(D).

## B. Procedural History

Along with the City of Huntington Beach and additional parents who have not appealed, Plaintiff-Appellant Parents—2A through 8A and 10A—brought suit in the Central District of California, seeking to enjoin the Challenged Provisions.

Parents 2A through 7A and 10A each have at least one minor child in California public school[1] who has manifested issues relating to gender identity (2C and 7C) or is subject to risk factors increasing the likelihood of gender incongruence or dysphoria. These risk factors include autism or other mental health diagnoses or symptoms (2C, 3C, 5D, 7C, 10C), a history of cross-sex dress (6C), and a sibling with demonstrated issues relating to gender identity (4D and 5D). In contrast, Parent 8A was forced to remove a child from public school to protect her parental rights, after her elder daughter was secretly socially transitioned in school. *See generally* 3-ER-351–400; 4-ER-656–57 ¶¶171–73. All Parent Plaintiffs want to be kept informed by their child's school if their child engages in gender-confused behavior that may indicate gender dysphoria or incongruence, especially if the school is treating the child by socially transitioning him or her to the gender opposite of the child's biological sex. *See generally* 3-ER-351–200; 4-ER-643 ¶47; 4-ER-645 ¶61; 4-ER-646

---

[1] Plaintiffs' children are at public schools in San Diego (Parents 2A and 5A), Los Angeles (3A and 6A), Orange County (7A), and Huntington Beach (10A), as well as a public charter school. *See* 3-ER-352; 3-ER-358; 3-ER-366; 3-ER-372; 3-ER-376; 3-ER-381; 3-ER-397.

¶78; 4-ER-647 ¶85; 4-ER-648 ¶102; 4-ER-649 ¶108; 4-ER-650 ¶121; 4-ER-653 ¶145; 4-ER-656 ¶167; 4-ER-659 ¶196.

Plaintiff City of Huntington Beach is a municipal corporation and charter city with nearly 200,000 residents and 35 elementary schools and five high schools. 3-ER-342–43. Defendants Robert Bonta, Attorney General, and Tony Thurmond, Superintendent of Public Instruction, are responsible for enforcing the Challenged Provisions. *See* Cal. Const. art. V, §13; Cal. Educ. Code §§ 33302–03.

Defendants moved to dismiss this case, and Plaintiffs moved for a preliminary injunction of the Challenged Provisions. On June 16, 2025, the district court granted in part and denied in part Defendants' 12(b)(1) motion to dismiss for lack of standing and granted Defendants' 12(b)(6) motion to dismiss for failure to state a claim. 1-ER-37.

First, the district court held that Parents 4A, 5A, 7A, and 8A had standing to sue, 1-ER-17, but that the City lacked standing as a political subdivision of the State. 1-ER-8–10. As to the other Parents, the court held that Parent 6A was not injured, even though the other parent dressed Parent 6A's son in girl's clothing for school, because the child showed no *other* signs of gender identity issues. 1-ER-13 & n.5; *see* 3-ER-

15

377. And the court held that Parents 3A and 10A were not injured because gender identity issues had not yet manifested, even though their autistic children were at higher risk of gender dysphoria. 1-ER-13. Apparently prejudging the merits, the court also held that Parent 10A could not sue to protect his procedural rights under the Ordinance because the Ordinance was preempted by AB 1955. 1-ER-14. Finally, the court held that "even if [Parent] 2A has pled causation, she has not pled redressability" because she had not alleged that her child's school would change its existing nondisclosure policy in the absence of AB 1955. 1-ER-16–17.

On the merits, the district court recognized both the "established … parental right to make decisions about a child's medical care," 1-ER-26 (citations omitted), and that the Challenged Provisions "prevent[] parents … from making the ultimate decision about whether the child socially transitions at school." 1-ER-22. But the court reframed the fundamental right at issue as the "right to decide *whether their child socially transitions*." 1-ER-22 (emphasis added). Based on that mischaracterization of Plaintiffs' claims, the court then held that— "despite Plaintiffs' ample allegations that social transition is a 'medical

treatment,'" 1-ER-23—social transition is not in fact a medical treatment because it does not involve, "for example, … hormone therapy or weekly sessions with a clinical therapist." 1-ER-25. And, because the Challenged Provisions do not *require* teachers to facilitate social transition, but merely allow them to do so without informing parents, the court concluded the right to direct medical treatment could not be infringed by mere "[n]ondisclosure." *Id.* The court also found that social transition was not medical treatment because, as alleged, it "does not involve any type of 'intrusions upon the bodily integrity of the child or other conduct with clinical significance' … by a state actor." 1-ER-26–27 (quoting *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 350 (1st Cir. 2025)).

As for the right to information needed to make informed decisions about their children's safety and well-being, the court held that Plaintiffs had identified no right to be informed about cross-sex conduct in the absence of allegations that "school staff *coerced* their children into adopting a different gender identity or socially transitioning," or "prohibited the children from sharing this information with their parents." 1-ER-34 (emphasis added). The district court also refused to

17

allow Plaintiffs to amend their complaint, finding amendment futile. *See* 1-ER-17; 1-ER-35–36.

The next day, the district court denied Plaintiffs' motion for preliminary injunction as moot. 1-ER-3. Plaintiffs immediately filed their notice of appeal. 4-ER-717–23.

On June 28, 2025, Plaintiffs moved the district court for a preliminary injunction pending appeal. Doc. 101. The district court continued the hearing on that motion to July 29. 2-ER-40. Plaintiffs accordingly moved this Court for a preliminary injunction pending appeal on July 7. ECF 9. The motion remains pending as of this filing.

## SUMMARY OF ARGUMENT

Plaintiffs amply pleaded their constitutional claims, and on the present evidentiary record are likely to succeed on the merits.

To begin, the district court erred in dismissing some Plaintiffs for lack of standing. Specifically, the dismissed Parent Plaintiffs pleaded sufficient harm given their children's elevated risk of gender incongruence or dysphoria. Those parents face acute risks from the cone of silence the Challenged Provisions authorize and abet. That injury is sufficiently concrete and imminent to allow them to protect their

18

constitutional interests here. Standing cannot be limited to those whose children have already *engaged* in gender-confused behavior or social transition. Concealing such behavior by children who have not engaged in it before is as harmful as concealing that behavior by children with a history of it. And the City of Huntington Beach has associational standing to protect the rights of its citizens even if it cannot sue on its own behalf.

Turning to the merits, the Challenged Provisions are subject to strict scrutiny under the Due Process Clause of the Fourteenth Amendment because they infringe Plaintiffs' fundamental parental rights to direct their children's medical and psychological treatment and to readily-available information about their children's health, including symptoms of psychological distress.

The district court acknowledged but disregarded "Plaintiffs' ample allegations that social transition is a 'medical treatment,'" 1-ER-23, concluding that only some physical invasion or perhaps forced therapy sessions could qualify. Yet the nature of social transition as a form of treatment is well-recognized, including by the State's expert psychologist. That social transition may be a less formal type of

19

immersive group therapy does not eliminate its clinical significance, or Plaintiffs' rights to direct it or at least know about it. Plaintiffs obviously cannot direct treatment that the Challenged Provisions authorize to proceed in secret. Plaintiffs sufficiently pleaded, and ultimately proved for purposes of a preliminary injunction, that social transition is medical treatment, and thus that the Challenged Provisions impair their right to direct their children's treatment.

Similarly, Plaintiffs adequately pleaded—and ultimately proved sufficiently for their preliminary-injunction motion—both the existence and the infringement of a right to information about their children's manifested symptoms of psychological distress through gender-confused behavior. This case does not present the precise contours of that right because the Challenged Provisions prohibit *any* requirement to disclose *any* information related to "gender identity" or "gender expression." But cross-sex behavior can be a significant warning sign of psychological distress, a concern that is acute given the psychological comorbidities that often accompany gender dysphoria and gender incongruence.

In the face of all this, the district court held that any informational right was limited to *coercive* conduct by the school. But the Constitution

20

does not permit schools to transform themselves into secret societies where children's conduct for half their waking hours may be concealed from parents, no matter how significant that conduct may be to the parents' right to raise and care for their children.

Because Plaintiffs established violations of their constitutional rights, Defendants bear the burden to show that flatly banning any requirement that school staff disclose to parents symptoms of their child's psychological distress, or social transition at school, is the least restrictive means of serving a compelling government interest. But the blanket prohibitions in the Challenged Provisions are not narrowly tailored. The Provisions penalize *all* parents in order to protect some children from abusive or unfit parents, rather than requiring that abuse or unfitness be shown.

Plaintiffs also satisfy the other elements needed for preliminary injunctive relief. The violation of Plaintiffs' fundamental parental rights constitutes irreparable harm. In addition, no legal remedies can compensate parents for the imminently threatened harm to their relationships with their children, or to the threatened harm to their children's mental and physical health.

21

Finally, the equities and balance of hardships tip sharply toward enjoining the Challenged Provisions. The Plaintiff Parents' fundamental rights outweigh the State's newly created privacy rights for children, rights that appear tailored to encourage cross-sex behavior. The orders of the district court should be reversed with instructions to enter a preliminary injunction enjoining the Challenged Provisions as to Plaintiffs.

## ARGUMENT

Under the governing standards, Plaintiffs adequately pleaded their claims and demonstrated their entitlement to a preliminary injunction. This Court has recognized that, "[a]lthough the standards for a motion for preliminary injunctive relief and dismissal under Rule 12(b)(6) are not conterminous, they overlap where a court determines that the plaintiff has no chance of success on the merits." *Arc of Cal. v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014). Moreover, this Court "review[s] de novo the district court's dismissal" of the Parents' claims and "accept[s] factual allegations in the complaint as true." *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015) (citation omitted). And these

22

allegations are viewed "in the light most favorable to the plaintiff." *Galanti v. Nev. Dep't of Corr.*, 65 F.4th 1152, 1154 (9th Cir. 2023).

Under these standards, Plaintiffs adequately pleaded violations of constitutionally protected parental rights and should have been permitted to pursue their claims. Moreover, Plaintiffs did more than plead their case: they submitted evidence that confirmed and expanded upon their pleadings when they moved for the preliminary injunction that the district court erroneously denied.

The denial of that motion is also reviewable for abuse of discretion. *Angelotti Chiropractic*, 791 F.3d at 1081; *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). And an abuse will be found if the order rests on an error of law or a clearly erroneous factual finding. *Alliance*, 632 F.3d at 1131. Review of the district court's legal conclusions is *de novo*; review of factual findings is for clear error, *id.*, but no facts were found here.

To merit injunctive relief, moreover, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

23

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, the balance of equities and public interest merge because the government is the defendant. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

The "'most important' *Winter* factor" is likelihood of success on the merits. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted). Under this Circuit's "sliding scale" approach, "a stronger showing of one element may offset a weaker showing of another." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quoting *Alliance*, 632 F.3d at 1131). Plaintiffs who show "serious questions go[ing] to the merits" of their claims and that the balance of hardships "tips 'sharply'" in their favor have a light burden on the other factors. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (quoting *Alliance*, 632 F.3d at 1135).

Here, Plaintiffs' evidence demonstrated their entitlement to a preliminary injunction of the Challenged Provisions. Accordingly, the judgment of the district court should be reversed.

## I.  Plaintiffs Have Standing To Challenge AB 1955.

At the threshold, each appealing Plaintiff has standing to bring suit seeking an injunction of the Challenged Provisions. When deciding a motion to dismiss or a motion for preliminary injunction, courts base standing determinations "only on the allegations of the … plaintiffs." *Isaacson v. Mayes*, 84 F.4th 1089, 1095 n.3 (9th Cir. 2023). The district court correctly recognized that Parents 4A, 5A, 7A, and 8A have alleged (1) an injury-in-fact, (2) that is fairly traceable to the Challenged Provisions, and (3) redressable by a favorable ruling. 1-ER-17; *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). But the court was wrong to dismiss the other Parent Plaintiffs and the City of Huntington Beach.

### A.  The additional Parent Plaintiffs have standing.

#### 1.  The additional Parent Plaintiffs adequately pleaded injury-in-fact.

To begin with, the district court was wrong to disregard Parent 10A's procedural right to the benefits of the City's Ordinance by erroneously prejudging the merits. If the Challenged Provisions are themselves unconstitutional, they cannot "preempt[]" the Ordinance. 1-ER-14. Therefore, Parent 10A has standing to contest the validity of the supposed preemption because the Challenged Provisions represent

an "attempted erasure" of his rights under the City's Ordinance. *See Deanda v. Becerra*, 96 F.4th 750, 759 (5th Cir. 2024) (holding that "attempted erasure" of parent's rights under a statute is itself an injury-in-fact).

In addition, and contrary to the district court's conclusion, Parents 2A, 3A, 6A, and 10A also adequately alleged that the Challenged Provisions override their parental rights, damage their relationships with their children, and increase the risks they will be kept in the dark regarding critical information about—and excluded from treatment decisions for—their children. 4-ER-643 ¶¶48–50; 4-ER-645 ¶¶62–64; 4-ER-650–51 ¶¶122–25; 4-ER-659 ¶198.

Contrary to the district court's conclusion, Parents 3A, 6A, and 10A also pleaded injury-in-fact. The court determined that, because Parents 3A, 6A, and 10A "do not allege their children *have* questioned or are questioning their gender identity," 1-ER-13 (emphasis added), the parents had nothing more than "a general legal, moral, ideological, or policy objection to a particular action." 1-ER-14 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). And the court thus declined to address causation for these three plaintiffs. 1-ER-16.

26

But Parents 3A, 6A, and 10A each raised specific allegations that their children were at increased *risk* of harm from the Challenged Provisions. 4-ER-645 ¶¶62–64; 4-ER-647 ¶86; 4-ER-650–51 ¶¶122–25; 4-ER-659 ¶198. In fact, this Court has recognized that "an increased risk of harm can itself be injury in fact sufficient for standing." *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 832 (9th Cir. 2021) (quoting *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000)). Here, Parents 3A, 6A, and 10A "face[] a credible threat of harm" to their parental rights and to their children's mental and physical health, caused by the Challenged Provisions, and that harm "is both real and immediate, not conjectural or hypothetical." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (cleaned up). A "credible threat" requires only a real risk of harm, not a near-certainty. *See id.* And that harm is "imminent" because it could occur at any time, even if Plaintiffs "may take some time … to become aware" of it. *In re Zappos.com, Inc.*, 888 F.3d 1020, 1029 (9th Cir. 2018) (cleaned up).

In particular, Parent 6A alleges that his son's mother dresses his son in girl's clothing when his son is at her house. 4-ER-649–50. The district court dismissed these allegations because Parent 6A also alleged

that his son otherwise "has no signs of gender dysphoria" and "has not displayed any issues with gender confusion," 1-ER-13. But the district court ignored the impact that the mother's actions have on his son. Gender identity is not fixed. 4-ER-673 (noting increasing numbers of desisting and detransitioning minors); 3-ER-432–40. And social pressure can influence gender identity, as demonstrated in the recent phenomenon of rapid-onset gender dysphoria, which is characterized by the "sudden appearance of gender dysphoria for the first-time during puberty or later." 4-ER-667 ¶239. Even WPATH "concedes that adolescents can be susceptible to social influence towards gender identity adoption." 4-ER-668 ¶249. Its president recognized that discounting this fact is "just not recognizing human behavior." 4-ER-668 ¶250. These pleaded facts establish the "increased risk of harm … sufficient for standing," *Ecological Rts. Found.*, 230 F.3d at 1151–52, where Parent 6A's son is at increased risk of gender incongruence or dysphoria given pressure from the other parent, which increases Parent 6A's risk of being deprived of essential information regarding his son's health, including a potential social transition at school, because of the Challenged Provisions.

The district court was also wrong to hold that the of Parents 3A and 10A do not support an injury-in-fact. 1-ER-13. Those parents allege that their children's diagnoses of autism spectrum disorder place them at "higher risk of gender dysphoria." 4-ER-644; 4-ER-658 ¶¶53, 188. The Parents also allege that there is a "substantial overlap" between minors with autism and gender dysphoria. 4-ER-678 ¶290 (collecting studies). Indeed, the risk to Parent 3A's son is compounded because he prefers to play with girls and is "very interested in colors, patterns, symbols, and rainbows," such that untrained teachers may mistake his friendships and interests as "indications of gender confusion." 1-ER-13. That puts Parents 3A and 10A at "an increased risk of harm," from the Challenged Provisions. *See Ecological Rts. Found.*, 230 F.3d at 1151–52. As with the Plaintiff Parents whose standing the district court recognized, the Challenged Provisions threaten to deprive Parents 3A and 10A of information essential to caring for their children, including information about social transition in school without parental knowledge or consent.

The district court was thus incorrect to reject these harms as not "certainly impending" or at substantial risk of occurring. 1-ER-13. It does not matter that—as far as Parents 3A, 6A, or 10A are aware—their

29

children are not *yet* gender-dysphoric or gender-incongruent and have not *yet* been secretly socially transitioned in school. The Challenged Provisions are specifically designed to prevent parents from knowing information about their children's psychological distress and from being able to consent to their treatment.

Here, the Supreme Court's recent decision in *Mahmoud v. Taylor*, 145 S.Ct. __, 2025 WL 1773627 (U.S. June 27, 2025), is instructive. The Court in that case refused to take a "wait and see" approach as to "how a particular book is used in a particular classroom on a particular day before evaluating the parents' [constitutional] claims." *Id.* at *20. Like the parents in *Mahmoud*, the parents here need not wait to sue until the interference manifests. As in *Mahmoud*, the injury here relates to schools' refusal to tell parents what is going on: as the Supreme Court recognized, "it is not realistic to expect parents to rely on after-the-fact reports by their young children to determine whether the parents' [constitutional] rights have been burdened." *Id.* Indeed, as with the school policy in *Mahmoud,* the obvious *purpose* of the Challenged Provisions is to empower children and teachers to conspire to keep parents in the dark—including about whether a child expresses a desire

to use a different name or pronouns, which is a "yellow flag" for gender dysphoria that "calls for a comprehensive psychiatric evaluation" by a mental health professional. 3-ER-456; *see also* 3-ER-530–33.

Indeed, this case presents an even more severe interference with parents' ability to direct their children's mental, emotional, physical, and sexual development than the interference with religious upbringing in *Mahmoud*, where the policy in question prohibited parents from opting their children out of LGBTQ lessons. Here, the Challenged Provisions keep parents from even finding out about social transition, an objectionable form of active treatment rather than the mere exposure at issue in *Mahmoud*. That is more than enough to show Article III injury.

The Act's "attempted erasure" of the Parents' constitutional right to "consent to … children's medical care" also creates an independently cognizable injury-in-fact. *Deanda*, 96 F.4th at 759. This injury, too, does not require Parents to wait until their children's schools actually social transition the children.

Nor are these injuries speculative. The Parent Plaintiffs each "have children in the [state]'s elementary, middle, and high schools," which must comply with the Challenged Provisions. *Parents Involved in Cmty.*

31

*Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007). Under *Parents Involved,* enrolling in a school controlled by a policy that would be injurious if enforced and that is reasonably likely to be enforced is a risk sufficient to confer standing. *See id.* at 718–19. The district court construed *Parents Involved* as limited to Equal Protection claims. 1-ER-14 n.8. But the Supreme Court did not "so limit its holding," and the notion "that injury under the Due Process Clause yields rank to injury under the Equal Protection Clause … makes no sense and has no basis in constitutional law." *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 643 (4th Cir. 2023) (Niemeyer, J., dissenting), *cert. denied mem.*, 144 S.Ct. 2560 (2024).

Plaintiffs 3A, 6A, and 10A also pleaded additional injuries-in-fact: harms such as "anxiety, stress, concern, and/or worry" constitute current "concrete injury." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1117 (9th Cir. 2017). And all those harms were pleaded here. 3-ER-359–60; 3-ER-377–78; 3-ER-398–99.[2]

---

[2] Parent 3A pleaded an additional, related injury: that she has been compelled to discuss gender issues with her child at a "much earlier age than she would have otherwise" because of AB 1955, and that the "anticipation of AB 1955 going into effect has thus caused [her] to alter

### 2. The additional Parent Plaintiffs' injuries would be redressed by an injunction.

The district court also held that Parent 2A's injury was not redressable because her child's school had secretly socially transitioned her child before AB 1955 went into effect. 1-ER-15–17. Without showing that the school might change its policies, the court held, Parent 2A had not pleaded that enjoining the Challenged Provisions would increase her access to information. But the Challenged Provisions do not merely foreclose existing official school policies—they prevent parents from seeking new policies or agreements. Under the broad language of the Challenged Provisions, Parent 2A cannot even obtain an agreement with the school that her child's teachers will tell her about her child's new or continued symptoms of psychological distress relating to gender identity.

Indeed, the Challenged Provisions are not limited to prohibiting so-called "forced-outing policies," as the State has previously argued. School staff "shall not be required to disclose *any* information *related to*" a child's

---

her parenting in ways she is not comfortable with but feels are necessary." 1-ER-13 n.7 (quoting 4-ER-645 ¶¶62–63). This injury is not self-inflicted but rather is necessitated by the "direct, coercive interactions between the State and its young residents" that public school implicates by taking charge of children for nearly half their waking hours. *Mahmoud*, 2025 WL 1773627, at *19.

"gender identity" or "gender expression" unless the child consents, "unless otherwise required by state or federal law." Cal. Educ. Code § 220.3(a) (emphasis added).

Contrary to the district court's conclusion, an injunction would redress all Parent Plaintiffs' injuries by making it possible to seek disclosure policies or agreements from their schools or school districts without being precluded by the Challenged Provisions. And schools and districts would be free to adopt nuanced policies that would allow disclosure of at least some cross-sex behavior to parents—policies that the Challenged Provisions prohibit. Removing the Challenged Provisions' blanket prohibition thus would increase Parent Plaintiffs' ability to receive critical information about their children while reducing the risk of secret social transition at school.

In short, all of the appealing Parent Plaintiffs have standing to bring suit against Defendants' enforcement of the Challenged Provisions.

## B. The City of Huntington Beach has standing.

The district court also erred in holding that the City lacks standing. Although Circuit precedent forecloses the City's direct claim, *City of South Lake Tahoe v. Cal. Tahoe Reg. Plan. Agency*, 625 F.2d 231 (9th Cir.

34

1980), as a charter city, the City has associational standing to sue on behalf of its members.[3] The district court rejected this claim because the City had "provide[d] no authority that associational standing is an exception to *South Lake Tahoe*'s per se standing bar in this context." 1-ER-9–10. But conversely, no authority prevents associational standing in this context. And associational standing provides limits that political subdivision standing does not.

Associational standing is particularly appropriate in the case of California charter cities. For all California cities, "[i]t is the free consent of the persons composing them that brings into existence municipal corporations[,] … while it is the sovereign will [of the state] which brings into being counties as local subdivisions of the state." *Haytasingh v. City of San Diego*, 286 Cal.Rptr.3d 364, 387 (Ct. App. 2021) (quoting *Otis v. City of Los Angeles*, 126 P.2d 954, 958 (Cal. Ct. App. 1942)). *See Abbott v. City of Los Angeles*, 326 P.2d 484, 501 (Cal. 1958) (noting that the Legislature "approved of the judicial construction" in *Otis* "excluding

---

[3] As in the district court, 1-ER-8, the City preserves its right to seek further review on the question whether it can raise direct claims as a charter city.

municipal corporations from the concept of 'political subdivisions of the State'"). And the California Constitution has been repeatedly amended to give charter cities greater (though not complete) autonomy from the Legislature. *See, e.g.*, *Johnson v. Bradley*, 841 P.2d 990, 993–95 (Cal. 1992). Because the City's existence arises from the "free consent of the persons" composing it rather than the State's "sovereign will," *Haytasingh*, 286 Cal.Rptr.3d at 387, associational standing is appropriate when the governing test is satisfied.

A government entity has associational standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 951 (9th Cir. 2002) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Cities satisfying that test have associational standing on behalf of their residents. *See, e.g., City of Stamps v. Alcoa, Inc.*, No. 05-1049, 2006 WL 2254406, at *5–6 (W.D. Ark. Aug. 7, 2006). And here the City satisfies all three elements: its residents have standing to bring their own claims for

violation of fundamental parental rights; the City has an interest in protecting the parents and children who reside there; and the participation of the City's residents is not required. The City thus satisfies the elements of associational standing set forth in *Central Delta*. No further restrictions apply.

## II. Plaintiffs Adequately Pleaded and Are Likely to Succeed On the Merits of Their Constitutional Claims.

Plaintiffs also adequately pleaded and are likely to succeed on the merits of both of their constitutional claims. Those claims rest on Plaintiffs' fundamental parental rights to "make decisions concerning the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.) (collecting cases), and to "direct the upbringing and education" of their children, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534 (1925). The prohibitions in the Challenged Provisions protect—and put the State's imprimatur on—violations of those rights by depriving parents of critical information about their children's behavior in school, and preventing parents from directing the medical treatment of their children.

### A. The Challenged Provisions violate parents' fundamental due process right to direct their children's medical care.

In holding that the Challenged Provisions do not violate Plaintiffs' fundamental parental right to direct the medical care of their children, the district court improperly rejected Plaintiffs' abundant pleadings and ignored overwhelming evidence that social transition is medical and mental health treatment.

The due process "analysis begins by 'carefully formulating' the asserted fundamental right." *Regino v. Staley*, 133 F.4th 951, 964 (9th Cir. 2025) (quoting *Glucksberg v. Washington*, 521 U.S. 702, 722 (1997)), *reh'g en banc denied* (9th Cir. May 14, 2025). It then "consider[s] whether the asserted right itself, or one in which it is encompassed, is 'objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed.'" *Id.* (citation omitted). The court then addresses whether the right is infringed, and, if so, whether the infringement is narrowly tailored to serve a compelling interest. *See id.* at 959–60.

38

Here, the district court recognized that parents have an "established … right to make decisions about a child's medical care," 1-ER-26 (citations omitted), and that the Challenged Provisions "prevent[] parents … from making the ultimate decision about whether the child socially transitions at school." 1-ER-22. But the court then discounted well-supported allegations that social transition is medical treatment, finding instead that social transition cannot be medical treatment because it "does not involve any type of 'intrusions upon the bodily integrity of the child or other conduct with clinical significance' … by a state actor." 1-ER-27 (quoting *Foote*, 128 F.4th at 350). That holding ignored this Court's rejection of any requirement that the pertinent medical treatment be "invasive" to trigger fundamental parental rights. *Mann v. County of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018).

Moreover, Plaintiffs' motion for preliminary injunction introduced overwhelming evidence that social transition is "conduct with clinical significance." *See Foote*, 128 F.4th at 350. That evidence—which the district court did not consider—fleshed out Plaintiffs' similar pleading, 4-ER-669–80 ¶¶252–98. And it makes crystal clear that Plaintiffs have a high likelihood of success on the merits of both their claims.

39

### 1. The parental right to direct children's medical care is deeply rooted and essential to liberty.

As the district court recognized, Plaintiffs have a fundamental right "to make decisions about [their] child's medical care," including to consent—or deny consent. *See* 1-ER-26. Indeed, this Court has held that "parental consent is critical" for medical treatment of children. *Mann*, 907 F.3d at 1162 (cleaned up); *see also Parham v. J.R.*, 442 U.S. 584, 603 (1979) (recognizing parental right to direct children's mental health care and noting that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment"); *Benavidez v. County of San Diego*, 993 F.3d 1134, 1150 (9th Cir. 2021) (parental rights include rights to notice of and consent to medical examinations).

The district court tried to define away Parent Plaintiffs' deeply rooted right to control medical care by asserting that their claims depend on an underlying "right to control a child's expression of gender that supersedes how the child wishes to express their gender." 1-ER-25. At that level of granularity, the district court maintained, "the relevant case law reveals no constitutional basis for such a right." 1-ER-25. But the court confused the deeply rooted right with the *form* of its infringement.

40

The State does not acquire free rein to infringe fundamental rights whenever a new context arises. In any event, absent clear evidence of abuse or other unfitness, parents' deeply rooted right to direct their children's upbringing surely encompasses the right to raise the child according to his or her biological sex until adulthood.

Not only is parents' right to direct their children's treatment deeply rooted, but the Supreme Court has also held that parents are entitled to a presumption that they "act in the best interests of their child." *Parham*, 442 U.S. at 604. And the government cannot deprive parents of their right to direct their children's care by "transfer[ring] the power to make [a] decision from the parents to some agency or officer of the state" just because "the decision of a parent is not agreeable or because it involves risks." *Id.* at 603. On the contrary, only "clear and convincing" evidence of harm or abuse can override the presumption. *Troxel*, 530 U.S. at 69 (plurality op.); *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). In accord with those principles, this Court has determined that this means "parents have ultimate authority to make medical decisions for their children unless [a] 'neutral fact finder' determines, through [a] due

41

process hearing, that [a] parent is not acting in [the] child's best interests." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).

Moreover, parents' "right to rear children without undue government interference," *Nunez v. City of San Diego*, 114 F.3d 935, 951 (9th Cir. 1997), does not end at "the threshold of the school door," as the district court incorrectly suggested. *Cf.* 1-ER-35 (quoting *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005)). This Court on rehearing "delete[d]" the language that the district court quoted from *Fields* and replaced it with the following:

> [T]he *Meyer–Pierce* due process right of parents to make decisions regarding their children's education does not entitle individual parents to enjoin school boards from providing information the boards determine to be appropriate in connection with the performance of their educational functions, or to collect monetary damages based on the information the schools provide.

*Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1191 (9th Cir. 2006). In other words, this Court in *Fields* held that the *Meyer-Pierce* parental right did not include the right to "limit what public schools or other state actors may *tell* their children regarding sexual matters." 427 F.3d at 1207 (emphasis added). Contrary to the district court, the decision did not hold that parental rights somehow evaporate at the doorway of a public school.

42

Nor is the Challenged Provisions' authorization of secrecy the kind of mere "curricular or administrative decision[]," *Foote*, 128 F.4th at 351, that lies beyond parents' due process rights to direct their children's medical and mental health care. There is nothing "curricular or administrative" about secretly facilitating medical or mental health care. For that reason, the district court also misplaced its reliance on this Court's decision in *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020). 1-ER-20. To be sure, this Court held that parents "lack constitutionally protected rights to direct school administration more generally." *Parents for Privacy,* 949 F.3d at 1231. But unlike the parents in that case, Plaintiffs here are not trying to direct school administration. Instead, they are challenging a statute that *prohibits* schools and school districts from issuing policies or otherwise requiring school staff to involve parents in decisions about the medical and mental health care provided to their children in school.

The district court's reliance on *Anspach v. City of Philadelphia*, 503 F.3d 256 (3d Cir. 2007), is even further afield. 1-ER-20. That case did not address parental rights in the context of compulsory public school, but rather involved a child's *voluntary* visit to a public health center. *See*

43

*Anspach*, 503 F.3d at 259. In fact, the Third Circuit distinguished the facts in *Anspach* from precedent in the school context: "In th[e] setting [of state-operated school systems] the state's power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* at 266 (quoting *Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000)).[4]

The Supreme Court recently recognized the same distinction in *Mahmoud*, determining that "[t]he government's operation of the public schools … implicates direct, coercive interactions between the State and its young residents." 2025 WL 1773627, at *19. That coercive setting is critical to Plaintiffs' medical treatment claim, where the Challenged Provisions allow school staff to facilitate the secret social transition of children in school.

Contrary to the district court here, the Supreme Court in *Mahmoud* made clear that parents have constitutional rights within the public

---

[4] The district court also relied on district court decisions improperly extending *Anspach* to schools. 1-ER-34. Acceding to a child's preference to be treated as a member of the opposite sex—and concealing both the symptoms and the school-supported treatment of them—is not a matter of "respect[]" but of replacing parental prerogatives with the State's and the school's choices.

44

schools that they fund, and in so doing "reject[ed] th[e] chilling vision of the power of the state to strip away the critical right of parents to guide the … development of their children." *Id.* at *20. Plaintiffs' fundamental right to direct their children's medical and mental health care has equal constitutional stature.

> **2.  The Challenged Provisions enable school staff and children to socially transition children in school without parental consent.**

The Challenged Provisions unduly burden Plaintiffs' fundamental right to direct their children's medical and mental health care by prohibiting schools and districts from requiring teachers and staff to inform parents about *any* student behavior relating to "gender expression" or "gender identity." 4-ER-710. That includes not only a student's superficial departures from gender norms, but also the adoption of a cross-sex name and entire identity with the acquiescence, active encouragement, or facilitation of teachers and school staff. As both the pleadings and evidence made clear, the risk is real: California schools regularly participate in secret social transitioning. 3-ER-465; 4-ER-639 ¶¶12–17; 4-ER-641–43 ¶¶34–44; 4-ER-646 ¶¶74–75; 4-ER-651–52 ¶¶130–143.

45

The district court recognized that the Challenged Provisions "prevent[] parents … from making the ultimate decision about whether the child socially transitions at school." 1-ER-22. Indeed, the Provisions usurp parental decision-making by enabling school staff (and children) to socially transition children in school without parental involvement or consent. 4-ER-695 ¶391. Judge Thapar recently described such policies as "beyond troubling," because they "strip" parents "of th[e] possibility" to "interven[e] and s[eek] medical help for their [child]." *Kaltenbach v. Hilliard City Schs.*, No. 24-3336, 2025 WL 1147577, at \*1–2 (6th Cir. Mar. 27, 2025) (Thapar, J., concurring).

The district court also recognized that the Challenged Provisions permit the State to "replace[] the parent as the decision-maker for what would serve the child's best interests." 1-ER-28 (collecting cases); 4-ER-710–11. And the legislative history indicates this was a feature of the Act, not a bug: The proponents of the Act believed "schools can be a critical source of support" *because* "not all young people are welcome or safe being their authentic selves at home." 3-ER-332. That appears to directly endorse secret social transition at school in order to exclude parents from the transition decision. The Act thus "not only failed to presume that the

46

plaintiff parents would act in the best interest of their children, [but] assumed the exact opposite." *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003). Indeed, the proponents of the Act sought to usurp *all* parents' rights because of their view that "some" children "will be exposed to serious harm" by their parents "if prematurely forced to reveal their … gender identity." 3-ER-334.

The Supreme Court's recent decision in *Mahmoud* shows that the mere fact that "AB 1955 neither requires nor prohibits conduct by either the parents or their children," is irrelevant, not "crucial[]," as the district court held. 1-ER-32. In *Mahmoud*, the Court held that a school board's refusal to provide notice and an opportunity to opt children out of the reading of LGBTQ-themed books to Pre-K and elementary school-aged children burdened parents' free-exercise rights by "substantially interfer[ing] with the religious development of their children." 2025 WL 1773627 at *15. That curriculum and policy neither required nor prohibited parents or children from doing anything—other than omitting a means to opt out of instruction. *See id.* at *5. Yet the Supreme Court held that they impermissibly burdened parents' right to the free exercise of religion, and granted a preliminary injunction, despite no evidence

47

that any of the books had been read to any child. *See id*. at \*20–22. In so doing, the Court declared that "[a] government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses a very real *threat* of undermining the religious beliefs and practices that the parents wish to instill." *Id*. at \*5 (emphasis added; cleaned up).

The parallels here are clear: Just as the lack of notice in *Mahmoud* violated parents' free exercise rights by "substantially interfer[ing] with" children's "religious development," *id*. at \*15, the restrictions on notice imposed by the Challenged Provisions violate Plaintiffs' fundamental parental rights by substantially interfering with parents' constitutionally protected right to direct their children's medical and mental health care. *See Troxel*, 530 U.S. at 65.

### 3. Social transition is medical and mental health care with significant effects on children's health and wellbeing.

For its part, the State has not disputed that, *if* social transition is medical treatment, the Challenged Provisions violate parents' due process right to direct their children's medical treatment. *See* 2-ER-145–48. And that is exactly what social transition is: medical and mental

48

health care implicating the fundamental parental right to direct children's treatment.

To begin, the district court erred in holding that social transition could not implicate parents' fundamental right to direct medical treatment because social transition "does not involve any type of 'intrusions upon the bodily integrity of the child or other conduct with clinical significance' … by a state actor." 1-ER-27 (quoting *Foote*, 128 F.4th at 350). In doing so, the district court explicitly departed from this Court's statement that "social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents" is a "medical treatment for gender dysphoria." *Doe v. Horne*, 115 F.4th 1083, 1107 n.13 (9th Cir. 2024) (citation omitted), *cert. petition docketed sub nom. Peterson v. Doe*, No. 24-449 (Oct. 22, 2024). The district court noted that this Court distinguished "social transition" from "medical transition." 1-ER-23 n.14. But this Court's statement was that the "medical treatment for gender dysphoria … commonly referred to as transition includes one or more of [three] components," including "social transition," and "medical transition." *Horne*, 115 F.4th at 1107 n.13 (cleaned up). The issue here is whether social transition *is* medical

49

treatment, not whether there is some difference between social and medical transition.

Addressing the issue without accepting *Horne*'s guidance, the district court mistakenly concluded that Plaintiffs had not alleged that social transition is medical care because they did not allege that social transition by school staff typically involves "intrusions upon the bodily integrity of the child." *See* 1-ER-27. But bodily intrusions are not required for treatment to constitute medical or mental health care.

And, unlike the plaintiffs in *Foote*, Plaintiffs alleged with specificity that social transition is "conduct with clinical significance," providing much more than "conclusory statements." *See Foote*, 128 F.4th at 349–50. Indeed, Plaintiffs specifically pleaded that social transition "may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." 4-ER-670 ¶255. And Plaintiffs alleged that "[p]ersistent social transitioning leads to chemical and then surgical transitioning," 4-ER-671 ¶259, because social transition can "lock … in" gender dysphoria. 4-ER-675 ¶277. Each of these points was supported by detailed factual allegations. *See* 4-ER-669–80 ¶¶252–98.

At the preliminary injunction stage, moreover, Plaintiffs introduced overwhelming evidence that social transition is "conduct with clinical significance." *Foote*, 128 F.4th at 350. Plaintiffs' experts testified that social transition changes outcomes for children and adolescents. In particular, social transition increases the incidence of persistence in cross-sex identity, resulting almost inevitably in hormonal and surgical transition, with all its associated risks. *See, e.g.,* 3-ER-441–43; 2-ER-100–02; 3-ER-538–42; 3-ER-598–607.

Indeed, the State's own psychologist, Dr. Christine Brady, has elsewhere promoted social transition's "medically and psychologically recognized benefits," 2-ER-156, despite her current reluctance to describe social transition as medical treatment. In otherwise nearly identical testimony for the State two years ago, Dr. Brady declared that "social transition is psychologically beneficial and is a *medically recognized treatment* for gender dysphoria." 2-ER-53 (emphasis added) (admissible as a prior inconsistent statement under Fed. R. Evid. 801(d)(1)(A)). And she recognized that "Social Transition Is a Treatment for Gender

51

Dysphoria" in a heading that, for this litigation, she revised to "What Social Transition Entails." *Compare* 2-ER-56 *with* 2-ER-161–62, § I.B.[5]

Even the pro-transition group WPATH's 8th Standards of Care ("SOC8") recognize the "potential *developmental* effect of a social transition on a child," and thus "recommend[s] health care professionals discuss the potential benefits and risks of a social transition with families who are considering it." 2-ER-109 (quoting SOC8 at S77–S78) (emphasis added). Accordingly, social transition—as "conduct with clinical significance," 1-ER-27 (quoting *Foote*, 128 F.4th at 350)—is medical and mental health treatment for gender dysphoria.

The district court mistakenly suggested that the parental right to direct medical treatment does not extend to treatments where "it would be impracticable for parents to be with their children." 1-ER-27–28 n.21. Although the cited cases recognize parents' right to be present whenever practicable, no case even suggests that the right to direct medical treatment—or how medical treatment is defined—somehow hinges on

---

[5] In addition, Dr. Brady's current testimony also contradicts itself. Her conclusion that social transition is "non-medical," *e.g.,* 2-ER-162, conflicts with her insistence that social transition is so "essential" and has so many "medically recognized benefits" that anything that "disincentiv[izes]" social transition would harm youth. 2-ER-184.

the parents' ability to be present when a particular treatment is given. Indeed, the district court's spurious restriction would nullify parental rights with respect to major surgery because parents cannot enter the operating room—and with respect to the one-on-one mental health treatment at issue in *Parham* itself. *See Parham*, 442 U.S. at 602, 614–15.

Moreover, it makes no difference that school staff who secretly socially transition a child do not know whether that child *actually* suffers from gender dysphoria. Gender dysphoria is a psychiatric diagnosis, and it requires evaluation by a mental health professional. 3-ER-410; 3-ER-454–55; 3-ER-458; 2-ER-85; 2-ER-94; 2-ER-108–09; 3-ER-519; 3-ER-536–37. That school staff who cannot make a diagnosis are providing treatment does not render social transition any less a treatment—indeed, it is still "conduct with clinical significance" when facilitated by untrained school staff. Social transition—addressing and otherwise treating a person as if he or she were of the opposite sex—amounts to a form of immersive group therapy focused on reinforcing the child's belief that his or her gender identity contradicts biology. But in the district

53

court's view, so long as therapy is administered by amateurs, parents have no right to direct it.

Nor is secret social transition of children harmless. On the contrary, Plaintiffs pleaded—and their experts testified to—the downstream risks and immediate harms associated with social transition. 4-ER-673–80 ¶¶267–98; 3-ER-461–62 (inherently harmful); 3-ER-538–42; 3-ER-554–56 (same); 3-ER-462 (comorbidities); 3-ER-542 (same); 3-ER-441–43 (persistence); 2-ER-100–02 (same); 3-ER-538–42; 3-ER-550 (same); 3-ER-598–607 (same); 3-ER-463 (leads to medical and surgical transition); 3-ER-605–07 (same). Social transition "solidifies what most likely would have been a temporary condition, making it permanent, with lifelong consequences." 3-ER-541–42.

For all the risks, moreover, there is an "absence of robust evidence" on the benefits of social transition to children suffering from gender dysphoria. 3-ER-447–48. Alternative treatments are available, including "watchful waiting"—where a mental health professional schedules regular follow-up appointments to monitor the child, and either does not provide active treatment or focuses on treating the child's mental health comorbidities, 3-ER-420—and psychotherapy, which focuses on

54

identifying and addressing "the causes of observed psychological distress." 3-ER-421–23; *see also* 3-ER-518; 3-ER-551. Given the available alternatives, it is parents' prerogative to choose appropriate medical treatment for their children, *see Mann*, 907 F.3d at 1162, and the child's disagreement does not transfer that power away from parents. *See Parham*, 442 U.S. at 603–04.

Accordingly, the district court erred in holding that acceding to a child's request for social transition is just a matter of "respect," not medical treatment. 1-ER-34. Nor is social transitioning akin to aerobic exercise, breathing exercises, and drinking low-fat milk, as the State has previously argued. Unlike those activities, social transition is a controversial, "major psychotherapeutic intervention" with clinical significance and real health *risks*. 3-ER-538–42. Changing a child's everyday social environment to match his or her belief in a cross-sex identity is immersive therapy that can, and often does, change a child's life as much as a weekly conversation with a counselor.

In short, on this record, because social transition is "conduct with clinical significance," social transition in school is medical and mental health treatment facilitated by state actors. By empowering teachers and

55

children to socially transition children without their parents' knowledge or permission, while depriving parents of information necessary to guide treatment decisions, the Challenged Provisions unconstitutionally deprive the Parents of their fundamental right to direct their children's medical treatment. Accordingly, Plaintiffs adequately pleaded—and are likely to succeed on—their claim that the Challenged Provisions unduly interfere with their rights to direct the medical and mental health treatment of their children.

**B.    The    Challenged    Provisions    violate    parents' fundamental due process right to information about their children's health.**

Plaintiffs are equally likely to succeed on the merits of their claim that the Challenged Provisions unconstitutionally interfere with their right to information about their children's psychological distress.

**1.    The parental right to information about their children's distress and symptoms of mental illness is deeply rooted and essential to liberty.**

On this point, the district court construed the First Amended Complaint to "assert a fundamental right to information about their children's *gender identity*." 1-ER-31 (emphasis added). But that unduly narrowed the right Plaintiffs actually asserted: the more general fundamental right to information about their children's "symptoms of

56

distress or mental illness in school." 2-ER-44 (citing *Mirabelli v. Olson*, 761 F.Supp.3d 1317, 1331 (S.D. Cal. 2025)); *see also* 4-ER-699–701 ¶¶422, 425–33.

As this Court recently instructed, a fundamental right "need not have been expressly recognized as fundamental in caselaw for it to be deeply rooted in our history and tradition and implicit in the concept of ordered liberty." *Regino*, 133 F.4th at 962. And this Court has made clear that parental rights continue to exist in the school context, *id.* at 964–66, as *Mahmoud* soon thereafter confirmed. *See* 2025 WL 1773627, at *20. This appeal thus presents the question whether parents' fundamental right to direct the upbringing of their children encompasses the right to receive information regarding their children's symptoms of mental or psychological distress from state actors who possess that information.

The premise for that right—i.e., parents' right to direct their children's upbringing—is firmly established. *Parham*, 442 U.S. at 602–03. And "it easily follows that parents *do* have a constitutional right to be accurately informed by public school teachers about their student's gender incongruity that could progress to gender dysphoria, depression, or suicidal ideation, because it is a matter of health." *Mirabelli*, 761

57

F.Supp.3d at 1332 (citing *John & Jane Parents 1*, 78 F.4th at 636 (Niemeyer, J., dissenting)). Indeed, parents cannot provide "mature advice and emotional support" to their children if they are kept in the dark. *Bellotti v. Baird*, 443 U.S. 622, 641 (1979). And parents cannot meaningfully exercise their recognized right to direct their children's medical treatment if they are kept ignorant of their children's symptomatic behavior. *See Mann*, 907 F.3d at 1162.

Given this, parents "have a constitutional right to be accurately informed by public school teachers about their student's gender incongruity that could progress to gender dysphoria, depression, or suicidal ideation, because it is a matter of health." *Mirabelli*, 761 F.Supp.3d at 1332. Just as a school could not conceal a child's serious (but not necessarily obvious) physical injury such as a concussion from parents, it cannot conceal a child's public behavior reflecting gender-related psychological stress.

The district court's refusal to recognize this right rested on the same shaky legal foundation that pervaded its ruling on the medical treatment claim. *See supra* at 42–44; 1-ER-32–33, 1-ER-35 (citing *Fields*, 427 F.3d at 1207; *Parents for Privacy*, 949 F.3d at 1231; *Anspach*, 503

58

F.3d at 259, 266). It relied on the same deleted language in *Fields*, 1-ER-35 (quoting *Fields*, 427 F.3d at 1207), which as revised held only that parents cannot enjoin schools from providing certain information to children or collect damages based on that information. *Fields*, 447 F.3d at 1191. But Plaintiffs here are not challenging the provision of information from public schools *to* their children—instead, they are challenging provisions of AB 1955 that encourage school staff to *conceal* information regarding children's distress *from* parents. And the other cases are not relevant here. *See supra* at 43–44.

The First Circuit misapprehended a similar issue in *Foote*—perhaps because of the sparse pleading in that case. *See* 128 F.4th at 349–50. Plaintiffs' allegations here show that withholding information about a child's gender-confused conduct does not merely make parenting "more challenging." *Id.* at 354. Instead, the Challenged Provisions permit state actors to systematically conceal from parents information they need to assess and seek treatment for their children's significant mental health issues—in favor of a state-sanctioned double life for the child.

And again, *Mahmoud* makes clear that parents' fundamental rights are not suspended while their children are in public schools. *See* 2025 WL

1773627, at *13–15. The government cannot hide behind an "internal affairs" argument rooted in a "chilling vision of the power of the state to strip away the critical right of parents" to critical information about their children's behavior while in the enforced custody of a state school. *Id.* at *19–20. Plaintiffs' right to care for their children necessarily includes the right not to be foreclosed from receiving information that may indicate a need for medical or psychological treatment.

### 2. The Challenged Provisions enable school staff to keep parents in the dark regarding their children's distress and symptoms of mental illness.

The Challenged Provisions unconstitutionally impair Parents' fundamental right to information regarding symptoms of their children's psychological distress. In particular, the Challenged Provisions forbid school districts from requiring teachers to disclose to parents—and thus allow teachers to hide from parents—"any information" regarding a child's gender identity or gender expression, including symptoms of gender dysphoria or other mental health conditions. *See* 4-ER-710.

As Plaintiffs' expert psychiatrist Dr. Levine elaborated, "a child or adolescent who expresses a desire to adopt a name and pronouns typically associated with the opposite sex or one that is culturally

unusual is inherently expressing discomfort with his or her natal sex." 2-ER-95; *see also* 3-ER-456 ("desire to adopt a transgender name and pronouns" is a "'yellow flag' that calls for" evaluation). This testimony fleshed out Plaintiffs' allegations about gender incongruence and dysphoria and their symptoms. 4-ER-664; 4-ER-667–69; 4-ER-690 ¶¶222–23, 239–51, 356–60. Thus, school staff who conceal from parents that a child has indicated a desire to use a cross-sex name and pronouns are withholding information relating to that child's psychological distress.

Further, many children who suffer from gender dysphoria also suffer from other mental health comorbidities, such as depression and suicidal ideation. 4-ER-664; 4-ER-676; 4-ER-678; 4-ER-700 ¶¶222, 278, 288, 426; 3-ER-455–56; 3-ER-458; 3-ER-530–33; 3-ER-542. That is one reason the Endocrine Society guidelines recommend that a child expressing gender concerns "undergo a thorough diagnostic analysis by a [mental health professional] with appropriate expertise." 3-ER-456; 3-ER-459; *see also* 4-ER-670 ¶257. But parents will not know to seek such a diagnostic evaluation if school staff conceal information regarding their child's psychological distress.

61

Moreover, it is irrelevant that, as Dr. Brady opined, "some" children who express such desire "may not experience gender dysphoria." 2-ER-160. In fact, gender dysphoria is a psychiatric diagnosis, and children may experience psychological distress that does not meet the diagnostic requirements. But school staff are not mental health professionals, and—although they can observe what they perceive to be symptoms of distress or mental illness—they cannot determine or diagnose whether a particular child is suffering from gender dysphoria or psychiatric comorbidities. 3-ER-456–57; *see also* 4-ER-680 ¶298. Parents alone can decide whether to seek professional help, *see* 2-ER-97–98; *see also* 4-ER-670 ¶¶256, 258, but they will not have the information necessary to make that decision if school staff conceal from them the symptoms children manifest in school.

In short, by enabling school staff to conceal from parents information about children's behavior or symptoms of distress that indicates a need for treatment or family involvement, the Challenged Provisions interfere with Plaintiffs' fundamental rights. Accordingly, Plaintiffs are likely to prevail on their claim that the Challenged

Provisions unduly interfere with their rights to information about their children's symptoms of distress or mental illness.[6]

### C.   The Challenged Provisions do not survive strict scrutiny.

The district court erroneously found that the Challenged Provisions satisfy rational basis review because "AB 1955 is reasonably related to a legitimate state interest." 1-ER-29. But because the Challenged Provisions unconstitutionally interfere with the Parents' fundamental parental rights, strict scrutiny applies. *See Regino*, 133 F.4th at 960.

Under that standard, once a plaintiff shows that fundamental rights have been infringed, the burden shifts to the government to show that "restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1163 (9th Cir. 2022) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022)). A narrowly tailored law "must target and eliminate no more than the exact source of the evil it seeks to remedy." *Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) (en banc)

---

[6] The State does not dispute that Plaintiffs' unconstitutional conditions claim is likely to succeed if Plaintiffs prevail on their substantial due process claims. 2-ER-149 n.14.

(cleaned up). AB 1955 does not serve a compelling interest and is far broader than the harm it purports to remedy.

Section 2 of AB 1955 "declares the state legislature's findings." 1-ER-29 & n.23; 4-ER-708–09. And the core of those findings is that "students have a right to express their identity 'without fear, punishment, or retaliation,' including forced outing" and that "students have a constitutional right to privacy of sensitive information about themselves." 1-ER-29. But the State cannot inflate these recently created state privacy rights for *children* into a compelling interest that "eclipse[s]" the "long-recognized federal constitutional rights of parents." *Mirabelli*, 761 F.Supp.3d at 1336.

In any event, a child's gender identity in school is not private. Indeed, a child who is socially transitioning in school is, by definition, doing so in *public*. And any other behavior raising the possibility of mental distress is equally public.

Moreover, the burdens imposed by the Challenged Provisions on parents' rights to information regarding their children's health and to make medical decisions for their children are far from narrowly tailored. The Challenged Provisions are not narrowly tailored to protect students

64

from bullying and harassment or to create a "safe" school environment. Because parents are not at school, there is no plausible connection between facilitating schools' ability to keep secrets from parents and these purported interests. And "obvious, less burdensome alternatives" such as anti-bullying initiatives are available. *Berger*, 569 F.3d at 1041. Further, keeping secrets from parents can make the school environment unsafe by normalizing strategies that school staff may use to groom children. *See* 3-ER-558–60; 3-ER-562–63.

Most invidiously, the Challenged Provisions establish a default practice of withholding critical health information from all parents of California public school children in an attempt to protect the privacy of *some* children who express symptoms of gender dysphoria or related conditions or who socially transition in school. An obvious narrower alternative would restrict disclosure only where parents are *shown* to be unfit or unlikely to act in their child's best interests, rather than assuming that all parents share those flaws. *See Wallis*, 202 F.3d at 1141.

In sum, the Challenged Provisions deprive all parents of fundamental constitutional rights as a baseline, *assume* that parents are bad actors, and assume that public school employees and children know

better. There is nothing narrow about that. Accordingly, the Challenged Provisions fail strict scrutiny.

## III. Plaintiffs Established the Additional Factors Entitling Them to a Preliminary Injunction.

### A. The Parents Will Be Irreparably Harmed If Relief Is Denied

Plaintiffs also have shown that they will continue to suffer irreparable harm if a preliminary injunction is not granted.

To begin, it is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). And the constitutional right of parents to direct the upbringing of their children "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel*, 530 U.S. at 65 (plurality op.) (collecting cases).

The Challenged Provisions irreparably harm Plaintiffs by forcing them to choose between withdrawing their children from public school and ceding their parental rights to the State—which has already resulted in Parent 8A withdrawing her child from public school. *See generally* 3-ER-351–400; 4-ER-656–57 ¶¶171–73. And, as the Supreme Court has recently recognized, "the suggestion that any parents who are unhappy

66

about [school] instruction … can simply place their children in private school or … educate them at home … is no answer" to parents' constitutional objections. *Mahmoud*, 2025 WL 1773627, at *20 (citations omitted). Education is compulsory in California and enforced against parents with fines or contempt. Cal. Educ. Code §§ 48200, 48293. And "many parents cannot afford" substitutes at their own expense, especially since "they already contribute to financing the public schools." *Mahmoud*, 2025 WL 1773627, at *20–21.

The Challenged Provisions threaten further irreparable harm as the 2025–2026 school year begins. Once Plaintiffs' children are in school under threat of government sanction, Plaintiffs will be systematically kept in the dark about whether their children are being socially transitioned at school. The Challenged Provisions replace the judgment of parents regarding the best interests of their children with that of school staff and the children themselves. But children's "lack of maturity" and "underdeveloped sense of responsibility" often lead to "impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).

67

Further, by keeping the Parents in ignorance regarding symptoms of gender dysphoria or comorbidities, as well as secret social transitions in school, the Challenged Provisions prevent the Parents from properly caring for, providing guidance to, and directing treatment of their children during adolescence, a critical period for mature psychological development. 3-ER-554–56.

For example, Parent 2A highlights the irreparable harm caused by not knowing if a child is being socially transitioned in school. Her daughter was secretly transitioned in school but has since desisted. Parent 2A's daughter tells her mother that "she doesn't really identify as trans anymore." 3-ER-354. But her daughter still suffers from mental health conditions: anxiety and obsessive-compulsive disorder. 3-ER-352. As a child with "a prior history of psychiatric illness," child 2C remains at higher risk for gender dysphoria. 3-ER-415–16. In fact, she is precisely the child who needs parental involvement the most: "[I]n the large majority of cases the involvement of one or both parents will be essential to a responsible, effective, and indeed ethical diagnosis and treatment of a child who is or may be suffering from gender dysphoria or … related conditions." 3-ER-454; *see also* 3-ER-555–56. But because of the

68

Challenged Provisions, Parent 2A cannot know whether her daughter's school is socially transitioning her again, and that uncertainty causes her irreparable emotional harm. 3-ER-355 ("I'm afraid that the school will use AB 1955 to keep me in the dark and socially transition her in secret.").

The other Plaintiffs share similar concerns. Indeed, Plaintiffs' children are at high risk of gender dysphoria because they suffer from autism, ADHD, or various mental health conditions. *See* 3-ER-415–16; 3-ER-530–31. Children 3C, 4D, and 10C have autism; Children 3C and 4D also have ADHD. 3-ER-358; 3-ER-366–67; 3-ER-398. Children 5D and 7C are being tested for ADHD and dyslexia, and 7C is also being tested for autism. 3-ER-372; 3-ER-382. Plaintiffs thus share in the fear and uncertainty that results from purposefully and systematically being kept in ignorance, and from the added risk that secret school-based social transitioning will drive a wedge between them and their children. *See, e.g.*, 3-ER-391 ("I'm afraid that the school staff will socially transition her in secret and cast me and my husband as the enemy.").

Moreover, Plaintiffs' *children* also risk irreparable harm. It is "inherently psychologically unhealthy" for a child to live a secret double

life. 3-ER-461–62; *see* 3-ER-554–55. Likewise, a child is "significantly less likely" to receive treatment for comorbidities if parents are kept in the dark. 3-ER-462; *see* 3-ER-542. Further, a child who is socially transitioned is less likely to desist from gender dysphoria. 3-ER-441–43; 3-ER-546. Instead, she is often placed on a "conveyor belt" to lifelong medicalization, 3-ER-443; 3-ER-463, and the costs and health risks that accompany puberty blockers, cross-sex hormones, and reassignment surgery. 3-ER-606–07; *see also United States v. Skrmetti*, 145 S.Ct. 1816, 1825–26 (2025); *id.* at 1841–45 (Thomas, J., concurring).

The State has disputed irreparable harm by contending that Plaintiffs waited too long to seek relief. On the contrary, while in the district court, Plaintiffs worked diligently to develop the extensive expert evidence that should have been sufficient to prevail there. And they sought a preliminary injunction in ample time for the upcoming school year.

In sum, the Challenged Provisions threaten imminent and irreparable harm to the constitutional rights and emotional well-being of Plaintiffs, and to their children's mental and physical health.

70

## B. The Balance of Equities and Public Interest Sharply Favor An Injunction

The balance of equities and public interest factors, which merge when the defendant is the government, *Nken,* 556 U.S. at 435, also strongly favor Plaintiffs. The public interest favors the Parents because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Horne*, 115 F.4th at 1098–99 (quoting *Melendres*, 695 F.3d at 1002). And here, both equity and the public interest support protecting the fundamental parental rights of the Parents from the unconstitutional infringements of the Challenged Provisions.

In contrast, the government has no legitimate interest in enforcing an unconstitutional law, *see, e.g.*, *Melendres*, 695 F.3d at 1002, or "in withholding or concealing" from parents any "information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns" that is necessary to meaningfully consent to treatment. *Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-cv-4015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022). The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Accordingly, a preliminary injunction would "serve[] the

71

interests of the general public by ensuring that" Defendants "comply with the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017).

Moreover, any alleged harms from keeping parents informed about their children's gender identity improperly presume that parents do not have the best interests of their children at heart. But the Supreme Court has long rejected such wrongheaded presumptions. *See Parham*, 442 U.S. at 604. To overcome the proper presumption that parents act in the best interests of their children, the State needs "clear and convincing" evidence of harm or abuse on an individualized basis, not a blanket presumption that schools know how to help children better than their parents. *See Troxel*, 530 U.S. at 69–79 (plurality op.).[7]

---

[7] The State's basis for asserting these alleged harms is improper expert opinion proffered by laypersons, testimony that should be excluded as unreliable. *See* Docs. 94-19–94-28 (Pls.' Objs. to Decls. of Al-Shamma, Russell-Slavin, Frese, Johnson, and Hirst). This lay testimony supports pro-secrecy positions, is biased toward social transition, and simply reinforces the Challenged Provisions' reverse presumption that parents are abusive and harmful, where the core fear seems to be that involving parents may lead to treatment that helps children accept their bodies as they are. As Dr. Stephen Levine explains, the lay experts offer nothing more than "anecdotal evidence"—at the bottom of the hierarchy of evidence-based medicine—and "focus[] only a limited phase of even the cherry-picked anecdotes." 2-ER-104 (emphasis deleted); *see* 2-ER-104–06

Further, the public interest favors an injunction of the Challenged Provisions because of the prospective harm to Plaintiffs' children if those Provisions remain in effect. Parents cannot obtain necessary professional help to diagnose and treat their children if they are left in the dark about "yellow flags" for gender dysphoria and other mental health comorbidities, such as depression, anxiety, and suicidal ideation. 3-ER-456–60. There is no increased risk of suicide associated with delaying social, chemical, or surgical transition. 3-ER-451–52. And social transitioning is not in itself some sort of societal good, as the State's expert seems to believe. *See* 2-ER-184. To the contrary, the negative effects of social transition—especially secret social transition—are observable and immediate. 3-ER-461–62; 3-ER-554–58. And the long-term harm of placing children on a path toward counter-sex hormones and sex-alteration surgery—and associated permanent dependence on medical and pharmaceutical intervention—is concrete, while any benefits have not been confirmed by evidence. *See* 3-ER-444–49; 3-ER-

---

(describing testimony). Plaintiffs' experts, who have specialized knowledge in this field, show that concerns that parents will harm their children are overblown. 2-ER-105; 2-ER-109–11; *see also* 2-ER-127–28.

73

546–47; 3-ER-606–07; 2-ER-92; 2-ER-98; *see also Skrmetti*, 145 S.Ct. at 1825–26.

In short, the harm suffered by the Parents and their children outweighs any other harm, including the State's concern that enjoining the Challenged Provisions will deter discussions between teachers and children about "one of the most intimate familial topics a parent can discuss with their child." 2-ER-150. Under the Constitution, and as a matter of public interest and equity, "intimate familial topics" are the province of parents, not the State. Under the Constitution, parental interests must control here.

## CONCLUSION

Plaintiffs have pleaded and proved—at this stage—that the Challenged Provisions unconstitutionally threaten to keep parents in the dark about their children's distress and schools' unauthorized but life-changing social transition treatment. The district court's orders should be reversed with instructions to enter a preliminary injunction enjoining Defendants' enforcement of the Challenged Provisions of AB 1955 as to the Plaintiffs.

74

July 16, 2025

Respectfully submitted,

*/s/ Gene C. Schaerr*

Michael J. Vigliotta
  City Attorney
OFFICE OF THE CITY ATTORNEY
2000 Main Street, P.O. Box 190
Huntington Beach, CA 96248
T: (714) 536-5555
mvigliotta@surfcity-hb.org

Gene C. Schaerr
Stephanie L. Freudenberg
Justin A. Miller
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

Nicholas Barry
Ian Prior
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave S.E., #231
Washington, DC 20003
Telephone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org

Donald M. Falk
SCHAERR | JAFFE LLP
One Embarcadero Center
Suite 1200
San Francisco, CA 94111
Telephone: (415) 562-4942
dfalk@schaerr-jaffe.com

*Counsel for Plaintiffs-Appellants*

75

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, counsel for Plaintiffs-Appellants is unaware of any related cases pending in this Court.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit Rule 32-1 because:

    ☒  this brief contains 13,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

    ☐  this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2016</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐  this brief has been prepared in a monospaced spaced typeface using (state name and version of word processing program) __ _____ with (state number of characters per inch and name of type style) _____ _____ _____.

                    */s/ Gene C. Schaerr*
                    Gene C. Schaerr
                    *Counsel for Plaintiffs-Appellants*

# ADDENDUM

## Pertinent Constitutional Provision, Statutes and Ordinance

## Addendum Table of Contents

United States Constitution Amendment XIV, § 1 ................................ A-2

California Assembly Bill 1955, § 2 ........................................................ A-3

California Education Code § 220.3 [AB 1955, § 5] ............................. A-6

California Education Code § 220.5 [AB 1955, § 6] ............................. A-7

California Education Code § 48200 ..................................................... A-8

California Education Code § 48293 ..................................................... A-9

City of Huntington Beach Municipal Ordinance No. 4326 ............... A-10

  Section 1.23.10 ................................................................................. A-10

  Section 1.23.20 ................................................................................. A-13

## United States Constitution Amendment XIV

**Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection; Appointment of Representation; Disqualification of Officers; Public Debt; Enforcement**

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

\* \* \*

A-2

# California Assembly Bill No. 1955
## CHAPTER 95

An act to add Sections 220.1, 220.3, and 220.5 to, and to add Article 2.6 (commencing with Section 217) to Chapter 2 of Part 1 of Division 1 of Title 1 of, the Education Code, relating to pupil rights.

[Approved by Governor July 15, 2024. Filed with Secretary of State July 15, 2024.]

\*     \*     \*

*The people of the State of California do enact as follows:*

\*     \*     \*

SEC. 2. The Legislature finds and declares all of the following:

(a) All pupils deserve to feel safe, supported, and affirmed for who they are at school.

(b) Choosing when to "come out" by disclosing an LGBTQ+ identity, and to whom, are deeply personal decisions, impacting health and safety as well as critical relationships, that every LGBTQ+ person has the right to make for themselves.

(c) Parents and families across California understand that coming out as LGBTQ+ is an extremely personal decision and want to support their children in coming out to them on their own terms.

(d) Parents and families have an important role to play in the lives of young people. Studies confirm that LGBTQ+ youth thrive when they have parental support and feel safe sharing their full identities with them, but it can be harmful to force young people to share their full identities before they are ready.

(e) Policies that forcibly "out" pupils without their consent remove opportunities for LGBTQ+ young people and their families to build trust and have these conversations when they are ready.

(f) LGBTQ+ pupils have the right to express themselves freely at school without fear, punishment, or retaliation, including that teachers or administrators might "out" them without their permission. Policies that require outing pupils without their consent violate pupils' rights to privacy and self-determination.

(g) Pupils have a constitutional right to privacy when it comes to sensitive information about them, and courts have affirmed that young people have a right to keep personal information private.

(h) Laws and policies that target or invite targeting of pupils on the basis of gender or sexual orientation are prohibited under state and federal law.

(i) Attacks on the rights, safety, and dignity of transgender, gender-expansive, and other LGBTQ+ youth continue to grow across the country, including here in California. These efforts are having a measurable impact on the health and well-being of LGBTQ+ pupils, and have led to a rise in bullying, harassment, and discrimination.

(j) School policies that support LGBTQ+ pupils and their parents and families in working towards family acceptance on their own terms, without interference from teachers and school staff, build safety and trust within school communities.

(k)(1) Teachers and school staff can provide crucial support to LGBTQ+ young people and can play an important role in encouraging them to seek out appropriate resources and support.

(2) Affirming school environments significantly reduce the odds of transgender youth attempting suicide, according to The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces (2020).

(3) LGBTQ+ students with supportive staff at their school experienced a number of positive outcomes, including being less likely to feel unsafe at school because of their gender expression or sexual orientation, or both, and reporting lower levels of depression, according to Joseph G. Kosciw, Ph.D., et al., The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools (2019).

A-4

(4) Transgender and gender-nonconforming youth with supportive educators had better education outcomes, according to Michelle Marie Johns et al., Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level (2018).

(*l*) School personnel have faced increasing harassment and adverse employment actions because of their lawful efforts to protect pupil privacy, to protect pupils from discrimination, to provide instruction consistent with state standards, and to create a safe and supportive learning environment for all pupils, including LGBTQ+ pupils.

(m) This harassment and adverse treatment of school personnel prevents all pupils from accessing safe and supportive learning environments.

(n) No school employee should suffer an adverse employment action because the employee supported a pupil or pupils in exercising their legal rights to privacy, nondiscrimination, state-aligned instructional materials, and equal educational opportunity.

\*     \*     \*

A-5

## California Education Code § 220.3
Effective: January 1, 2025
### § 220.3. Employee or contractor shall not be required to disclose information relating to pupil's sexual orientation, gender identity, or gender expression

(a) An employee or a contractor of a school district, county office of education, charter school, or state special school for the blind or the deaf shall not be required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law.

(b) Subdivision (a) does not constitute a change in, but is declaratory of, existing law.

## California Education Code § 220.5
### Effective: January 1, 2025
### § 220.5. Prohibition of enactment or enforcement of policy, rule, or administrative regulation that would require employee or contractor to disclose information related to pupil's sexual orientation, gender identity, or gender expression; invalidity of such policy, regulation, guidance, directive, or other action

(a) A school district, county office of education, charter school, state special school for the blind or the deaf, or a member of the governing board of a school district or county office of education or a member of the governing body of a charter school, shall not enact or enforce any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law.

(b) Subdivision (a) does not constitute a change in, but is declaratory of, existing law.

(c) Any policy, regulation, guidance, directive, or other action of a school district, county office of education, charter school, or state special school for the blind or the deaf, or a member of the governing board of a school district or county office of education or a member of the governing body of a charter school, that is inconsistent with subdivision (a) is invalid and shall not have any force or effect.

## California Education Code § 48200
## § 48200. Children between ages 6 and 18 years

Each person between the ages of 6 and 18 years not exempted under the provisions of this chapter or Chapter 3 (commencing with Section 48400) is subject to compulsory full-time education. Each person subject to compulsory full-time education and each person subject to compulsory continuation education not exempted under the provisions of Chapter 3 (commencing with Section 48400) shall attend the public full-time day school or continuation school or classes and for the full time designated as the length of the schoolday by the governing board of the school district in which the residency of either the parent or legal guardian is located and each parent, guardian, or other person having control or charge of the pupil shall send the pupil to the public full-time day school or continuation school or classes and for the full time designated as the length of the schoolday by the governing board of the school district in which the residence of either the parent or legal guardian is located.

Unless otherwise provided for in this code, a pupil shall not be enrolled for less than the minimum schoolday established by law.

A-8

**California Education Code § 48293**
Effective: September 14, 2006
**§ 48293. Penalties against parents**

(a) Any parent, guardian, or other person having control or charge of any pupil who fails to comply with this chapter, unless excused or exempted therefrom, is guilty of an infraction and shall be punished as follows:

(1) Upon a first conviction, by a fine of not more than one hundred dollars ($100).

(2) Upon a second conviction, by a fine of not more than two hundred fifty dollars ($250).

(3) Upon a third or subsequent conviction, if the person has willfully refused to comply with this section, by a fine of not more than five hundred dollars ($500). In lieu of imposing the fines prescribed in paragraphs (1), (2), and (3), the court may order the person to be placed in a parent education and counseling program.

(b) A judgment that a person convicted of an infraction be punished as prescribed in subdivision (a) may also provide for the payment of the fine within a specified time or in specified installments, or for participation in the program. A judgment granting a defendant time to pay the fine or prescribing the days of attendance in a program shall order that if the defendant fails to pay the fine, or any installment thereof, on the date that it is due, or fails to attend a program on a prescribed date, he or she shall appear in court on that date for further proceedings. Willful violation of the order is punishable as contempt.

(c) The court may also order that the person convicted of the violation of subdivision (a) immediately enroll or reenroll the pupil in the appropriate school or educational program and provide proof of enrollment to the court. Willful violation of an order under this subdivision is punishable as civil contempt with a fine of up to one thousand dollars ($1,000). An order of contempt under this subdivision shall not include imprisonment.

# CITY OF HUNTINGTON BEACH
## ORDINANCE NO. 4326

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF
HUNTINGTON BEACH ADDING CHAPTER 1.23 OF THE
HUNTINGTON BEACH MUNICIPAL CODE RELATING TO
PARENTS RIGHT TO KNOW CITY

The City Council of the City of Huntington Beach does hereby
ordain as follows:

SECTION 1. The Huntington Beach Municipal Code is amended by
adding Chapter 1.23 to read as follows:

CHAPTER 1.23
HUNTINGTON BEACH PARENTS' RIGHT TO KNOW CITY

1.23.010. **Findings.**

   A.   State Assembly Bill ("AB") 1955, signed into law by Governor
        Newsom on July 15, 2024, prohibits public schools from adopting
        or enforcing any policy, rule, or administrative regulation
        requiring an employee to disclose any information related to a
        student's sexual orientation, gender identity, or gender
        expression to any other person without the minor student's
        consent.

   B.   Numerous studies assert that transgender and gender
        nonconforming students suffer from increased psychological,
        emotional, and physical harassment and abuse, and that
        transgender youth experience an abnormally high number of
        suicidal thoughts and make an abnormally high number of
        suicide attempts.

   C.   The matters of "student sexual orientation, gender identity, or
        gender expression" contained in the prohibitions of AB 1955 are
        not related to "education" but instead are subject matters that
        are extremely "private" and highly "personal" for the parent and
        child.

A-10

D. The State may not claim control over education as a pretext or a guise to invade or regulate the "private" and highly "personal" matters that naturally belong to and should remain within the parent/child relationship. Accordingly, as the State's attempt to legislate the parent/child relationship by way of AB 1955 is an illegal violation of the California and United States constitutions and not "education," as such, AB 1955 does not preempt local regulation and may be subject to legal challenges of local authorities, parents, and/or children.

E. Although the State may regulate "education," AB 1955 exceeds the State Legislature's authority to regulate public schools under the California and United States Constitutions and infringes on parents' constitutional rights by prohibiting schools from adopting policies that would require notifying parents of "private" and highly "personal" matters such as when a parents' child may be at increased risk of psychological, emotional, and physical harassment and abuse, and extremely high rates of suicide and suicide attempts, no matter how young the child is, without the child's consent and is not a matter of statewide concern.

F. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." (U.S. Const. amend. XIV.) The United States Supreme Court has repeatedly recognized parents' constitutional right to make decisions concerning the care, custody, and control of their children. (*Troxel v. Granville,* 530 U.S. 57, 65 (2000).) This includes the right to direct their children's upbringing and education. (*Meyer v. Nebraska,* 262 U.S. 390, 400 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 534-535 (1925).)

G. Parental rights are not secondary to the desires of government agencies. In *Parham v. J.R.,* 442 U.S. 584, 602-603 (1979), the United States Supreme Court declared, "our constitutional system long ago rejected any notion that a child is 'the mere creature of the State' and, on the contrary, asserted that parents generally 'have the right, coupled with the high duty, to recognize and prepare their children for additional obligations'

A-11

… [t]he statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition."

H.   In *David v. Kaulukukui,* 38 F.4th 792, 799 (2022), the United States Court of Appeals for the Ninth Circuit observed, "[t]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court. Our case law has long recognized this right for parents and children under the Fourth and Fourteenth Amendments."

I.   The City of Huntington Beach has nearly 200,000 residents comprised of parents and children. There are 35 elementary schools and five high schools located in the City. By population, Huntington Beach is the 23rd largest city, or is within the top four percent largest cities, among a total of 482 cities in the State of California.

J.   The City of Huntington Beach was constituted by its people and incorporated on February 17, 1909. Since adoption of its Charter on May 17, 1937, the City of Huntington Beach is a Charter City created by the consent of the people within its jurisdiction and authorized by Article XI, Section 5 of the California Constitution to exclusively govern municipal affairs.

K.   Charter Cities "are distinct individual entities and are not connected political subdivisions of the state." (*Haytasingh v. City of San Diego*, 66 Cal.App.5th 429, 459 (2021)). "It is the free consent of the persons composing them that brings into existence municipal corporations." (*Id.*) Charter Cities are creatures of the state constitution, formed by the authority of the people. "Charter Cities are specifically authorized by our state constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*City of Redondo Beach v. Padilla,* 46 Cal.App.5th. 902, 909 (2020).) As a Charter City, Huntington Beach is a City of and by the people. Its people, including parents and children, are directly affected by AB 1955.

A-12

L.    The protection of parents and children in the City from interference by the State over "a student's sexual orientation, gender identity, or gender expression" is a municipal affair, not a statewide concern. There can be no greater example of a municipal affair than the regulation of Huntington Beach citizens private and highly personal subject of "a student's sexual orientation, gender identity, or gender expression" that should be, and remain, between a parent and a child. The people of Huntington Beach have a right to govern Huntington Beach municipal affairs and challenge the State's attempt to assert authority of municipal affairs.

M.   As a Charter City, that derives its power from the consent of the people, the City of Huntington Beach has a direct interest in protecting the rights of parents of minor children residing within its jurisdiction, and it has a direct interest in challenging the State's actions that are demonstrably driving large economic producers out of California.

1.23.020.   **Huntington Beach is a "Parents' Right to Know" City.**

A.    For the purposes of this chapter, "parents" shall refer to parents and/or legal guardians.

B.    Parents have a right to know about their child's "sexual orientation, gender identity, or gender expression" without the interference, prohibition, and/or inhibition presented by AB 1955.

C.    Based on the findings in Section 1.23.010 above, the City of Huntington Beach, California is hereby declared a "Parents' Right to Know" City.

D.    No educators in the City of Huntington Beach, including, but not limited to, instructors, counselors, or other adults entrusted with the teaching or caring of children, who work in the City's Libraries, Parks, City Recreational Facilities, Community Services Facilities, or other City facilities or City sponsored programming shall withhold any information related to a child's sexual orientation, gender identity, or gender expression to parents of said children with or without the child's consent.

*        *        *

A-13