No. 25-3826

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

CITY OF HUNTINGTON BEACH, *et al.*,

*Plaintiffs-Appellants*,

v.

GAVIN NEWSOM, *et al.*,

*Defendants-Appellees*.

————————————

**On Appeal from the United States District Court
for the Central District of California**
No. 8:24-cv-02017-CBM (JDEx)
Hon. Consuelo B. Marshall, District Judge

————————————

## APPELLEES' ANSWERING BRIEF

————————————

ROB BONTA
  *Attorney General of California*
HELEN H. HONG
  *Acting Solicitor General*
CHERYL FEINER
  *Senior Assistant Attorney General*

SAMUEL T. HARBOURT
JULIE VEROFF
  *Deputy Solicitors General*
DARRELL W. SPENCE
DARIN WESSEL
  *Supervising Deputy Attorneys General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov
*Attorneys for Defendants-Appellees*

August 13, 2025

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................. 1

Statement of the issues ......................................................... 3

Statement of the case ............................................................ 3

    A.    Background .................................................... 3

    B.    Procedural history ........................................ 8

Summary of argument ........................................................ 11

Argument .............................................................................. 14

    I.    Plaintiffs lack standing .......................................... 15

        A.    The City of Huntington Beach lacks standing
               under this Court's longstanding limits on the ability
               of political subdivisions to sue their parent State ......... 15

        B.    The parent plaintiffs failed to establish standing .......... 18

            1.    Parent plaintiffs failed to show an injury in
                  fact ......................................................... 19

            2.    Parent plaintiffs failed to show causation and
                  redressability .......................................... 29

    II.    Plaintiffs fail to state a claim for relief ..................... 35

        A.    Parental substantive due process rights are strictly
               limited, especially in the school setting ........................ 36

        B.    Plaintiffs do not assert a fundamental right ................. 39

            1.    There is no fundamental right to control
                  whether school officials respect a transgender
                  or gender nonconforming child's decision to
                  socially transition at school ................................ 39

            2.    There is no fundamental right to compel
                  school officials to relay information related to
                  a child's gender identity or gender expression ... 43

i

## TABLE OF CONTENTS
### (continued)

Page

|  | C. | Plaintiffs do not plausibly allege that AB 1955 infringes any fundamental right | 46 |
|  | D. | Sections 5 and 6 of AB 1955 satisfy any standard of scrutiny | 52 |
| III. |  | The Court need not and should not address the preliminary injunction motion in the first instance | 56 |

Conclusion ........................................................................... 58

Statement of related cases .......................................................... 60

# TABLE OF AUTHORITIES

**Page**

CASES

*Anspach ex rel. Anspach v. City of Phila. Dep't of Pub. Health*
    503 F.3d 256 (3d Cir. 2007) ................................................................. 48, 49

*Arnold v. Bd. of Educ. of Escambia Cnty.*
    880 F.2d 305 (11th Cir. 1989) ............................................................. 48, 49

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ............................................................................... 43

*Babbitt v. United Farm Workers Nat'l Union*
    442 U.S. 289 (1979) ............................................................................... 21

*Bank of Lake Tahoe v. Bank of America*
    318 F.3d 914 (9th Cir. 2003) ................................................................ 31

*Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*
    420 U.S. 128 (1975) ............................................................................... 18

*Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*
    136 F.3d 1360 (9th Cir. 1998) .............................................................. 16

*Butt v. State of Cal.*
    4 Cal. 4th 688 (1992) ............................................................................ 32

*C.N. v. Ridgewood Bd. of Educ.*
    430 F.3d 159 (3d Cir. 2005) ................................................................ 46

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*
    973 F.3d 1010 (9th Cir. 2020) ......................................................... 38, 39

*California v. Texas*
    593 U.S. 659 (2021) ............................................................................... 34

*Central Delta Water Agency v. United States*
    306 F.3d 938 (9th Cir. 2002) ................................................................ 17

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Chino Valley Unified Sch. Dist. v. Newsom*
2025 WL 1151004 (E.D. Cal. Apr. 17, 2025) ........................................... 22

*City of Huntington Beach v. Newsom*
2024 WL 4625289 (9th Cir. Oct. 30, 2024) .............................................. 16

*City of Los Angeles v. Lyons*
461 U.S. 95 (1983) .................................................................................... 31

*City of S. Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*
625 F.2d 231 (9th Cir. 1980) ......................................................... 15, 16, 17

*City of San Juan Capistrano v. Cal. Pub. Utilities Comm'n*
937 F.3d 1278 (9th Cir. 2019) .................................................................. 16

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ...................................................... 19, 24, 25, 30, 34, 35

*Cruzan et rel. Cruzen v. Dir. Mo. Dep't of Health*
497 U.S. 261 (1990) .................................................................................. 36

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*
489 U.S. 189 (1989) .................................................................................. 49

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*
145 S. Ct. 2121 (2025) .............................................................................. 29

*Doe by & through Doe v. Boyertown Area Sch. Dist.*
897 F.3d 518 (3d Cir. 2018) ................................................................ 52, 53

*Doe by Doe v. Austin*
848 F.2d 1386 (6th Cir. 1988) .................................................................. 18

*Doe v. Franklin Square Union Free Sch. Dist.*
100 F.4th 86 (2d Cir. 2024) ...................................................................... 43

*Doe v. Horne*
115 F.4th 1083 (9th Cir. 2024) ................................................................. 42

## TABLE OF AUTHORITIES
### (continued)

Page

*Doe v. Irwin*
  615 F.2d 1162 (6th Cir. 1980) ..................................................... 49

*Doe v. Madison Sch. Dist. No. 321*
  177 F.3d 789 (9th Cir. 1999) ....................................................... 18

*Doe v. Pine-Richland Sch. Dist.*
  2024 WL 2058437 (W.D. Pa. May 7, 2024) ............................ 22

*Dubbs v. Head Start, Inc.*
  336 F.3d 1194 (10th Cir. 2003) ................................................. 41

*Ecological Rts. Found. v. Pac. Lumber Co.*
  230 F.3d 1141 (9th Cir. 2000) ................................................... 24

*Edmo v. Corizon*
  935 F.3d 757 (9th Cir. 2019) ..................................................... 45

*Epona v. Cnty. of Ventura*
  876 F.3d 1214 (9th Cir. 2017) ............................................ 14, 15

*Fields v. Palmdale Sch. Dist.*
  427 F.3d 1197 (9th Cir. 2005) ..................................... 14, 37, 38

*Fleck & Assocs., Inc. v. Phoenix, City of, an Ariz. Mun. Corp.*
  471 F.3d 1100 (9th Cir. 2006) ................................................... 35

*Food & Drug Admin. v. All. for Hippocratic Med.*
  602 U.S. 367 (2024) ................................................ 15, 19, 20, 29

*Foote v. Ludlow Sch. Comm.*
  128 F.4th 336 (1st Cir. 2025) ....................... 40, 41, 43, 45, 47, 48, 49, 52

*Garcia v. Google, Inc.*
  786 F.3d 733 (9th Cir. 2015) ..................................................... 57

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*
  512 F.3d 1112 (9th Cir. 2008) ................................................... 57

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Grimm v. Gloucester Cnty. Sch. Bd.*
  972 F.3d 586 (4th Cir. 2020) ..................................................42, 45

*Gruenke v. Seip*
  225 F.3d 290 (3d Cir. 2000) .........................................................48

*Harrahill v. City of Monrovia*
  104 Cal. App. 4th 761 (2002) ......................................................32

*Hunt v. Wash. State Apple Advert. Comm'n*
  432 U.S. 333 (1977).....................................................................16

*In re Zappos.com, Inc.*
  888 F.3d 1020 (9th Cir. 2018) ...............................................22, 23

*Inland Empire Waterkeeper v. Corona Clay Co.*
  17 F.4th 825 (9th Cir. 2021) ..................................................23, 24

*Int'l Partners for Ethical Care, Inc. v. Ferguson*
  __ F.4th __ (9th Cir. July 25, 2025) ........................23, 24, 25, 26

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*
  650 F.3d 915 (3d Cir. 2011) ...........................................46, 47, 50

*John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*
  78 F.4th 622 (4th Cir. 2023) ....................................22, 24, 25, 26

*Johnson v. Astrue*
  597 F.3d 409 (1st Cir. 2009)........................................................43

*Kaltenbach v. Hilliard City Schools*
  730 F. Supp. 3d 699 (S.D. Ohio 2024) .......................................22

*Kanuszewski v. Mich. Dep't of Health & Hum. Serv.*
  927 F.3d 396 (6th Cir. 2019) .......................................................41

*Krottner v. Starbucks Corp.*
  628 F.3d 1139 (9th Cir. 2010) ....................................................23

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*
132 F.4th 1232 (11th Cir. 2025) .................................................. 48

*Loffman v. Cal. Dep't of Educ.*
119 F.4th 1147 (9th Cir. 2024) .................................................. 15

*Lujan v. Def. of Wildlife*
504 U.S. 555 (1992) ..................................................... 15, 21, 30

*Mae M. v. Komrosky*
111 Cal. App. 5th 198 (2025) ..................................................... 32

*Mahmoud v. Taylor*
606 U.S. __ , 145 S. Ct. 2332 (June 27, 2025) .................. 25, 26, 38, 39, 51

*Mann v. Cnty. of San Diego*
907 F.3d 1154 (9th Cir. 2018) .................................................. 41

*Maryland v. King*
567 U.S. 1301 (2012) .................................................................... 57

*Maya v. Centex Corp.*
658 F.3d 1060 (9th Cir. 2011) .................................................. 35

*Meland v. Weber*
2 F.4th 838 (9th Cir. 2024) .................................................. 28

*Mueller v. Auker*
700 F.3d 1180 (9th Cir. 2012) .................................................. 41

*Murthy v. Missouri*
603 U.S. 43 (2024) ...................................................................... 28, 33

*New York v. Ferber*
458 U.S. 747 (1982) .................................................................... 52

*Ngoun v. Wolf*
517 F. Supp. 2d 1177 (C.D. Cal. 2007) ..................................... 53

vii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Parents for Privacy v. Barr*
    949 F.3d 1210 (9th Cir. 2020) .............................................................38, 50

*Parents Involved in Community. Schools v. Seattle School*
    *District No. 1*
    551 U.S. 701 (2007).................................................................................26

*Parents Protecting Our Children, UA v. Eau Claire Area School*
    *District, Wisconsin*
    95 F.4th 501 (7th Cir. 2024) ......................................................................22

*Parham v. J. R.*
    442 U.S. 584 (1979)..................................................................................41

*Phyllis v. Super. Ct.*
    183 Cal. App. 3d 1193 (1986) .....................................................................7

*Pioneers Mem. Healthcare Dist. v. Imperial Valley Healthcare*
    *Dist.*
    745 F. Supp. 3d 1088 (S.D. Cal. 2024).......................................................17

*Regino v. Staley*
    133 F.4th 951 (9th Cir. 2025) ....................35, 36, 37, 40, 44, 45, 46, 52, 58

*Roberts v. U.S. Jaycees*
    468 U.S. 609 (1984)..................................................................................52

*Shanks v. Blue Cross & Blue Shield of Wis.*
    979 F.2d 1232 (7th Cir. 1992) ...................................................................40

*Short v. New Jersey Dep't of Educ.*
    2025 WL 984730 (D. N.J. Mar. 28, 2025) ...........................................22, 50

*Spokeo, Inc. v. Robins*
    578 U.S. 330 (2016)..............................................................................19, 32

# TABLE OF AUTHORITIES
## (continued)

Page

*Stoyas v. Toshiba Corp.*
  896 F.3d 933 (9th Cir. 2018) ........................................................ 15

*Susan B. Anthony List v. Driehaus*
  573 U.S. 149 (2014) ................................................................ 19, 20

*Tingley v. Ferguson*
  47 F.4th 1055 (9th Cir. 2022) ................................................. 40, 41

*TransUnion LLC v. Ramirez*
  594 U.S. 413 (2021) ................................................................ 28, 30

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*
  489 U.S. 749 (1989) ...................................................................... 53

*United States v. Skrmetti*
  605 U.S. __ , 145 S. Ct. 1816 (2025) .......................................... 44

*Wallis v. Spencer*
  202 F.3d 1126 (9th Cir. 2000) ................................................ 55, 56

*Wash. Env't Council v. Bellon*
  732 F.3d 1131 (9th Cir. 2013) ..................................................... 30

*Washington v. Glucksberg*
  521 U.S. 702 (1997) ........................................................ 36, 37, 46

*Whitmore v. Ark.*
  495 U.S. 149 (1990) ...................................................................... 20

*Winter v. Nat. Res. Def. Council*
  555 U.S. 7 (2008) .......................................................................... 57

## TABLE OF AUTHORITIES
### (continued)

Page

STATUTES

20 U.S.C. § 1232g(a)(1)(A) ................................................................ 6

Cal. Educ. Code
  § 220.3(a) ....................................................5, 6, 9, 30, 32, 34
  § 220.5(a) ....................................................5, 6, 9, 30, 32, 34
  § 220.5(c) .................................................................................. 7
  § 35160 ..................................................................................... 32
  § 35160.1 .................................................................................. 32
  § 49602 ....................................................................................... 7
  § 51101(a)(1) .............................................................................. 6
  § 51101(a)(10) ............................................................................ 6
  § 56035 ..................................................................................... 31

Cal. Fam. Code § 6902 ..................................................................... 40

REGULATIONS

34 C.F.R. § 99.10(a) .......................................................................... 6

OTHER AUTHORITIES

Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of
  Mental Disorders (5th ed. 2013) ................................................. 44

Cal. Dep't of Justice, *Legal Alert: Forced Disclosure Policies re:
  Transgender and Gender Nonconforming Students*, OAG-
  2024-02 (Jan. 11, 2024) ............................................................. 5, 7

Cass Review, *Final Report: Independent Review of Gender
  Identity Services for Children and Young People* (2024) ............... 21

City of Huntington Beach, Adopt Ordinance No. 4326 (Sept. 17,
  2024) ....................................................................................... 17

x

## TABLE OF AUTHORITIES
### (continued)

**Page**

Esther Gómez-Gil et al., *Familiality of Gender Identity Disorder in Non-Twin Siblings*, 39 Arch. of Sexual Behavior 546 (2010) ................................................................................................21

S.F. Unified Sch. Dist. Admin. Reg. 5145.4.......................................................33

William Byne et al., *Report of the APA Task Force on Treatment of Gender Identity Disorder*, 169 Am. J. Psych. Data suppl. 4 (2012).............................................................................................28, 29

World Health Org., *Gender Incongruence and transgender health in the ICD* (last accessed Aug. 12, 2025) .................................................44

## INTRODUCTION

The California Legislature enacted Assembly Bill 1955 after finding that LGBTQ youth thrive when they are able to share their sexual orientation and gender identity with others—including their parents—when they are ready.  The Legislature recognized that parents and families play an important role in shaping students' lives.  It also found that outing LGBTQ students to their families without their consent hinders their ability to learn and succeed in school, undermines their relationships with their families, and puts far too many at risk of physical and psychological harm.

To balance these considerations, the Legislature narrowly crafted AB 1955 to prohibit only those school policies that require school officials to out LGBTQ students without the student's consent.  In other words, the Legislature prohibited blanket outing mandates that do not permit school officials to take account of individualized considerations, such as whether disclosure would serve the student's well-being or put the student at serious risk of harm.  AB 1955 does not require schools to adopt policies prohibiting school officials from disclosing information to parents.  It also does not restrict or otherwise regulate permissive school policies that allow for disclosure in certain circumstances and account for concerns such as a student's well-being.  And AB 1955 does not interfere with any disclosures that are required under federal or state law.

1

A group of parents and the City of Huntington Beach contend that AB 1955's limited prohibition unconstitutionally infringes parental substantive due process rights to decide whether school officials can respect their children's requests to socially transition at school (which they allege is medical treatment) and to be notified if their children identify as transgender (which they allege is a form of psychological distress and symptomatic of mental illness). The upshot of that argument is extraordinary: that the Constitution *compels* school districts to adopt mandatory disclosure policies as a matter of substantive due process doctrine and that more permissive, nuanced school policies—such as policies that allow disclosure when consistent with the student's well-being—are never constitutional.

The district court properly rejected that far-reaching claim. It dismissed many of plaintiffs' claims for lack of standing, and rightly so. Although plaintiffs' standing theories are flawed in many respects, the principal problem is that AB 1955 does not bar any school officials from disclosing the information that plaintiffs seek. For that reason, plaintiffs cannot show that any form of judicial relief would redress their asserted injuries. Plaintiffs' claims also fail on the merits. They have not plausibly identified any invasion of a fundamental right. For that reason, they are not entitled to relief on substantive due process grounds, and this Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether plaintiffs lack Article III standing to challenge Sections 5 and 6 of Assembly Bill 1955.

2. Whether plaintiffs fail to state a claim for relief.

3. Whether plaintiffs' motion for preliminary injunction is moot because plaintiffs lack standing and fail to state a claim for relief.

## STATEMENT OF THE CASE

### A.   Background

In response to a growing number of "[a]ttacks on the rights, safety, and dignity" of LGBTQ youth in schools, the California Legislature in July 2024 enacted Assembly Bill 1955, known as the Support Academic Futures and Educators for Today's Youth Act.  *See* 4-ER-707–708.  In so doing, the Legislature expressed particular concern about "forced outing" policies.  4-ER-708.  Those policies single out transgender and gender nonconforming students for discriminatory treatment by requiring school staff to notify parents when a student identifies as transgender or gender nonconforming or requests to use a name and pronouns consistent with that identity.  *Id.*  And those policies typically apply even if the student expressly does not consent to parental notification and even if notifying the parent poses a serious risk of physical or psychological harm to the student.  *Id.*

3

The Legislature recognized that LGBTQ students—like all students—deserve to feel safe and supported at school so that they can learn and thrive.  4-ER-708–709.  The Legislature also recognized that forced outing policies hinder that objective:  "Choosing when to 'come out' by disclosing an LGBTQ+ identity, and to whom, are deeply personal decisions, impacting health and safety as well as critical relationships, that every LGBTQ+ person has the right to make for themselves."  4-ER-708.  Forced outing policies deny LGBTQ students the ability to make those decisions and thereby "remove opportunities for LGBTQ+ young people and their families to build trust and have these conversations when they are ready."  *Id*.  They also put many LGBTQ students at risk of physical, mental, and emotional harm.  *Id*.  The Legislature reviewed research finding that "57% of LGBTQ youth reported parental rejection"—ranging from "mocking" to "physical abuse and being kicked out of the home"—and that such rejection is associated with a heightened risk of depression, suicide, substance abuse, homelessness, and sexual risk-taking.  4-ER-626–628.  Given these risks, forced outing policies deter LGBTQ students from seeking needed support at school.  4-ER-628.  For example, one study reviewed by the Legislature found that 44% of LGBTQ youth who experienced harassment at school did not report it due to fear that school officials would "out them to their family."  *Id.*

4

At the same time, the Legislature also recognized that "[p]arents and families have an important role to play in the lives of young people," and that "LGBTQ+ youth thrive when they have parental support and feel safe sharing their full identities with them." 4-ER-708. To accommodate the concerns about forced outing policies and the benefits of parental support, the Legislature crafted AB 1955 to prohibit only mandatory school policies—policies that *require* school employees to out LGBTQ students even where the student does not consent to that disclosure. 4-ER-708–711; Cal. Educ. Code §§ 220.3(a), 220.5(a).

AB 1955 does not mandate that schools adopt non-disclosure policies or otherwise obligate schools to keep gender-identity and related information secret from parents. Nor does it prohibit or otherwise regulate permissive school policies that *allow* school employees to disclose information, including pursuant to considerations like a student's physical or mental well-being.[1] And AB 1955 expressly does not interfere with circumstances in which federal or state law

---

[1] AB 1955 is not the only authority relevant to the legality of disclosure or non-disclosure policies. Any such policy would, of course, have to comply with other constitutional and statutory limits, such as the State's Equal Protection Clause. *See, e.g.*, Cal. Dep't of Justice, *Legal Alert: Forced Disclosure Policies re: Transgender and Gender Nonconforming Students*, OAG-2024-02 at 2, http://bit.ly/3GnYR3L (Jan. 11, 2024).

requires school employees to report covered information to parents.  Cal. Educ. Code §§ 220.3(a), 220.5(a).[2]

Specifically, Section 5(a) of AB 1955 provides that "[a]n employee or a contractor of a school district, county office of education, charter school, or state special school for the blind or the deaf shall not be required to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law."  4-ER-710; Cal. Educ. Code § 220.3(a).  Section 6(a) similarly provides that no school district or other covered agency or office shall "enact or enforce any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law."  4-ER-710–711; Cal. Educ. Code § 220.5(a).

---

[2] For example, provisions of the federal Family Educational Rights Privacy Act and similar state laws allow parents to request and receive their child's school records and to visit their child's classroom.  *See, e.g.*, 20 U.S.C. § 1232g(a)(1)(A) (parental "right to inspect and review the education records of their children"); 34 C.F.R. § 99.10(a) (same); *see also* Cal. Educ. Code §§ 51101(a)(1), (10) (parental right "to observe [their child's] classroom" and "have access to the school records of their child").

Any policy "that is inconsistent with [Section 6(a)] is invalid and shall not have any force or effect." 4-ER-711; Cal. Educ. Code § 220.5(c).[3]

AB 1955 accordingly does not prohibit schools from disclosing information to parents, for example, when a student's health and well-being are at risk. "[F]easible and effective alternatives to forced disclosure policies"—alternative policies that AB 1955 in no way restricts—include "allow[ing] disclosure where a student does not consent where there is a compelling need to do so to protect the student's wellbeing." Cal. Dep't of Justice, *Legal Alert*, *supra*, at 2. Under state law, schools may notify parents—and, in some instances, *must* notify parents— when staff learn of significant risks to student safety. *See, e.g.*, Cal. Educ. Code § 49602 (allowing disclosure of confidential communications to school counselor where "necessary to avert a clear and present danger"); *cf. Phyllis v. Super. Ct.*, 183 Cal. App. 3d 1193, 1196 (1986) (school had tort duty to notify parents that 8-year-old student had been sexually assaulted at school).

---

[3] Other sections of AB 1955 aim to "support LGBTQ+ pupils and their parents and families in working towards family acceptance on their own terms" and to ensure that students can access "safe and supportive learning environments." 4-ER-708–709. Section 3 requires the California Department of Education to develop resources to better support LGBTQ middle- and high-school students and their families. 4-ER-709–710. Section 4 prohibits school officials from retaliating against employees who comply with state education and anti-discrimination laws and support students in exercising their rights under the same. 4-ER-710.

AB 1955 also does not call for school officials to have any role in whether, when, or how a student requests to use a name and pronouns consistent with their gender identity at school.  Nor does it speak to whether school officials must honor such requests.  And it does nothing to prevent students from choosing to share information about their gender identity and gender expression with their parents, or to prevent parents from talking with their children about gender identity and gender expression.  AB 1955 has been in effect since January 1, 2025.  1-ER-5.

## B.    Procedural History

Two months after the Legislature enacted AB 1955, the City of Huntington Beach and nine parents filed this lawsuit challenging Sections 5 and 6 of AB 1955 as unconstitutional.  4-ER-729.  Parent plaintiffs alleged that Sections 5 and 6, as related to gender identity and gender expression (but not sexual orientation), violate their substantive due process rights to make medical decisions for their children and to receive medical information about them.  4-ER-693–696, 4-ER-698–701.  They also alleged that the provisions are an unconstitutional condition on access to public education.  4-ER-697–698.  Plaintiff Huntington Beach pled one Declaratory Judgment Act claim, seeking a declaration that AB 1955 would not prevent it from enforcing a local ordinance providing that "[n]o educators in the City of Huntington Beach, including, but not limited to, instructors, counselors, or other adults entrusted with the teaching or caring of children, who work in the

8

City's Libraries, Parks, City Recreational Facilities, Community Services

Facilities, or other City facilities or City sponsored programming shall withhold

any information related to a child's sexual orientation, gender identity, or gender

expression to Parents of said children with or without the child's consent." 4-ER-

701–702, 4-ER-715.  None of those city facilities (or any city entity) is covered by

AB 1955.  *See* Cal. Educ. Code §§ 220.3(a), 220.5(a).[4]

After defendants moved to dismiss the original complaint for lack of standing

and failure to state a claim, 4-ER-736–737, plaintiffs filed an amended complaint,

adding one parent plaintiff and dropping Governor Gavin Newsom as a defendant.

*See* 1-ER-6.  Defendants again moved to dismiss pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).  4-ER-738–739.  After that motion was fully

briefed, and six months after plaintiffs first filed their suit and several months after

AB 1955 went into effect, plaintiffs moved for a preliminary injunction.  4-ER-

740–741.

The district court denied the preliminary injunction motion as moot when it

granted defendants' motion to dismiss.  1-ER-3–37.  The district court held that

Huntington Beach lacks standing because political subdivisions cannot sue the

State to challenge the validity of a state law under the federal constitution.  1-ER-

---

[4] Plaintiffs' unconstitutional conditions and declaratory judgment claims rise
and fall with their substantive due process claims.  1-ER-35–36; Opening Br. 63
n.6.

8–9.  The district court also held that the parent plaintiffs lack standing with respect to children who are not at "substantial risk" of identifying as transgender or gender nonconforming.  1-ER-12–13, 1-ER-15, 1-ER-17, 1-ER-37.[5]  With respect to the parents of children who have *already* identified as transgender or gender nonconforming, however, the district court held that all but one satisfied Article III for purposes of the motion-to-dismiss stage.  1-ER-14–15.[6]  In the court's view, these parents had "establish[ed] a substantial risk" that their children may "revert to identifying with their biological sex," but then "change gender identities [and] . . . choose to socially transition . . . at school" without informing the parents.  1-ER-15.  On the merits, the district court held that they did not plausibly allege that AB 1955 infringes any substantive due process right.  1-ER-18–36.

Huntington Beach and eight of the ten parent plaintiffs appealed the district court's dismissal order and the order denying the preliminary injunction as moot.

_____

[5] The parents in this group are 3A, 6A, and 10A, as well as 4A, 5A, and 8A with respect to their children 4D, 5D, and 8D.  1-ER-12, 1-ER-15, 1-ER-37.

[6] The parents in this group that the district court deemed to have standing are 4A, 5A, and 8A with respect to their children 4C, 5C, and 8C, and parent 7A.  1-ER-14–15, 1-ER-17.  The district court held that parent 2A failed to adequately allege redressability because she did not plead that, absent AB 1955, her child's school "would be amenable to disclosing any changes to 2C's gender identity without the child's consent."  1-ER-17.

4-ER-718.[7]  On June 28, two weeks after the dismissal order, plaintiffs moved in the district court for an injunction pending appeal.  4-ER-746.  One week later, plaintiffs filed an emergency motion in this Court, seeking interim injunctive relief as to a subset of parents and children and requesting for the first time that such relief be entered by July 21.  C.A. Dkt. 9.1.  This Court denied plaintiffs' request for relief by July 21 in light of plaintiffs' failure to seek "assertedly emergency relief with appropriate dispatch."  C.A. Dkt. 20.  Plaintiffs' request before the district court remains pending, as does the remainder of their request for an injunction pending appeal from this Court.

## SUMMARY OF ARGUMENT

Plaintiffs lack standing and fail to state a claim for relief.  This Court should affirm the dismissal of plaintiffs' claims and the dismissal of their motion for preliminary injunction as moot.

The City of Huntington Beach lacks standing under longstanding circuit precedent.  This Court long ago held in *South Lake Tahoe* that political subdivisions lack standing to sue their parent State over alleged violations of the federal Constitution.  This Court has repeatedly applied that rule in recent decades, including where, as here, the plaintiff is a California charter city.

---

[7] Parents 1A and 9A have not appealed the district court's order dismissing their claims.  *See* 4-ER-718; Opening Br. i, 13.

The parent plaintiffs likewise lack standing. They allege a speculative future injury: that school officials will elect not to disclose information related to their child's gender identity or gender expression, thereby preventing parents from exercising alleged substantive due process rights. But there is no plausible basis to think any such injury is certainly impending or at a substantial risk of occurring. Several parents do not even allege that their children are or are substantially likely to be transgender or gender nonconforming. And the other parents allege that they are already aware that their children identify as transgender or gender nonconforming. Those parents have not explained how they are harmed by the withholding of information that they already know.

The parents' standing theory also fails on causation and redressability grounds. No plaintiff persuasively explains how any information related to their child's gender identity or gender expression could be withheld *because of* AB 1955. AB 1955 is limited in scope: it bars only mandatory policies that require disclosure, regardless of an individual student's circumstances. Accordingly, an injunction against enforcement of AB 1955 would not ensure that plaintiffs receive any information about their children. A school district would remain free to adopt a policy forbidding disclosure or allowing disclosure based on a student's individual circumstances. And plaintiffs provide no plausible basis to

conclude that their children's school districts would alter their policies in any way if AB 1955 were enjoined.

Plaintiffs also fail to state a claim for relief on the merits. The doctrine of substantive due process requires application of strict scrutiny only where plaintiffs identify the infringement of a fundamental right—that is, a right deeply rooted in the Nation's history and traditions. Here, plaintiffs have not done so. There is no fundamental right for parents to control whether school officials respect a transgender or gender nonconforming child's decision to socially transition at school by using the name and pronouns that reflect the child's gender identity. Nor is there a fundamental right for parents to compel school officials to relay information related to a child's gender identity or gender expression.

Plaintiffs invoke cases recognizing a limited parental right to direct a child's medical treatment in certain circumstances. But respecting a person's gender identity—something laypeople regularly do in the course of daily life as a matter of common courtesy—is not a form of medical treatment. And contrary to plaintiffs' assertions, identifying as transgender or gender nonconforming does not in and of itself mean that an individual suffers from psychological distress or mental illness.

But even if plaintiffs' allegations did somehow implicate a cognizable substantive due process right, they have failed to plausibly allege that AB 1955 materially burdens that right. AB 1955 does not concern whether a school official

13

must honor a transgender student's request to use a name or pronouns consistent with their gender identity. Nor does it mandate non-disclosure of that information to parents. It merely prohibits school districts and other covered entities from adopting extreme policies that mandate disclosure. And because that prohibition serves compelling government interests in protecting the safety, well-being, and privacy of transgender and gender nonconforming students, the statute would survive any applicable form of scrutiny, including strict scrutiny.

The Court should affirm the district court's dismissal of plaintiffs' complaint. If the Court affirms, it need not reach plaintiffs' request for a preliminary injunction—which fails in any event. For the foregoing reasons, plaintiffs have not shown a likelihood of success or risk of irreparable harm. And the equities and public interest weigh strongly in favor of leaving in place an important protection for LGBTQ students.

## ARGUMENT

This Court reviews de novo a district court's order granting a motion to dismiss. *See Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1203 (9th Cir. 2005). Where a district court dismisses a plaintiff's claims and then denies a motion for a preliminary injunction as moot, the Court limits its review to the dismissal order and remands (if necessary) for the district court to consider in the first instance whether to award a preliminary injunction. *See, e.g., Epona v. Cnty. of Ventura*,

876 F.3d 1214, 1227 (9th Cir. 2017); *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1171-1172 (9th Cir. 2024). Consistent with that practice, this Court should focus narrowly on the complaint's allegations and disregard plaintiffs' citations to their evidentiary submissions filed in connection with their preliminary injunction motion.[8]

## I.   PLAINTIFFS LACK STANDING

The core requirements for Article III standing are injury, causation, and redressability. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992). Here, no plaintiff has satisfied their burden.

### A.   The City of Huntington Beach Lacks Standing Under This Court's Longstanding Limits on the Ability of Political Subdivisions to Sue Their Parent State

The district court correctly held that Huntington Beach lacks standing. 1-ER-8–10. As plaintiffs concede, *see* Opening Br. 34, circuit precedent has long established that political subdivisions, including charter cities, lack standing in federal court to challenge state laws under the federal constitution. *See, e.g.*, *City*

---

[8] *See, e.g.*, *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 938 (9th Cir. 2018) (review of a motion to dismiss "'is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice'").

*of S. Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233-234 (9th Cir. 1980); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998); *City of Huntington Beach v. Newsom*, 2024 WL 4625289, at *1 (9th Cir. Oct. 30, 2024).  That rule is often referred to as "*South Lake Tahoe*," based on the name of the case that first recognized it.  Although some jurists have questioned *South Lake Tahoe* as applied to claims under the Supremacy Clause, *see, e.g.*, *City of San Juan Capistrano v. Cal. Pub. Utilities Comm'n*, 937 F.3d 1278, 1283 (9th Cir. 2019) (R. Nelson, J., concurring), there is no serious question that political subdivisions lack standing to assert the sole claim at issue here.  *See id.* at 1283-1284 ("all circuit courts and the Supreme Court bar due process claims" by political subdivisions against their parent State).

Huntington Beach seeks to circumvent *South Lake Tahoe* by styling its standing theory as one of "associational standing."  *E.g.*, Opening Br. 35.  But associational standing is a doctrine that allows an association to raise claims on behalf of its members.  *See generally Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Although governmental bodies occasionally act in ways akin to private associations, *see, e.g.*, *id.* at 342-344, Huntington Beach is not doing so in any ways relevant here.  It is asserting federal constitutional claims on behalf of a subset of the private individuals who reside in the city.  Many other city

16

residents surely support AB 1955—or at least oppose this litigation.[9]  And if harm to a subset of city residents sufficed to allow a political subdivision to sue on associational-standing grounds, there would effectively be nothing left of *South Lake Tahoe*'s longstanding rule.  It would be trivially easy for a political subdivision to identify a small number of residents who have allegedly suffered harm from a state law or policy.  *Cf. Pioneers Mem. Healthcare Dist. v. Imperial Valley Healthcare Dist.*, 745 F. Supp. 3d 1088, 1101-1102 (S.D. Cal. 2024) (rejecting political subdivision's attempt to plead around *South Lake Tahoe* with "third party" standing).

The principal case invoked by Huntington Beach in support of its associational standing theory—*Central Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002)—is far afield.  That case did not implicate *South Lake Tahoe*; it involved a suit against the federal government, not a state government.  It also involved government water agencies that functioned as "traditional trade association[s]" by representing the interests of certain farmers who used large amounts of water.  *Id.* at 951 n.8; *see* 1-ER-10 ("The City [of Huntington Beach] does not represent an industry, nor does it function like a traditional trade association.").

---

[9] *See* City of Huntington Beach, Adopt Ordinance No. 4326 (Sept. 17, 2024), http://bit.ly/44TUs0l (adopting mandatory disclosure ordinance by a closely divided 4-3 vote after hearing speakers both in favor and opposed).

17

## B.    The Parent Plaintiffs Failed to Establish Standing

Of the ten parent plaintiffs, the district court held that five lack standing and five have alleged sufficient facts to support standing at the current stage of proceedings.  1-ER-17; *see supra* p. 10.  The first group are parents of children who have not exhibited signs of identifying as transgender or gender nonconforming, plus one parent of a transgender child who failed to show redressability.  The second group are parents who are already aware that their children identify as transgender or gender nonconforming and are already aware of how their children express their identities at school.[10]   The district court should have rejected standing as to both groups of parents:  neither can satisfy the requirements of injury, causation, or redressability.

---

[10] Parents with children in the first category are 2A, 3A, 6A, 9A, and 10A.  *See* 1-ER-12–13, 1-ER-16–17.  Parents with children in the second category are 1A, 4A, 5A, 7A, and 8A.  *See* 1-ER-14–17.  (Parents 4A, 5A, and 8A also have children in the first category, and the district court held they lack standing as to those children.  1-ER-15.)

Two of the parents—1A and 9A—have not appealed, so their claims are no longer at issue.  *Supra* p. 11 n.7.  And two other parents have claims that are now moot—one (5A) because the relevant child (5C) has graduated from high school, *see* 4-ER-647, and another (8A) because the relevant child (8C) turned 18, *see* C.A. Dkt. 9.1 at 12; *see e.g.*, *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) ("A student's graduation moots claims for declaratory and injunctive relief."); *Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (similar); *see also Doe by Doe v. Austin*, 848 F.2d 1386, 1392-1393 (6th Cir. 1988) (recognizing that parental due process rights have little, if any, force once a child turns 18 and becomes an adult).

18

### 1.    Parent plaintiffs failed to show an injury in fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized'"— meaning "it 'must affect the plaintiff in a personal and individual way'" and be "'real,' and not 'abstract.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-340 (2016). The injury must also be "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. A plaintiff alleging "future injury" must show that "the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). A future injury that "relies on a highly attenuated chain of possibilities" does not suffice. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

Here, parent plaintiffs allege a future injury: that school officials will elect not to disclose information related to their child's gender identity or gender expression and thereby prevent them from exercising alleged substantive due process rights. 4-ER-690–701. That theory of injury depends on a series of events all materializing: The child must (1) identify as transgender or gender nonconforming; (2) tell their school about their gender identity or otherwise express that identity at school; and (3) ask their school not to share that information with their parents. And then (4) the school must decide not to inform

19

the parents of the child's gender identity or expression.  1-ER-13.  Parent plaintiffs' "allegations do not establish that this chain of events is certainly impending or at a substantial risk of occurring."  *Id.*

a.  With respect to parents of children in the first category discussed above (*supra* p. 18 & n.10), their standing theory fails at the first step because they do not allege that their children are transgender or gender nonconforming.  1-ER-12–15; *see* 4-ER-643–645, 4-ER-647, 4-ER-649–650, 4-ER-656–659.  Nor do they plausibly allege that their children are substantially likely to identify as transgender or gender nonconforming, let alone anytime "soon."  *All. for Hippocratic Med.*, 602 U.S. at 381; *see also Whitmore v. Ark.*, 495 U.S. 149, 155 (1990) (injury in fact "must be concrete in both a qualitative and temporal sense").

Plaintiffs merely point to certain characteristics that they view as "risk factors" for identifying as transgender or gender nonconforming, Opening Br. 14— namely, an ADHD diagnosis, *e.g.*, *id.* at 6, an autism diagnosis, *e.g.*, *id.* at 14, 29, and having a sibling who is transgender or gender nonconforming, *e.g.*, *id.* at 6.  But plaintiffs' complaint does not identify any plausible basis for treating those characteristics as genuine "risk factors"—and certainly fails to identify any basis for treating those factors as sufficient to support the "substantial risk" necessary to show Article III standing.  *E.g.*, *Susan B. Anthony List*, 573 U.S. at 158.  Plaintiffs instead point to a report noting "limited data" showing a possible correlation

between "autism spectrum condition" or ADHD and transgender identity or expression. Cass Review, *Final Report: Independent Review of Gender Identity Services for Children and Young People* 5 (2024), https://tinyurl.com/y8z6xjxz, cited at 4-ER-678. Similarly, plaintiffs invoke a report merely speculating that there "may" be a relationship between having a transgender sibling and identifying as transgender. Esther Gómez-Gil et al., *Familiality of Gender Identity Disorder in Non-Twin Siblings*, 39 Arch. of Sexual Behavior 546, 550 (2010), http://bit.ly/46S9gzt, cited at 4-ER-678–679. The report acknowledges, however, that any "absolute percentage is quite low" and that the "study had a number of limitations." *Id.* Those "'conjectural'" correlations are too "'speculative'" to establish an "'actual or imminent'" injury. *Lujan*, 504 U.S. at 560-561; *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (plaintiff must establish a "realistic danger of sustaining a direct injury").

Plaintiffs' remaining "risk" factors are similarly unpersuasive. Being "very interested in colors, patterns, symbols, and rainbows," 4-ER-644, is plainly insufficient to establish a likelihood that the child will later identify as transgender or gender nonconforming. *See* 1-ER-13. And although one child discussed in the complaint has sometimes "dress[ed] . . . in girl's clothing," *id.*, a therapist who saw the child for "many months" "confirmed that, despite the pattern of repeated dress

wearing when [the child] is with his mother, [the child] has no signs of gender dysphoria, gender incongruence, or [being transgender]," 4-ER-650.

Other circuits have held that similar allegations by parents challenging school gender-identity non-disclosure policies are insufficient to show actual or imminent injury, and the Supreme Court has declined to review those decisions. For example, in *Parents Protecting Our Children, UA v. Eau Claire Area School District, Wisconsin*, 95 F.4th 501, 504-506 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 14 (2024), the Seventh Circuit held that parents lacked standing where they failed to allege that their children "had questioned their gender identity or otherwise sought guidance or support under the school district's policy." Mere "expressions of worry and concern," the Court held, "do not suffice to show" injury. *Id.*; *see also John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629-631 (4th Cir. 2023) (similar), *cert. denied*, 144 S. Ct. 2560 (2024).[11]

Plaintiffs' allegations are wholly unlike those in the cases that they invoke. *See* Opening Br. 27. For example, in *In re Zappos.com, Inc.*, 888 F.3d 1020, 1026-

---

[11] Several district courts have held that parent plaintiffs advancing similar allegations lack standing. *See, e.g.*, *Chino Valley Unified Sch. Dist. v. Newsom*, No. 2:24-cv-01941, 2025 WL 1151004, at *5 (E.D. Cal. Apr. 17, 2025), *appeal docketed*, No. 2503686 (9th Cir.); *Short v. New Jersey Dep't of Educ.*, No. 23-21105, 2025 WL 984730, at *12-13 (D. N.J. Mar. 28, 2025); *Doe v. Pine-Richland Sch. Dist.*, No. 2:24-cv-51, 2024 WL 2058437, *4-9 (W.D. Pa. May 7, 2024), *appeal docketed*, No. 24-3348 (3d Cir.); *Kaltenbach v. Hilliard City School*s, 730 F. Supp. 3d 699, 703-704 (S.D. Ohio 2024), *appeal dismissed for lack of jurisdiction*, No. 24-3336, 2025 WL 1147577 (6th Cir. Mar. 27, 2025).

1027 (9th Cir. 2018), the Court held that the theft of a laptop with personal

identifying information established injury because the thief "had all the

information he needed to open accounts or spend money in the plaintiffs' names."

For that reason, there was "a 'substantial risk' of injury." *Id.* If plaintiffs had

merely alleged a "'risk that [the laptop] would be stolen at some point in the

future,'" their allegations would have been too speculative to show standing. *Id.*

(quoting *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010)).

Similarly here, plaintiffs have not alleged facts to show a substantial, non-

speculative risk of injury. *Supra* pp. 20-22.

Plaintiffs attempt to exempt themselves from Article III's requirement that

they show a non-speculative risk of injury, but their arguments are unavailing.

Contrary to plaintiffs' assertion, this Court has not held that any "*risk* of harm"—

no matter how small—establishes standing. Opening Br. 27. As this Court

recently explained, "[a]lthough probabilistic harm can create standing, it does not

replace the foundational rule that a future injury must be imminent in order to

satisfy the injury-in-fact requirement." *Int'l Partners for Ethical Care, Inc. v.*

*Ferguson*, __ F.4th __, 2025 WL 2089421, at *9 (9th Cir. July 25, 2025).

Consistent with that settled rule, in the cases plaintiffs cite, the Court allowed

plaintiffs to challenge violations of environmental statutes because the alleged

violations either substantially harmed the environment, *see Inland Empire*

*Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 832 (9th Cir. 2021) ("noticeable decrease in water quality conditions"), or posed a significant risk of harm, *see Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1144, 1150-1151 (9th Cir. 2000) (pointing to the risk of harm to a creek's water quality due to runoff from two sawmill facilities that drained into the creek).

Plaintiffs allege nothing remotely comparable here. Instead, their theories of harm "rely on an enormity of 'ifs' and 'shoulds,' without any detail or explanation as to when or why these contingencies might occur.'" *Int'l Partners for Ethical Care*, __ F.4th at __, 2025 WL 2089421, at *8. Plaintiffs' "amorphous and insufficiently explained concerns about 'some day' injuries are 'simply not enough' to satisfy Article III." *Id.*

Parent plaintiffs suggest that they need not show a substantial risk of harm because they may never learn that their children have identified as transgender or gender nonconforming at school. *See* Opening Br. 30-31. The Fourth Circuit properly rejected a similar argument under the Supreme Court's reasoning in *Clapper*. *See John & Jane Parents 1*, 78 F.4th at 631. This Court should follow the same course.

*Clapper* considered a challenge to Section 702 of the Foreign Intelligence Surveillance Act by lawyers and organizations who were concerned that their privileged and confidential communications with foreign clients and colleagues

24

would be intercepted. *See* 568 U.S. at 406. The Supreme Court held that the plaintiffs lacked standing because they had failed to allege that such interceptions had occurred or were "certainly impending." *Id.* at 410. Instead, plaintiffs had "relie[d] on a highly attenuated chain of possibilities." *Id.* In the Court's view, it did not matter that the plaintiffs had "no actual knowledge" of how the government targeted foreign communications; it was still plaintiffs' "burden to prove their standing by pointing to specific facts, not the Government's burden to disprove standing by revealing details of its surveillance priorities." *Id.* at 411, 412 n.4 (citation omitted). Similarly here, parent plaintiffs rely on a highly attenuated chain of hypotheticals. And the mere possibility that they may not receive information from school officials about their children's gender identities does not relieve parent plaintiffs of their obligation to allege a certainly impending or substantial risk of harm. *See John & Jane Parents 1*, 78 F.4th at 631.[12]

Nor does *Mahmoud v. Taylor*, 606 U.S. __, 145 S. Ct. 2332 (June 27, 2025), relieve parent plaintiffs of their burden to show that a future injury is certainly

---

[12] Parent 3A also alleges that she is injured by feeling "forced" by AB 1955's existence "to begin discussing gender issues with 3C at a much earlier age than she would have otherwise." 4-ER-645. As the district court held, however, "plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" 1-ER-13 (quoting *Clapper*, 568 U.S. at 416); *see also Int'l Partners for Ethical Care*, __ F.4th at __, 2025 WL 2089421, at *6 (parents' changes to their parenting styles in response to state laws not yet applied to them were "not sufficient to confer standing").

impending or at substantial risk of occurring.  *See* Opening Br. 30.  *Mahmoud*

addressed the merits of a free exercise claim, not Article III standing.  And in

*Mahmoud*, the parent plaintiffs demonstrated a substantial risk of harm:  they

challenged a school system's use of books as part of its curriculum, and it was

undisputed that teachers were "requir[ed] . . . to use [the books] as part of

instruction" and "encouraged . . . to approach classroom discussions in a certain

way."  *Mahmoud*, 145 S. Ct. at 2358.  Here, by contrast, it is far from "clear and

undisputed" that the complained-of conduct will ever occur.  *See also Int'l*

*Partners for Ethical Care*, __ F.4th at __, 2025 WL 2089421, at *10 ("standing in

pre-enforcement cases still requires 'circumstances that render the threatened

enforcement sufficiently imminent'").  As discussed above, *supra* pp. 20-22,

plaintiffs have not plausibly alleged that their children are or are substantially

likely to be transgender or gender nonconforming, let alone that they will express

those identities at school, ask school officials not to share that information with

their parents, and have that request honored.[13]

---

[13] This case also bears no material resemblance to *Parents Involved in Community. Schools v. Seattle School District No. 1,* 551 U.S. 701 (2007), which involved the unique harm of being "forced to compete in a race-based system." 551 U.S. at 719; *see John & Jane Parents 1*, 78 F.4th at 634-635 (rejecting parent plaintiffs' reliance on *Parents Involved*); 1-ER-14 (same); *contra* Opening Br. 31-32.  Plaintiffs do not allege any such injury here.

b.  The parent plaintiffs with children in the second category discussed above, *supra* p. 18 & n.10, acknowledge that they know their children are transgender or gender nonconforming and have expressed that identity at school.  Parent 7A, for example, alleges that she has known for more than three years that 7C is transgender and that she knows school officials have referred to 7C by a name consistent with 7C's gender identity for the last two years.  4-ER-651–652.[14] These parents cannot plausibly be injured by a school official's decision not to provide them with information that they already know.

Plaintiffs assert that a parent is injured every time a school official uses a student's requested name and pronouns without providing notice to the parent.  *See* 4-ER-690 (alleging that "[t]he 'loss of information is not a one-time event,'" but encompasses "each time that a child requests . . . social transitioning").  But they offer no explanation of how they are separately injured each time a school official respects a student's gender identity.  Nor do they identify any additional burden on their alleged substantive due process rights where the parent already knows that the child identifies as transgender or gender nonconforming and expresses that identity

---

[14] *See also* 4-ER-642–643 (2A alleging that 2C "'came out' to her parents "as 'trans-identified'" a year-and-a-half ago but has "agreed with her parents to use her legal name and female pronouns with all school staff"); 4-ER-646 (4A alleging that she knows that 4C "began identifying as 'trans'" several years ago and that school officials "generally" used a name and pronouns corresponding with 4C's gender identity); 4-ER-654–656 (8A alleging that she knows that her adult child 8C identifies as transgender and expresses that identity at school).

27

at school.  *See generally TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021)

("An 'asserted informational injury that causes no adverse effects cannot satisfy

Article III.'").

Plaintiffs also contend that identifying as transgender is not "an immutable

characteristic" and that some people "desist or detransition."  4-ER-673, 4-ER-690.

Their theory of injury appears to be that their children are likely to stop identifying

as transgender, and then later again identify as transgender, seek to express that

identity at school, and ask their school officials not to share that information with

their parents.  The district court erred in crediting that theory as establishing a

substantial risk of future harm.  1-ER-15.  *See, e.g.*, *Meland v. Weber*, 2 F.4th 838,

843 (9th Cir. 2024) (reviewing de novo whether plaintiff adequately alleged

Article III standing).  Plaintiffs' proffered chain of events is far too speculative and

generalized to satisfy Article III's injury requirement.  *See, e.g.*, *Murthy v.

Missouri*, 603 U.S. 43, 58-62 (2024).

And plaintiffs' own allegations undercut their theory.  Plaintiffs invoke a

paper authored by the American Psychiatric Association for the proposition that

their adolescent children will change their minds about their gender identity.  *See*

4-ER-675.  But the paper does not support that assertion.  It instead observes that

individuals who identify as transgender or gender nonconforming in adolescence

are likely to continue doing so as adults.  *See* William Byne et al., *Report of the*

28

*APA Task Force on Treatment of Gender Identity Disorder*, 169 Am. J. Psych. Data suppl. 4 (2012), https://tinyurl.com/4wy4w7xh, cited at 4-ER-675.  The high "desistence rates" that plaintiffs allege are with respect to *prepubertal* children with gender dysphoria who no longer identify as transgender or gender nonconforming as adolescents.  *See* 4-ER-674–675.  No plaintiff alleges that they have a prepubertal child with gender dysphoria; rather, their transgender or gender nonconforming children are all adolescents.  *See* 4-ER-641, 4-ER-645, 4-ER-651, 4-ER-653.

Finally, parent plaintiffs have argued that they must have standing to challenge AB 1955 because if they cannot show a cognizable injury, no parent can.  *See* C.A. Dkt. 23.1 at 2, 4.  But the Supreme Court has "long rejected that kind of 'if not us, who?' argument."  *All. for Hippocratic Med.*, 602 U.S. at 396.  To challenge AB 1955 in federal court, plaintiffs must satisfy all required elements of Article III standing.  Plaintiffs have failed to do so.

### 2.    Parent plaintiffs failed to show causation and redressability

Even if one or more of the parent plaintiffs could establish injury in fact, they could not show causation or redressability.  Those requirements "are usually 'flip sides of the same coin.'"  *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133 (2025).  Causation requires the plaintiff to show "that the injury was likely caused by the defendant," and redressability requires the plaintiff

29

to demonstrate "that the injury would likely be redressed by judicial relief."
*TransUnion*, 594 U.S. at 423.

To satisfy causation, a plaintiff must show that an alleged injury is "'fairly
traceable'" to the defendant's alleged misconduct and not the result of third-party
conduct. *Lujan*, 504 U.S. at 560-561 (alterations omitted). "'The line of causation
. . . must be more than attenuated" and any links in the causal chain must be
plausible, not merely "'hypothetical or tenuous.'" *Wash. Env't Council v. Bellon*,
732 F.3d 1131, 1142 (9th Cir. 2013). "[I]t is ordinarily 'substantially more
difficult'" to establish causation where, as here, "the plaintiff is not himself the
object of the government action . . . he challenges." *Lujan*, 504 U.S. at 562. A
plaintiff may not "rely on speculation about the unfettered choices made by
independent actors not before the courts." *Clapper*, 568 U.S. at 415 n.5 (quotation
marks omitted). Both causation and redressability must be "'likely,' as opposed to
merely 'speculative.'" *Lujan*, 504 U.S. at 561.

None of the parent plaintiffs has adequately alleged that information related to
a child's gender identity or gender expression would be withheld *because of
AB 1955*. AB 1955 prohibits only mandatory disclosure policies governing public
schools and adopted by particular bodies: school districts, county offices of
education, charter schools, or state special schools. Cal. Educ. Code §§ 220.3(a),
220.5(a). But no parent plaintiff alleges that their child attends a school that would

30

likely be covered by a mandatory disclosure policy but for the enactment of
AB 1955.[15]

Specifically, parent plaintiffs allege that their children attend schools in San
Diego, Los Angeles, Orange, and San Francisco Counties, as well as the City of
Huntington Beach.  Opening Br. 14 n.1; 4-ER-641, 4-ER-643, 4-ER-645, 4-ER-
647, 4-ER-649, 4-ER-651, 4-ER-653, 4-ER-659.  Plaintiffs have not identified—
and defendants are not aware of—any county board of education that has adopted a
mandatory disclosure policy prohibited by AB 1955.  Nor have plaintiffs provided
any plausible basis to think that any of those counties would adopt such a policy in
the absence of AB 1955.  Although one plaintiff's children attend school in the
City of Huntington Beach, *see* 4-ER-659, the city's mandatory-disclosure
ordinance does not cover schools and thus does not conflict with AB 1955.  4-ER-
715.  Plaintiffs' contrary reading of the ordinance, *see, e.g.*, C.A. Dkt. 23.1 at 2-3,
is untenable—not only because its plain text does not cover schools, *see* 4-ER-715,

---

[15] Parents 4A and 8A allege that their children 4C and 8D attend non-public
schools for reasons other than AB 1955 and are unlikely to attend public school in
the future.  *See* 3-ER-363, 3-ER-365–366, 4-ER-646 (alleging 4C attends
"nonpublic nonsectarian school" to receive disability accommodations); Cal. Educ.
Code § 56035; 3-ER-388, 4-ER-656–657 (8D attends "private Catholic school"
due to older sibling's experiences in San Francisco public schools that pre-dated
AB 1955).  Because parents 4A and 8A do not have a credible threat of future
injury as to these children, they lack standing to seek injunctive or declaratory
relief.  *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Bank of
Lake Tahoe v. Bank of America*, 318 F.3d 914, 918 (9th Cir. 2003).

but also because city governments lack authority to regulate schools under California law, *see, e.g.*, *Harrahill v. City of Monrovia*, 104 Cal. App. 4th 761, 764 (2002). State law entrusts that responsibility to the State and local school districts. *See id.*; *Butt v. State of Cal.*, 4 Cal. 4th 688, 680-681 (1992); Cal. Educ. Code §§ 35160, 35160.1. And there is no other source of conflict between AB 1955 and the ordinance because AB 1955 is inapplicable to libraries, parks, and other city-run facilities covered by the ordinance. *Compare* Cal. Educ. Code §§ 220.3(a), 220.5(a) *with* 4-ER-715.[16]

None of the plaintiffs has identified the particular school district that their child attends. *See* Opening Br. 14 n.1; *see also generally* 4-ER-639–659 (omitting information about school districts). Although certain school districts have in the past adopted the types of forced outing policies now forbidden by AB 1955, *see, e.g.*, *Mae M. v. Komrosky*, 111 Cal. App. 5th 198, 206-207 (2025), no plaintiff has specified that they reside in such a district. Plaintiffs' highly generalized assertion that "[s]ome" unspecified parents "lived in communities and school districts with . . . policies requiring schools to inform parents if the school had been asked

---

[16] Because there is no conflict between AB 1955 and Huntington Beach's ordinance, parent 10A lacks standing to assert any procedural right under the ordinance's provisions. *Contra* Opening Br. 25-26; 4-ER-659, 4-ER-692. And even if the ordinance did extend to the school attended by parent 10A's children, a bare violation of the ordinance—apart from any concrete showing of injury-in-fact—would not suffice to give parent 10A standing. *See Spokeo*, 578 U.S. at 341.

to facilitate social transitioning," 4-ER-691, is insufficient to satisfy plaintiffs'

burden to show standing.  *See Murthy*, 603 U.S. at 61 ("treating the defendants"

and "plaintiffs . . . each as a unified whole" is error); *cf. id.* ("'standing is not

dispensed in gross'").

If anything, several of parent plaintiffs' allegations strongly suggest that the

relevant school districts would have no interest in adopting the narrow type of

mandatory disclosure policy prohibited by AB 1955.  Those districts have instead

adopted permissive disclosure policies—policies that pre-date AB 1955.[17]  As a

result, any injunction against enforcement of AB 1955 would not necessarily have

any impact on the policies of parent plaintiffs' children's schools.  *See* 1-ER-17.

And where plaintiffs' alleged injuries arise from *other* laws and policies—laws and

policies not challenged in the case before the Court—plaintiffs cannot establish

---

[17] *See* 1-ER-16–17 (noting Parent 2A complained "that school staff were already withholding information about her child's gender identity and social transition before AB 1955"); 1-ER-17 (holding that Parent 2A failed to show redressability and causation for that reason); 4-ER-644 (3A alleging school principal "confirmed that the school will not notify 3A or her husband if 3C begins expressing doubts about his gender, changes his name or pronouns, or desire to socially transition"); 4-ER-651–652 (7A alleging 7C's high school counselor "refused to put 7C's real name in the [school] system" to avoid outing 7C to a substitute teacher); 4-ER-653 (alleging 8C attends school in San Francisco County); S.F. Unified Sch. Dist. Admin. Reg. 5145.4, https://bit.ly/3GuSls1 (describing San Francisco Unified School District's  non-discrimination policy, which allows disclosure of a student's "transgender or gender non-conforming status" only when the student provides "prior written consent," "the disclosure is otherwise required by law," or the district "has compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being").

causation and redressability. *See, e.g.*, *California v. Texas*, 593 U.S. 659, 678-679 (2021); *Clapper*, 568 U.S. at 417.

In holding that several parent plaintiffs adequately alleged causation and redressability, the district court appears to have misunderstood the scope of AB 1955. The court suggested that AB 1955 "prohibit[s] schools and school district employees from disclosing" gender identity information to a parent. *E.g.*, 1-ER-22. But as discussed above, *see, e.g.*, *supra* pp. 5-7, the statute does nothing of the kind. AB 1955 simply prevents schools from adopting mandatory policies that *require* school employees to disclose information over a student's lack of consent. Cal. Educ. Code §§ 220.3(a), 220.5(a). AB 1955 says nothing about whether or how school officials may choose to disclose information related to a student's gender identity or gender expression on a permissive basis. Enjoining AB 1955 would therefore not mean that school officials would be "*required* to disclose the information to [parent plaintiffs] under any circumstances." 1-ER-17. That makes this case much like *Clapper*, 568 U.S. at 412, where the Supreme Court emphasized that "because [the challenged law] at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural."

To the extent plaintiffs wish to challenge the refusal of school officials or districts to share information with parents, their complaints lie with *those* officials

34

or districts, not the state officials tasked with implementing AB 1955. *Compare,*

*e.g.*, *Regino v. Staley*, 133 F.4th 951, 956 (9th Cir. 2025) (suit addressing legality

of district policy barring disclosure of student's "preferred name and pronouns"

without student's permission). It is well-settled that plaintiffs lack standing where

their "standing theories . . . require guesswork as to how independent

decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413; *see also*

*Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (similar). And the

theoretical possibility that plaintiffs would have standing to sue other defendants in

a future case does not give them standing to bring this suit.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF

Because no plaintiff has standing, the Court need not address whether

plaintiffs have stated a claim for relief. *See, e.g.*, *Fleck & Assocs., Inc. v. Phoenix,*

*City of, an Ariz. Mun. Corp.*, 471 F.3d 1100, 1106 n.4 (9th Cir. 2006). But if the

Court reaches the merits, it should uphold the district court's conclusion that

plaintiffs fail to state a claim for relief. The interests that plaintiffs assert are not

fundamental rights for purposes of substantive due process doctrine, nor do

plaintiffs plausibly allege that AB 1955 infringes a substantive due process right.

And even if they did, AB 1955 would survive any applicable standard of scrutiny.[18]

### A. Parental Substantive Due Process Rights Are Strictly Limited, Especially in the School Setting

"[C]aution is warranted" in the area of substantive due process because "'guideposts for responsible decisionmaking . . . are scarce and open-ended.'" *Regino*, 133 F.4th at 960 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). "Substantive due process protects individuals from state action that interferes with fundamental rights." *Id.* at 959-960. "To assess whether there has been a violation of a fundamental right, [courts] begin with 'a careful description of the asserted fundamental liberty interests.'" *Id.* at 960 (quoting *Glucksberg*, 521 U.S. at 721). Arriving at that "careful description" requires a court to "examine [the plaintiff's] articulation of the particular fundamental right she asserts," "consult . . . 'the scope of the challenged regulation,'" "eschew sweeping generalizations, and instead 'adopt a narrow definition of the interest at stake.'" *Regino*, 133 F.4th at 964 (citing, *e.g.*, *Cruzan et rel. Cruzen v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 277-279 (1990) (examining the "right to refuse lifesaving hydration and nutrition" rather than the more generic "right to die")).

---

[18] Plaintiffs challenge Sections 5 and 6 of AB 1955 on their face and as applied to parents 4A, 5A, 6A, and 10A. *See* 4-ER-696. "Regardless of the type of challenge, however, the underlying constitutional standard remains the same." *Regino*, 133 F.4th at 967.

"With that careful description in mind, [a court] must then decide whether the asserted interest" qualifies as "fundamental." *Regino*, 133 F.4th at 960. To do so, a court asks whether the asserted interest is "'objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed.'" *Id.*; *see also Glucksberg*, 521 U.S. at 720-721. Supreme Court precedent requires courts to be "'reluctant to expand the concept of substantive due process'" and to "'exercise the utmost care' before 'breaking new ground' in the area of unenumerated fundamental rights." *Regino*, 133 F.4th at 960, 962.

This Court recently "identif[ied] some of the important decisional guideposts" with respect to whether an asserted parental interest qualifies as a fundamental right. *Regino*, 133 F.4th at 965. The Court noted that "the right to 'make decisions concerning the care, custody, and control' of children 'is not without limitations,'" and is especially "cabined" in school settings. *Id.* at 966 (internal citation omitted). "As a general matter, 'parents have the right to choose the educational forum'" for their child, "'but not what takes place inside the school.'" *Id.* "Parents 'lack a constitutional right to direct the curriculum that is taught to their children,' and 'also lack constitutionally protected rights to direct school administration more generally.'" *Id.* That "well-established limitation[ ]," *id.*, reflects that "[s]chools cannot be expected to accommodate" the familial "concerns of every parent."

37

*Fields*, 427 F.3d at 1206. "Such an obligation would not only contravene the educational mission of the public schools, but also would be impossible to satisfy." *Id.*

In keeping with those substantive due process guideposts, this Court has repeatedly rejected parents' substantive due process challenges to various school policies. In *Fields*, for example, the Court affirmed the dismissal of a parent's substantive due process challenge to a school's survey of elementary-school students about their sexual experiences. *Id.* at 1200-1202, 1207-1208. And in *Parents for Privacy v. Barr*, 949 F.3d 1210, 1232-1233 (9th Cir. 2020), *cert. denied* 141 S. Ct. 894 (2020), the Court rejected a parental substantive due process challenge to a school policy allowing transgender students to use facilities consistent with their gender identity. *See also Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020) (rejecting parents' substantive due process challenge to school curriculum); *Fields*, 427 F.3d at 1204-1205 (collecting cases rejecting parental substantive due process challenges to school programs and policies concerning sex education, condom distribution, attendance, speech therapy services, and community service).

The Supreme Court's recent decision in *Mahmoud* does not affect this precedent or otherwise inform the analysis of plaintiffs' substantive due process claims. *Contra* Opening Br. 31, 44. *Mahmoud* was a First Amendment free

38

exercise case; "the Court's analysis makes no mention of substantive due process rights or the Fourteenth Amendment Due Process Clause." *Mahmoud*, 145 S. Ct. at 2400 (Sotomayor, J., dissenting). Substantive due process and free exercise claims are subject to different constitutional standards, *see, e.g.*, *Cal. Parents*, 973 F.3d at 1019-1020, and plaintiffs have not raised a free exercise claim here. *See* 4-ER-693–702.

### B.    Plaintiffs Do Not Assert a Fundamental Right

Plaintiffs assert that AB 1955 unconstitutionally burdens their substantive due process rights in two principal respects: first, by denying them the ability to control whether school officials respect their children's decision to socially transition at school (which they allege is medical treatment) and second, by allowing school officials to withhold information that their children identify as transgender or gender nonconforming (which they allege is a form of psychological distress and symptomatic of mental illness). Those asserted interests are not cognizable fundamental rights.

### 1.    There is no fundamental right to control whether school officials respect a transgender or gender nonconforming child's decision to socially transition at school

Plaintiffs first assert that they have a fundamental right to prevent their transgender or gender nonconforming children from socially transitioning at school. Opening Br. 41. That asserted interest is premised on the allegation that

39

honoring a student's request to use a name and pronouns consistent with their

gender identity is medical treatment. *Id.* at 40-41, 48-50; 4-ER-662, 4-ER-669–

673, 4-ER-693. The district court correctly rejected that view. 1-ER-23–28.

Courts have recognized a parental substantive due process right to "make

important medical decisions for their children" in certain circumstances. *Regino*,

133 F.4th at 961-62. As this Court and others have recognized, medical treatment

is what licensed healthcare professionals provide their patients in the course of

diagnosis and treatment, consistent with the regulated practice of medicine. *See,

e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1082-1083 (9th Cir. 2022); *Shanks v.

Blue Cross & Blue Shield of Wis.*, 979 F.2d 1232, 1233 (7th Cir. 1992)

("Treatment, as commonly understood, occurs when a health care provider takes

steps to remedy or improve a malady that caused the patient to seek his help.").[19]

Accordingly, when courts have recognized a parental right to make decisions about

a child's medical treatment, they have done so with respect to conduct involving

"intrusions upon the bodily integrity of the child or other conduct with clinical

significance—whether through a medical procedure, examination, or

hospitalization." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 350 (1st Cir. 2025);

---

[19] *See also, e.g.*, Cal. Fam. Code § 6902 ("'Medical care' means X-ray examination, anesthetic, medical or surgical diagnosis or treatment, and hospital care under the general or special supervision and upon the advice of or to be rendered by a physical and surgeon licensed under the Medical Practice Act.").

*see, e.g.*, *Parham v. J. R.*, 442 U.S. 584, 603 (1979) (hospitalization for mental illness); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1158 (9th Cir. 2018) ("medical examination"); *Mueller v. Auker*, 700 F.3d 1180, 1186-1189 (9th Cir. 2012) (administration of antibiotics and spinal tap); *Kanuszewski v. Mich. Dep't of Health & Hum. Serv.*, 927 F.3d 396, 411-416 (6th Cir. 2019) (retention of blood samples for disease screening); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203-1204 (10th Cir. 2003) (medical examinations and blood tests); 1-ER-26–27.

Respecting a transgender person's request to be called by a name and pronouns consistent with their gender identity is far afield from anything that courts have recognized as medical treatment.  Doing so involves no medical procedure, examination, or hospitalization; need not be prescribed or performed by medical personnel; and is not regulated as part of the practice of medicine.  *See* 1-ER-23–24; *Foote*, 128 F.4th at 350.  Rather, it is "something people routinely do with one another," whether as a matter of basic courtesy or in keeping with anti-discrimination laws.  *Foote*, 128 F.4th at 350; *cf. Tingley*, 47 F.4th at 1082-1083 (distinguishing "the work that licensed mental health providers do," which "is treatment," from "book club discussions or conversations among friends," which are not).  Unsurprisingly, no court has accepted plaintiffs' suggestion that using a transgender student's requested name and pronouns constitutes medical treatment.  To the contrary, courts in many instances have held that anti-discrimination laws

41

require school officials to respect a transgender person's desire to express their identity, and have never once suggested that doing so requires the school officials to provide medical treatment. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).

Plaintiffs point to a footnote from this Court's decision in *Doe v. Horne*, 115 F.4th 1083 (9th Cir. 2024), a case involving an Equal Protection Clause and Title IX challenge to an Arizona law barring transgender girls from playing on girls' sports teams. *See* Opening Br. 49. The footnote recites a factual finding from the underlying district court opinion that treatment for gender dysphoria can include "social transition" and "medical transition." 115 F.4th at 1108 n.13. To be sure, social transition is sometimes recommended by medical professionals to alleviate the symptoms of gender dysphoria. But it does not follow that an individual who respects someone else's decision to socially transition by using their requested name and pronouns—an action routinely undertaken by laypeople in all facets of daily life—is administering medical treatment, and *Doe* did not hold otherwise. Nor did *Doe* in any way embrace plaintiffs' far-reaching position that conduct qualifies as medical treatment whenever it has some downstream impact on health-related outcomes. *See* Opening Br. 50.

Accepting plaintiffs' understanding of medical care would lead to absurd results. For example, exercise can alleviate the symptoms of certain health issues

42

and is sometimes recommended by medical professionals.  *See, e.g.*, *Johnson v. Astrue*, 597 F.3d 409, 411-412 (1st Cir. 2009).  But school officials who allow students to engage in physical activity during recess are not providing medical treatment giving rise to a parental substantive due process claim.  Courts "need not abandon [their] 'judicial experience and common sense' in [their] scrutiny of allegations pled." *Foote*, 128 F.4th at 350 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)); *see also, e.g.*, *Doe v. Franklin Square Union Free Sch. Dist.*, 100 F.4th 86, 96-97 (2d Cir. 2024) (rejecting argument that "the wearing of a mask qualifies as medical treatment" because, although a "'[m]ask [m]andate was obviously intended as a health measure, it no more requires a 'medical treatment' than laws requiring shoes in public places or helmets while riding a motorcycle'").

### 2. There is no fundamental right to compel school officials to relay information related to a child's gender identity or gender expression

Plaintiffs also invoke a "more general fundamental right to information about their children's 'symptoms of distress or mental illness in school.'"  Opening Br. 56-57.  Specifically, they assert that they have a fundamental right to receive information from school officials related to their child's gender identity or gender expression.  *Id.* at 57.[20]  As the district court correctly held, plaintiffs do not show

---

[20] Plaintiffs described this asserted right more broadly in their operative complaint.  There, they referred to a parental right to "medical, mental,

(continued…)

43

that the "general" interest they assert is a fundamental right, nor do they plausibly allege that information related to a student's gender identity or gender expression necessarily implicates a student's "mental or psychological distress."  Opening Br. 57; *see* 1-ER-31–35.

As the sources cited in plaintiffs' own complaint make clear, *see* 4-ER-664, being transgender or gender nonconforming is not a mental health condition or disorder.[21]  Nor is identifying as transgender or gender nonconforming "symptomatic behavior" of any other medical condition.  Opening Br. 58.  The Supreme Court recently recognized in *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816, 1833 (2025), that "there is a 'lack of identity' between transgender status and . . . medical diagnoses" of "gender dysphoria, gender identity disorder,

---

educational, and religious information" of virtually any type—including "information fundamental to a child's identity, personhood, and mental and emotional well-being."  4-ER-698–700.  "These shifts in position are problematic because they undermine the critical requirement that [courts] begin the substantive due process analysis with a 'careful description' of the asserted fundamental right." *Regino*, 133 F.4th at 963.

[21] *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 451 (5th ed. 2013) ("gender non-conformity is not in itself a mental disorder"), cited at 4-ER-664; World Health Org., *Gender Incongruence and transgender health in the ICD*, https://tinyurl.com/5t3jba6z (last accessed Aug. 12, 2025) (explaining ICD-11 addresses "gender incongruence" in "Conditions related to sexual health" chapter and not "Mental and behavioural disorders" chapter to "reflect[] current knowledge that trans-related and gender diverse identities are not conditions of mental ill-health"); 4-ER-664 (citing "Gender Incongruence" entry in ICD-11).

and gender incongruence." *See also, e.g.*, *Edmo v. Corizon*, 935 F.3d 757, 769 (9th Cir. 2019) ("Not every transgender person has gender dysphoria."); *Grimm*, 972 F.3d at 594 ("Being transgender is also not a psychiatric condition, and 'implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.'").

Plaintiffs do not seriously contend otherwise. Instead, they argue that they have a fundamental right to be notified if their children are transgender or gender nonconforming because their "'gender incongruity . . . *could* progress to gender dysphoria, depression, or suicidal ideation.'" Opening Br. 57 (emphasis added). But plaintiffs fail to show that any such right is "'objectively, deeply rooted in this Nation's history and tradition.'" *Regino*, 133 F.4th at 960. Indeed, courts have repeatedly held that "mere nondisclosure of information" does not implicate a parental right. *Foote*, 128 F.4th at 354 ("the withholding of information about a student's expression of gender while at school" does not constitute "a constitutional deprivation") (collecting cases); *see* 1-ER-31–35. Just as parents have no fundamental right to direct the conduct of school officials that might one day have a downstream impact on health, *see supra* pp. 42-43, they lack a fundamental right to receive information that might be related to a health issue that may or may not emerge at some unknown point in the future.

## C.    Plaintiffs Do Not Plausibly Allege that AB 1955 Infringes Any Fundamental Right

Even assuming plaintiffs do assert a fundamental right, their substantive due process claims fail as a matter of law because they do not plausibly allege that AB 1955 infringes their asserted interests.  *See Regino*, 133 F.4th at 961 ("'identifying a general parental right is far different than concluding that it has been infringed'").  Infringement of a parental substantive due process right occurs only where "the state's action 'deprived [parents] of their right to make decisions concerning their child,' and not when the action merely 'complicated the making and implementation of those decisions.'"  *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011); *see also, e.g.*, *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) (similar) (collecting cases).[22]

To start, plaintiffs' theory of infringement rests on a misapprehension of AB 1955's scope and operation.  AB 1955 does not speak to whether a school official must honor a student's request to use a name or pronouns consistent with their gender identity.  *See, e.g.*, *supra* p. 8.  AB 1955 thus in no way "'transfer[s] the power to make [a] decision'" about whether a child socially transitions "'from the parents to some agency or officer of the state.'"  Opening Br. 41.  Nor does AB

---

[22] *See generally Glucksberg*, 521 U.S. at 767 n.8 (Souter, J., concurring) (infringement of a fundamental right requires a "'substantial obstacle'" to its exercise, not merely an "incidental[ ]" effect that "makes it somewhat harder to exercise a fundamental liberty").

46

1955 "keep parents in the dark" or "encourage school staff to conceal information regarding children's distress from parents." *Id.* at 59, 60. AB 1955 does not mandate non-disclosure. AB 1955's limited restriction on blanket forced-outing policies allows schools to make disclosures to parents based on a student's particular circumstances, including when doing so will benefit the student's health and well-being. *See supra* pp. 5-7. That limited restriction is based on the Legislature's finding that allowing young people to come out to their parents on their own terms, without undue interference from state actors, helps to *strengthen* trust between parents and their children. *See* 4-ER-708–709; *contra* Opening Br. 41-42, 46-47.

Plaintiffs' theories of infringement also fail because plaintiffs do not plausibly allege any "'coercive' or 'restraining' conduct" by state actors with respect to parents or their children. *Foote*, 128 F.4th at 353 (collecting cases); *see, e.g.*, *J.S. ex rel. Snyder*, 650 F.3d at 933-934 ("A conflict with the parents' liberty interest will not be lightly found, and indeed, only occurs where there is some 'manipulative, coercive, or restraining conduct by the State.'"). AB 1955 does not grant school officials any authority to "decide whether a child socially transitions—only the child makes that decision." 1-ER-28. Nor does AB 1955 call for school officials to prevent or discourage students from speaking with their parents about their gender identity or to prevent or discourage parents from

speaking with their children about the same. Parents and children remain free to speak with each other whenever, wherever, and however they would like. And parents remain free to participate in their children's education in myriad ways—for example, by visiting their schools, volunteering in their classrooms, and requesting and receiving educational records. *See, e.g.*, *supra* p. 6 n.2. Indeed, AB 1955 does not "force" parents or their children "to do anything at all." *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1245 (11th Cir. 2025) (rejecting due process challenge to school officials' non-disclosure). AB 1955 is thus fundamentally unlike the state action "that other courts have found to restrict parental rights." *Foote*, 128 F.4th at 353.[23]

Parents reasonably desire "as much information as possible about their [children's] well-being and behavior in school." *Foote*, 128 F.4th at 355. But substantive due process does not compel state actors to "*assist*" individuals "as parents or affirmatively *foster* the parent/child relationship." *Anspach ex rel. Anspach v. City of Phila. Dep't of Pub. Health*, 503 F.3d 256, 266 (3d Cir. 2007).

---

[23] *See, e.g.*, *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 309, 312-313 (11th Cir. 1989) (school officials coerced student to have an abortion, paid for the procedure, and "[c]oerc[ed]" the student "to refrain from discussing the matter with the parents"); *Gruenke v. Seip*, 225 F.3d 290, 296-297, 305-307 (3d Cir. 2000) (school official forced student to discuss her possible pregnancy with him despite her express wishes otherwise; forced student to take a pregnancy test that he paid for; and disclosed student's pregnancy to school community despite wishes of student and her parents to keep information private).

There is no "constitutional obligation on state actors to contact parents of a minor or to encourage minors to contact their parents." *Id.* at 262. The Due Process Clause accordingly does not compel school districts to require their employees to out transgender and gender nonconforming students to their parents in all circumstances.

Courts have reached the same conclusion across a variety of contexts. *See, e.g., Arnold*, 880 F.2d at 314 (school officials not "constitutionally mandat[ed]" to "notify the parents of a minor who receives counseling regarding pregnancy"; no constitutional violation where "[t]he decision whether to seek parental guidance . . . rest[s] within the discretion of the minor"); *Anspach*, 503 F.3d at 262 (affirming dismissal of a parent's substantive due process claim against a health center that provided a minor with emergency contraception absent parental notice); *Doe v. Irwin*, 615 F.2d 1162, 1168-1169 (6th Cir. 1980) (health clinic's "practice of not notifying [parents] of their children's voluntary decisions" did not infringe any parental right); *cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (substantive due process "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means").[24]

---

[24] Plaintiffs suggest that the Third Circuit did not intend for *Anspach* to have any purchase in the school context, *see* Opening Br. 43-44, but the Third Circuit

(continued…)

Plaintiffs' contrary view would be untenable.  According to plaintiffs, the Due Process Clause compels schools to provide them with all manner of information that might bear in some way on parenting decisions.  *See* Opening Br. 41.  That would presumably include (among other things) whether their child attends prom with a student of a different race or removes their religious garments at school. That obligation "would be 'impossible' for public schools" to manage.  *Parents for Privacy*, 949 F.3d at 1233.  And it would invade students' privacy and threaten to unduly entangle teachers and school officials in the relationship between students and their parents.

Plaintiffs resist this sizable body of precedent by invoking *Mahmoud*.  *See* Opening Br. 44, 47-48, 59-60.  But as noted above, *see supra* pp. 26, 38-39, *Mahmoud* is a free exercise case; it did not address and has no bearing on substantive due process doctrine.  And *Mahmoud*'s holding was quite narrow in any event.  *Mahmoud* merely held that a school district burdened parental free exercise rights where it subjected "young children" (ages 5 to 11) to "unmistakably normative" books that "explicitly contradict[ed] their parents' religious views" and encouraged teachers "to reprimand any children who disagree[d]" or "express[ed] a degree of religious confusion."  145 S. Ct. at 2353, 2355 n.8, 2356.

and district courts within it have relied on *Anpsach* in school-related cases. *See, e.g.*, *J.S. ex. rel. Snyder*, 650 F.3d at 933-934; *Short*, 2025 WL 984730, at *17 (collecting cases).

AB 1955, by contrast, does not involve "the potentially coercive nature of classroom instruction" or anything with comparable coercive potential. *Mahmoud*, 145 S. Ct. at 2355. The statute does not require school officials to use any curriculum, books, or other forms of instruction. Indeed, AB 1955 does not require teachers to convey anything to students. Rather, it is *students* who make the decision to share with school officials that they are transgender or gender nonconforming, ask to use a name and pronouns consistent with that identity, and ask for school officials not to disclose that information to their parents. AB 1955 also does not require teachers to express any particular view in response to a student's gender identity or gender expression. Nor is AB 1955 limited to "young children"; it concerns mandatory-disclosure policies with respect to all public-school students, including those in high school. And again, AB 1955 is exceptionally narrow in that it does not prohibit school officials from providing information to parents. *See supra, e.g.*, pp. 5-7. It bars only mandatory policies that require disclosure without student consent regardless of the particular facts and circumstances.

### D.    Sections 5 and 6 of AB 1955 Satisfy Any Standard of Scrutiny

Because AB 1955 "do[es] not infringe a fundamental right," it need only be "'rationally related to legitimate government interests'" to "survive substantive due process scrutiny." *Regino*, 133 F.4th at 960.  The district court correctly held that AB 1955 satisfies rational basis review and plaintiffs do not argue otherwise.  *See* 1-ER-28–29, 1-ER-35; Opening Br. 63-66.  As the district court recognized, the government has a rational, legitimate interest in helping to "cultivat[e] an environment where students may feel safe in expressing their gender identity." 1-ER-29 (quoting *Foote*, 128 F.4th at 357).

Even if AB 1955 were subject to strict scrutiny, however, it would satisfy that standard.  AB 1955 advances compelling state interests in protecting the safety and well-being of transgender and gender nonconforming students; fostering a safe and supportive school environment in which they can thrive; and protecting students' privacy with respect to their gender identity.  *See* 4-ER-708–709; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (compelling interest in "eradicating discrimination" and ensuring "equal access to publicly available goods and services"); *New York v. Ferber*, 458 U.S. 747, 756-757 (1982) (same with respect to "State's interest in 'safeguarding the physical and psychological well-being of a minor'"); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-

529 (3d Cir. 2018) (same with respect to protecting transgender students against discrimination).

Plaintiffs do not dispute that the first two interests are compelling. They contend only that there is no compelling state interest in protecting students' privacy with respect to their gender identity because "a child who is socially transitioning in school is, by definition, doing so in public." Opening Br. 64 (emphasis omitted). But "disclosure in one context" does not "necessarily relinquish[] the privacy right in all contexts." *Ngoun v. Wolf*, 517 F. Supp. 2d 1177, 1191 (C.D. Cal. 2007) (recognizing student's "[c]onstitutionally protected privacy right with respect to disclosure of her sexual orientation" by school officials to her parents); *see U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 770 (1989) ("[T]he fact that 'an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information.'").

AB 1955 is also narrowly tailored. It prohibits only the policies that the Legislature found especially harmful to LGBTQ students—mandatory disclosure policies that require school officials to out students without the student's consent in *all* cases, without any consideration of individual circumstances, such as the risk of harm to the student from the disclosure. AB 1955 goes no further. It does not mandate non-disclosure; rather, it allows for mandatory disclosure where required

by law or where a student consents, and it allows schools and officials to adopt nuanced disclosure policies that account for considerations like a student's safety and well-being. *Supra* pp. 5-7. AB 1955 also aims to strengthen relationships between LGBTQ students and their parents by requiring the California Department of Education to develop and update school- and community-based resources specifically for those families. 4-ER-709–710.

Plaintiffs dispute the connection between the Legislature's findings and the means chosen. They assert that "[b]ecause parents are not at school, there is no plausible connection" between AB 1955's limited prohibition on mandatory disclosure policies and the State's asserted interests in combating discrimination and creating a safe and supportive school environment. Opening Br. 65. But the Legislature carefully reviewed evidence showing otherwise. For example, it considered research demonstrating that forced outing policies dissuade LGBTQ students from seeking help from school officials. *See* 4-ER-628; 4-ER-708–709. In that way, AB 1955 bears a substantial connection to the State's compelling interest in protecting students from harm.

Plaintiffs' proposed "alternatives" are no alternatives at all. Opening Br. 65. The suggestion of "anti-bullying initiatives" is nondescript and unresponsive to the Legislature's findings that mandatory disclosure policies harm LGBTQ students' relationships with their families, threaten their privacy, and put their safety and

well-being at risk should they face rejection at home.  *See* 4-ER-708.  And the proposal that the State "restrict disclosure only where parents are shown to be unfit or unlikely to act in their child's best interests" is unworkable, because undertaking that assessment would very likely out the child.  *See* Opening Br. 65 (emphasis omitted).  An ambiguous standard of that nature would also threaten to chill students from expressing their identities openly and honestly at school, as it would be difficult for students to know in advance whether the information would be conveyed to parents.  And in at least one critical respect, plaintiffs' proposed alternative would be much broader than AB 1955 because it would "restrict disclosure" in some circumstances.  As discussed above, *see, e.g.*, *supra* pp. 5-7, AB 1955 does not restrict what teachers and other school officials can disclose.

Plaintiffs point to *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000), which held that the State generally cannot subject children to investigatory physical examinations absent parental consent unless the parents have first been notified and given an opportunity to be heard and a judicial officer has approved the examination.  But *Wallis* recognized that those measures would be inappropriate where they would either undermine the State's purpose in performing the investigatory examinations—such as where there is "a reasonable concern that material physical evidence might dissipate"—or would cause harm to the child—such as where there is "some urgent medical problem . . . requiring

55

immediate attention." *Id.* Here, providing any comparable form of notice would chill transgender students from expressing their identities at school in the first instance and effectively out them to their parents—thus vitiating the very purpose of AB 1955's prohibition on forced outing policies and risking the substantial harms to students discussed above. *Supra* pp. 3-5.

Finally, plaintiffs assert that AB 1955 may help to "normaliz[e] strategies that school staff may use to groom children." Opening Br. 65. Plaintiffs do not spell out what they mean by "grooming children," but the preliminary-injunction declaration they cite refers to grooming as "emotional and psychological manipulation" to enable sexual abuse and exploitation. 3-ER-558. Plaintiffs come nowhere close to identifying any connection between that remarkable assertion and AB 1955. The Court should reject plaintiffs' baseless allegations and uphold the district court's dismissal order.

## III. THE COURT NEED NOT AND SHOULD NOT ADDRESS THE PRELIMINARY INJUNCTION MOTION IN THE FIRST INSTANCE

Because plaintiffs' claims were properly dismissed for lack of standing and failure to state a claim, their motion for preliminary injunction was denied as moot. 1-ER-3. If the Court disagrees that the district court correctly dismissed plaintiffs' claims, however, it should remand to the district court to decide in the first instance whether plaintiffs are entitled to a preliminary injunction, consistent with its typical practice. *See supra* pp. 14-15.

56

Should this Court depart from that practice and address the preliminary injunction motion in the first instance, it should hold that plaintiffs are not entitled to that extraordinary relief. *See generally Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). Plaintiffs have not shown that they are likely to succeed on the merits. As discussed above, plaintiffs have not established standing or demonstrated a violation of any cognizable substantive due process right. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015); *supra* pp. 15-56. Nor have they established that they are likely to suffer irreparable harm absent preliminary injunctive relief. *Garcia*, 786 F.3d at 740. Plaintiffs' allegations of irreparable harm fail for much the same reason that their standing theories fail: AB 1955 merely prevents schools from adopting blanket policies that require employees to out their students where the student does not consent to disclosure and no law otherwise requires the disclosure. Nothing in AB 1955 requires schools to adopt non-disclosure policies that would *bar* employees from making disclosures to parents.

The equities and public interest also weigh heavily against relief. The State and the public have a strong interest in preserving duly enacted laws. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126-1127 (9th Cir. 2008). They likewise have a strong interest in ensuring that

57

LGBTQ students feel safe and supported at school and are not put at risk of physical, psychological, or other harm due to compulsory disclosure policies. *See* 4-ER-708. The Legislature balanced those concerns against the important interest that parents have in being involved in their children's lives. *See id.* In light of that careful balance, the Legislature declined in AB 1955 to require school districts to adopt any particular non-disclosure policies. Courts in other contexts are currently weighing how to approach substantive due process questions that may be implicated by specific policies adopted at the school district level. *See, e.g.*, *Regino*, 133 F.4th at 968. But the narrow scope of AB 1955 provides no occasion for the Court to do so in this case—and certainly provides no basis for extraordinary injunctive relief.

## CONCLUSION

The judgment of the district court dismissing plaintiffs' claims and the judgment of the district court denying the motion for preliminary injunction as moot should be affirmed.

Dated:  August 13, 2025                    Respectfully submitted,

       *s/ Julie Veroff*
_____


ROB BONTA
  *Attorney General of California*
HELEN H. HONG
  *Acting Solicitor General*
CHERYL FEINER
  *Special Assistant Attorney General*
SAMUEL T. HARBOURT
JULIE VEROFF
  *Deputy Solicitors General*
DARRELL W. SPENCE
DARIN WESSEL
  *Supervising Deputy Attorneys General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*

**STATEMENT OF RELATED CASES**

The following related case is pending: *Chino Valley Unified School District et al.*

*v. Newsom et al.*, No. 25-3686.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-3826

I am the attorney or self-represented party.

**This brief contains** | 13,918 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Julie Veroff | **Date** | 08/13/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/22*