No. 25-3826

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

CITY OF HUNTINGTON BEACH, *et al.*,

*Plaintiffs - Appellants*,

v.

GAVIN NEWSOM, *et al.*,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Central District of California
Honorable Consuelo B. Marshall, No. 8:24-cv-02017-CBM-JDE

_____

**BRIEF OF PROFESSORS OF PSYCHOLOGY &
HUMAN DEVELOPMENT AS AMICI CURIAE
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

_____

Shannon Minter (CA Bar: 168907)
Amy Whelan (CA Bar: 215675)
NATIONAL CENTER FOR
LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
T: (415) 392-6257
E: awhelan@nclrights.org
*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES .......................................................... ii

RULE 29(A)(4)(E) STATEMENT ......................................... vii

INTEREST OF AMICI CURIAE.............................................1

ARGUMENT ...............................................................................6

I.     STATE LAW AND RESEARCH-BASED PUBLIC POLICY
DEMONSTRATE THAT NOT AUTOMATICALLY
DISCLOSING CONFIDENTIAL INFORMATION TO A
STUDENT'S PARENT IN LIMITED CIRCUMSTANCES TO
PROTECT STUDENT SAFETY AND WELLBEING IS A
COMPELLING GOVERNMENTAL INTEREST. ......................9

II.    REQUIRING SCHOOL PERSONNEL TO
AUTOMATICALLY DISCLOSE A STUDENT'S REQUEST
TO USE A DIFFERENT NAME OR PRONOUN TO THEIR
PARENT CAN UNDERMINE A SCHOOL DISTRICT'S
COMPELLING INTEREST IN THE STUDENT'S SAFETY
AND WELLBEING. ...................................................................15

III.   MAJOR EDUCATIONAL PROFESSIONAL
ASSOCIATIONS CAUTION AGAINST MANDATORY
DISCLOSURE OF GENDER IDENTITY IN SCHOOLS..........................22

IV.   SCHOOL SUPPORT OF A STUDENT'S REQUESTED
NAME AND PRONOUNS DOES NOT CONSTITUTE
MEDICAL TREATMENT...........................................................24

CONCLUSION.........................................................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Foote v. Ludlow Sch. Comm.*,
128 F.4th 336 (1st Cir. 2025) ................................................................24

### STATUTES

105 Ill. Comp. Stat. Ann. 10/5 ..............................................................10

Cal. Educ. Code § 220.3(a) ...................................................................24

Cal. Educ. Code § 49602 .......................................................................12

Cal. Educ. Code § 72621 .......................................................................10

Conn. Gen. Stat. Ann. § 10-154a ..........................................................10

Md. Code Ann., Educ. § 7-412 ........................................................10, 12

N.D. Cent. Code Ann. § 31-01-06.1 ......................................................10

N.J. Stat. Ann. § 18A:40A-7.1 ..............................................................10

N.Y. Educ. Law § 3038 ..........................................................................10

Wisc. Stat. Ann. § 118.126(1) ...........................................................10, 13

### OTHER AUTHORITIES

Alida Bouris & Brandon Hill, *Exploring the mother-adolescent relationship as a promotive resource for sexual and gender minority youth*, 73 J. of Soc. Issues 618 (2017) .................................................21

Am. Acad. of Pediatrics, *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents* (Hagan et al., eds., 3d ed. 2008) ................................................................................14

Am. Acad. of Pediatrics, Comm. on Adolescence, *The Adolescent Right to Confidential Care When Considering Abortion*, 97 Pediatrics 746 (1996) ................................................................................14

ii

Am. Coll. of Obstetricians & Gynecologists, *ACOG Committee Opinion 803: Confidentiality in adolescent care* (2020).....................................13

Am. Med. Ass'n, *Opinion 5.055 Confidential care for minors*, 16 AMA J. of Ethics 901 (2014) ...................................................14

Am. Sch. Counselors Ass'n, *The School Counselor and Confidentiality* (2018).........................................................13

Am. Sch. Counselors Ass'n, *The School Counselor and Transgender and Nonbinary Youth* (2022) ..............................................23

Amanda M. Pollitt, et al., *Predictors and Mental Health Benefits of Chosen Name Use Among Transgender Youth*...........................20

Caitlyn Ryan, et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009) ..............................17

Caitlyn Ryan, et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. of Homosexuality 159 (2018)................16

California Department of Education, *Frequently Asked Questions: School Success and Opportunity Act (AB 1266)*, (September 16, 2021) ...........................................................................8

Carol A. Ford et al., *Foregone Health Care Among Adolescents*, 282 JAMA 2227 (1999)....................................................11

Carol Ford, et al., *Confidential health care for adolescents: position paper of the Society for Adolescent Medicine*, 35 J. of Adolescent Health 160 (2004) ...............................................................14

D.C. Pub. Schs., Transgender & Gender Nonconforming Policy Guidance (Jun. 2015).........................................................8

Durham Pub. Schs., LGBTQIA+ (Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Allied/Asexual+) and Gender Supports Policy (Dec. 2022)..............................................7

iii

Human Rts. Campaign & Gender Spectrum, *Supporting and Caring for Our Gender Expansive Youth: Lessons from the Human Rights Campaign's Youth Survey* 10 (2014) .................................................................18

Jenifer K. McGuire, et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses,* 39 J. Youth Adolescense 1175 (2010) ...............................................19

Joseph G. Kosciw, et al., *2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 16 (2021) ............................................... 17, 18, 20

Katharine B. Parodi, et al., *Associations between school-related factors and mental health among transgender and gender diverse youth,* 90 J. of School Psychol. 135 (2022) .......................................................19

Kristie L. Seelman, et al., *School engagement among LGBTQ high school students: The roles of safe adults and gay–straight alliance characteristics,* 57 Children and Youth Services Review 19 (2015) ................19

L. Durwood, et al., *Social Support and Internalizing Psychopathology in Transgender Youth,* 50 J. of Youth and Adolescence 841-854 (2021) .............................................................................................................20, 21

Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from a National Survey of Services Providers Working with Lesbian, Gay, Bisexual and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless* (2012) ..............................................................16

Laurie S. Zabin & Samuel D. Clark, Jr., *Institutional Factors Affecting Teenagers' Choice and Reasons for Delay in Attending a Family Planning Clinic*, 15 Fam. Plan. Persp. 25 (1983)...................................11

Laurie Zabin et al., *To Whom Do Inner-City Minors Talk About Their Pregnancies? Adolescents' Communications with Parents and Parent Surrogates*, 23 Fam. Plan. Persp. 148, 151 (1992) ................................14

Lisa Simons, et al., *Parental support and mental health among transgender adolescents*, 53 J. of Adolescent Health 791 (2013).....................21

Mavis Sanders & Steven Sheldon, *Principals Matter: A Guide to School, Family, and Community Partnerships* (2009) ........................................10

iv

Melissa Prober, *Please Don't Tell My Parents: The Validity of School Policies Mandating Parental Notification of a Student's Pregnancy*, 71 Brook. L. Rev. 557, 575 n. 108 (2005) .....................................11

Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students - 19 States and Large Urban School Districts, 2017*, 68 MMWR 67 (2019).........................................17

Mollie McQuillan, et al., *Examining School Supports and Barriers to Improving the Health, Safety, and Academic Achievement of MMSD LGBTQ+ Students,* Madison, WI: Madison Education Partnership 26 (2021)...........................................................................20

National Association of School Psychologists, *Position Statement: Safe and Supportive Schools for Transgender and Gender Diverse Students* (2022) ......................................................................23

National Education Center, *Legal Guidance on Transgender Students' Rights* ................................................................................22

New York State Department of Education, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices ......................................................................7

N.J. Dep't of Educ., *Transgender Student Guidance for School Districts*................................................................................8

Rhonda Williams & Joseph Wehrman, *Collaboration and Confidentiality: Not a Paradox but an Understanding Between Principals and School Counselors*, 94 NAASP Bull. 107, 110 (2010)...........................................................................11

Russell Toomey, et al., *Heteronormativity, school climates, and perceived safety for gender nonconforming peers*, 35 J. of Adolescence 187 (2012) .................................................19

v

Sabra Katz-Wise, et al., *Family functioning and mental health of transgender and gender nonconforming youth in the Trans Teen and Family Narratives project*, 55 J. of Sex Research 582 (2018) ...................21

Sabra Katz-Wise, et al., *LGBT Youth and Family Acceptance*, 63 Pediatric Clinics of N. Am. 1011 (2016) ............................................16

Sharon Levy & Miriam Schnizer, *AAP Technical Report: Adolescent Drug Testing Policies in Schools*, 135 Pediatrics e1107 (2015) ......................13

Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in Minors' Abortion Decisions*, 24 Fam. Plan. Persp. 196 (1992) ..........................15

Stephanie Budge, et al., *A grounded theory study of the development of trans youths' awareness of coping with gender identity*, 27 J. of Child Family Studies 3048 (2018) ...................................................21

Stephen Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. of Adolescent Health 503 (2018) .................20

Tiffany Jones, *Evidence Affirming School Supports for Australian Transgender and Gender Diverse Students* .......................................18

Tina Cheng, et al., *Confidentiality in health care: a survey of knowledge, perceptions, and attitudes among high school students*, 269 JAMA 1404 (1993) ...................................................................11

## <u>RULE 29(A)(4)(E) STATEMENT</u>

No party's counsel authored any portion of this brief, in whole or in part. No person or entity other than amici and amici's counsel has or is expected to contribute money intended to fund the preparation or submission of this brief.

## INTEREST OF AMICI CURIAE[1]

Dr. Stephanie Budge, Dr. Mollie McQuillan, Dr. Stephen Russell, Dr. Kristina Olson, Dr. Sabra Katz-Wise, Dr. Russell Toomey, Dr. Jenifer McGuire, and Dr. Katherine Kuvalanka[2] join as amici because of their collective understanding that requiring school personnel to automatically disclose information related to a student's sexual orientation, gender identity, gender exploration, or gender expression to the student's parents or guardians—regardless of a student's individual circumstances or potential vulnerability to harm—would contradict best practices regarding the disclosure of potentially sensitive personal information and undermine the school's ability to create a school environment that supports student development and success. Amici are professors of sexuality, human development, psychology, and family science with extensive experience studying the effects of home and school environments on the development and wellbeing of young people, including LGBTQ+ young people.

**Dr. Stephanie Budge** is a licensed psychologist and a Professor and Director of Clinical Training in the Department of Counseling Psychology at the University of Wisconsin-Madison. Her clinical work and research focus on improving medical

---

[1] Pursuant to FRAP 29(a)(2), this brief is filed with the consent of all parties.

[2] Amici's views and opinions expressed in this brief reflect their extensive research and scholarship on LGBT youth in school and family settings, but do not necessarily reflect the opinions of amici's employers or affiliated institutions.

and psychotherapy treatments (and access to care) for Two Spirit, trans, and nonbinary (2STNB) youth and adults. She is also the founder of the Trans CARE Collaborative at UW-Madison. Dr. Budge is currently an Associate Editor of Psychology of Sexual Orientation and Gender Diversity. She is also on the editorial board of the International Journal of Transgender Health and LGBTQ+ Family: An Interdisciplinary Journal.

**Dr. Mollie McQuillan** is an Assistant Professor in the Department of Educational Leadership and Policy Analysis at the University of Wisconsin - Madison. Dr. McQuillan received her PhD in Human Development and Social Policy from Northwestern University. Her research examines the intersection of educational policy, leadership, school climates, and health of LGBTQ+ and other gender-expansive people in PK-12 schools. Prior to her graduate studies at Northwestern, Mollie spent 12 years working with adolescents, including seven as a public-school teacher.

**Dr. Stephen Russell** is Foundation Professor and Director of the T. Denny Sanford School of Social and Family Dynamics at Arizona State University. His research focuses on adolescent development, with an emphasis on LGBT youth development and health, parent-adolescent relationships, and school policies and practices associated with positive adjustment in adolescence. He was President of the Society for Research on Adolescence (2012-2014), and has served on the

2

governing boards of: the Society for Research in Child Development; the Council on Contemporary Families; the National Scientific Council on Adolescence; and the National Academies of Sciences, Engineering and Medicine Board on Children, Youth and Families. He is a fellow of the National Council on Family Relations, and is an elected member of the National Academy of Education.

**Dr. Kristina Olson** is a Professor of Psychology at Princeton University and the Director of the Human Diversity Lab. She received her B.A. in Psychology and African and African-American Studies from Washington University in 2003 and her Ph.D. from Harvard University in 2008. Before joining the faculty of Princeton, she was a professor at Yale University and then the University of Washington. She studies early social cognitive development and directs the TransYouth Project, a large-scale, national longitudinal study following more than 300 transgender youth. In 2018, Dr. Olson was awarded a MacArthur Genius Grant for her work in advancing the scientific understanding of gender and shedding light on the social and cognitive development of transgender and gender- nonconforming youth. She was also the recipient of the 2018 Alan T Waterman Award from the National Science Foundation, their highest award for a scientist under the age of 40, given to one scientist across all areas of science and engineering per year. Dr. Olson also received the 2016 Janet Taylor Spence Award for Transformational Early Career Contributions from the Association for Psychological Science, and was awarded

the 2015 Davida Teller Distinguished Faculty Mentor Award. Her research has been funded by the National Science Foundation and the National Institutes of Health for over a decade.

**Dr. Sabra Katz-Wise** is an Associate Professor in Adolescent/Young Adult Medicine at Boston Children's Hospital, in Pediatrics at Harvard Medical School, and in Social and Behavioral Sciences at the Harvard T. H. Chan School of Public Health. She is also Adjunct Faculty at The Fenway Institute. She is Director of the SOGIE (Sexual Orientation Gender Identity and Expression) Health Equity Research Collaborative and the GenderWise Lab, and she is a Senior Faculty Advisor for the Boston Children's Office of Health Equity and Inclusion. Dr. Katz-Wise's research uses community-engaged mixed methods to investigate sexual orientation and gender identity development and fluidity, health inequities related to sexual orientation and gender identity in adolescents and young adults, and psychosocial functioning in families with transgender and nonbinary youth. Her work has been funded by several federal and foundation grants and is widely published in peer-reviewed journals. In addition to research, Dr. Katz-Wise is involved in advocacy efforts to improve the workplace climate, patient care, and learning environment for LGBTQ+ individuals, including her role on the Queer Leadership Council for the Boston Children's Rainbow Alliance and member of the Boston Children's Equity, Diversity, and Inclusion Council.

4

**Dr. Russell Toomey** is University Distinguished Scholar and Professor of Human Development and Family Science at the University of Arizona. He conducts research on the processes by which sexual and gender minority youth thrive and are resilient despite discrimination, systemic barriers, and other challenges they encounter in society. His research identifies both the individual-level mechanisms (e.g., coping, activism) and systems-level policies (e.g., inclusive school policies) that reduce the impacts of discrimination and contribute to optimal health, well-being, and educational outcomes. At the University of Arizona, he teaches undergraduate and graduate courses on adolescent development, human sexuality, professional development, and advanced graduate-level applied statistics. He has served on the Board of Directors for the Society for Research on Adolescence, the Governing Council of the Society for Research in Child Development, and the Editorial Board for the *Journal of Youth and Adolescence.*

**Dr. Katherine Kuvalanka** is a Professor in the Department of Family Science and Social Work at Miami University in Ohio. Her research has focused broadly on sexuality and gender socialization within families, and more specifically on families with lesbian, gay, bisexual, transgender, and queer (LGBTQ) family members, and most recently on custody cases involving families with transgender children. She is the principal investigator of the Trans*Kids Project, a longitudinal study of 50

families with transgender and gender-diverse (TGD) children, which began more than a decade ago.

**Dr. Jenifer McGuire** is a Professor of Family Social Science at the University of Minnesota. She studies the well-being of young people who identify as transgender with a specific focus on ways that family environments can best support healthy development. Specifically, she focuses on gender development among adolescents and young adults and how social contexts like schools and families influence the well- being of trans and gender non-conforming young people. Dr. McGuire's current focus is on gender identity development across a broad spectrum and family relationships among transgender and genderqueer identified youth and young adults.

Amici's research shows that when transgender and nonbinary students are supported at school, including through the use of the names and pronouns the child uses, they experience significant improvements in academic achievement and a marked decrease in symptoms of depression. Drawing from that research, amici urge this Court to affirm the district court's dismissal of Plaintiffs-Appellants' Complaint and denial of Motion for Preliminary Injunction.

## ARGUMENT

School administrators, counselors, and teachers work every day to meet the myriad needs of students and foster an environment that supports each student's

academic, social, and emotional growth. Because of the care and support they show students, students often look to school personnel as a resource to help them address issues such as substance misuse, problems with peers, unplanned pregnancy, and problems with family members. School personnel are entrusted to rely on their expertise and professional judgment to provide that guidance; in fact, numerous states protect those conversations from disclosure to encourage students to seek the confidences of school personnel.

Consistent with their legal obligations under federal and state laws and evidence-based best practices, state education agencies and school districts around the country have adopted policies to ensure that transgender students—like all other students—feel safe at school to learn and grow. *See, e.g.*, New York State Department of Education, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices, *available at* https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf (last visited August 13, 2025); Durham Pub. Schs., LGBTQIA+ (Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Allied/Asexual+) and Gender Supports Policy (Dec. 2022), *available at*, https://go.boarddocs.com/nc/dpsnc/Board.nsf/goto?open&id=CLXMFD58A27C

(last visited August 13, 2025); D.C. Pub. Schs., *Transgender & Gender Nonconforming Policy Guidance* (Jun. 2015), *available at*, https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/ attachments/DCPS%20Transgender%20Gender%20Non%20Conforming%20Policy%20Guidance.pdf (last visited August 13, 2025); N.J. Dep't of Educ., *Transgender Student Guidance for School Districts*, available at https://www.nj.gov/education/safety/sandp/climate/docs/Guidance.pdf (last visited August 13, 2025). Those policies also help guide school personnel in exercising their professional judgment to address the needs of transgender students, including around the disclosure of a student's transgender status. The disclosure of that sensitive information can have a significant effect on the social and emotional wellbeing of a transgender student and, as such, needs to be approached with care. AB 1955 does precisely that, by appropriately protecting sensitive and confidential information from mandatory disclosure so that all students, including LGBT youth, can build trust with their families and have conversations about their identity when they are ready. AB 1955 § 2(e). In so doing, AB 1955 also reflects the guidelines previously established by the California Department of Education, which were designed to reduce stigmatization and support healthy communication between educators, students, and parents. California Department of Education, *Frequently Asked Questions: School Success and Opportunity Act (AB 1266)* (September 16, 2021),

*available* *at*

https://web.archive.org/web/20241224194546/https://www.cde.ca.gov/re/di/eo/faq s.asp (last visited August 14, 2025).

The district court correctly concluded that AB 1955 does not infringe on Plaintiffs-Appellants' constitutional rights. Indeed AB 1955 is consistent with California law, California Department of Education guidelines, and evidence-based best practices regarding the disclosure of confidential student information and the health and wellbeing of students. The lower court therefore correctly held that Plaintiffs-Appellants have failed to state any claim for relief and that further amendment of their Complaint would be futile. This Court should affirm the district court's dismissal of Plaintiffs-Appellants' Complaint with prejudice.

## I. State law and research-based public policy demonstrate that not automatically disclosing confidential information to a student's parent in limited circumstances to protect student safety and wellbeing is a compelling governmental interest.

Administrators and school personnel strive to build an environment that is welcoming and inclusive of all students so that students can thrive socially, emotionally, and academically. Because of that common interest, school personnel and parents are natural collaborators. Schools strive to maintain open lines of communication with a student's parents and to encourage open communication between students and parents. Doing so is important for many reasons, including that it may provide school personnel with an opportunity to share information and

resources that will help parents support their child in navigating difficult circumstances. Unsurprisingly, research demonstrates the benefits of such partnerships. *See generally*, Mavis Sanders & Steven Sheldon, *Principals Matter: A Guide to School, Family, and Community Partnerships* (2009); Nat'l Cmte. For Citizens in Educ., *A New Generation of Evidence: The Family is Critical to Student Achievement* (Henderson & Berla, Eds., 1994).

Maintaining open communication with parents is the ideal method for supporting student development and growth; however, as numerous state laws have long recognized, there are limited circumstances where schools must—consistent with their obligations to protect students—respect students' confidentiality when failing to do so may deter them from seeking support or put them at risk of harm. *See, e.g.*, Cal. Educ. Code § 72621 (protecting information provided to school-based mental health providers as confidential and not subject to disclosure to parents); 105 Ill. Comp. Stat. Ann. 10/5 (same); N.D. Cent. Code Ann. § 31-01-06.1 (same); Md. Code Ann., Educ. § 7-412 (designating information provided by students to school mental health professionals regarding substance abuse as confidential and not subject to disclosure absent consent of the student); Conn. Gen. Stat. Ann. § 10-154a (same); N.J. Stat. Ann. § 18A:40A-7.1 (same); N.Y. Educ. Law § 3038; Wisc. Stat. Ann. § 118.126(1) (same).

Importantly, research has documented that for many students, being able to

10

confide in school personnel is critical to students' willingness to seek adult support. School employees are a likely source for that support because of their proximity to students and because a student's outreach to them generally does not require obtaining parental permission or assistance, like a therapist visit would. Laurie S. Zabin & Samuel D. Clark, Jr., *Institutional Factors Affecting Teenagers' Choice and Reasons for Delay in Attending a Family Planning Clinic*, 15 Fam. Plan. Persp. 25 (1983). Research repeatedly shows that without confidentiality protections, many young people would rather forgo seeking help than risk their parents finding out. Melissa Prober, *Please Don't Tell My Parents: The Validity of School Policies Mandating Parental Notification of a Student's Pregnancy*, 71 Brook. L. Rev. 557, 575 n.108 (2005) (breaching student confidentiality can have a chilling effect, causing students to forgo seeking other health-related services from the school); *see also* Carol A. Ford et al., *Foregone Health Care Among Adolescents*, 282 JAMA 2227 (1999); Rhonda Williams & Joseph Wehrman, *Collaboration and Confidentiality: Not a Paradox but an Understanding Between Principals and School Counselors*, 94 NAASP Bull. 107, 110 (2010) ("99% of participants identified confidentiality as essential (53%) or important (46%) in their decision to seek help from a school counselor"); Tina Cheng, et al., *Confidentiality in health care: a survey of knowledge, perceptions, and attitudes among high school students*, 269 JAMA 1404 (1993). When students do reach out in this way, state laws and

11

research-based best practices prohibit automatic disclosure of sensitive information to a student's parent or guardian, opting instead for a flexible and individualized assessment of the student and situation that focuses on family support. Guided by the best interests of the students, those policies—including AB 1955—safeguard the ability of students to obtain support from trusted adults in navigating difficult—if not, crisis—situations.

As noted above, many states have enacted confidentiality provisions related to students in school. The most common examples are statutes and policies governing the confidentiality of reports of substance abuse and access to reproductive healthcare, including pregnancy-related services. For example, California law permits disclosure of student records only in limited circumstances, including where disclosure is necessary to avert a clear and present danger to the health, safety, or welfare of the pupil or others within the school community. Cal. Educ. Code § 49602. Maryland law has long recognized a privileged relationship between school personnel and students "who seek[] information to overcome any form of drug abuse." Md. Code Ann., Educ. § 7-412(a). Those communications are safeguarded from disclosure without exception. *Id.* at § 7-412(b). Other states permit disclosure only in very limited circumstances, including written consent for the disclosure from the student or if the disclosure is required to prevent "serious and imminent danger to the health, safety or life of any person and . . . . [n]o more

information than is required to alleviate the serious and imminent danger may be disclosed." *See* Wisc. Stat. Ann. § 118.126(1)(a)–(c). In contrast, policies that mandate automatic disclosure of sensitive information to parents, such as random drug testing of students, can undermine the school environment by sowing distrust between school personnel and students. They can also encourage students to engage in more dangerous behavior to evade detection—for example, by using drugs that are not typically tested for, even though those drugs have higher morbidity and mortality rates. *See* Sharon Levy & Miriam Schnizer, *AAP Technical Report: Adolescent Drug Testing Policies in Schools*, 135 Pediatrics e1107 (2015). As a result, the American Academy of Pediatrics does not support school-based drug testing programs. *Id.*

Likewise, research-based best practices regarding the confidentiality of a student's pregnancy strongly support confidentiality and respect for the student's decision regarding if, and when, to disclose that information to their parent or guardian. Those best practices have been adopted by many major associations of professionals working with young people in the United States. *See, e.g.,* Am. Sch. Counselors Ass'n, *The School Counselor and Confidentiality* (2018), *available at*, https://www.schoolcounselor.org/Standards-Positions/Position-Statements/ASCA-Position-Statements/The-School-Counselor-and-Confidentiality (last visited August 14, 2025); Am. Coll. of Obstetricians & Gynecologists, *ACOG Committee Opinion*

*803: Confidentiality in adolescent care* (2020), *available at*, https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2020/04/confidentiality-in-adolescent-health-care (last visited August 14, 2025); Am. Med. Ass'n, *Opinion 5.055 Confidential care for minors*, 16 AMA J. of Ethics 901 (2014); Am. Acad. of Pediatrics, *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents* (Hagan et al., eds., 3d ed. 2008); Carol Ford, et al., *Confidential health care for adolescents: position paper of the Society for Adolescent Medicine*, 35 J. of Adolescent Health 160 (2004).

In practice, this confidentiality is most often time limited: long enough to support the student in coping with the immediate situation while providing the student the tools and support they need to disclose this information to their parent or guardian. For example, one study found that around ninety percent of students who become pregnant eventually disclose that information to at least one parent. Laurie Zabin et al., *To Whom Do Inner-City Minors Talk About Their Pregnancies? Adolescents' Communications with Parents and Parent Surrogates*, 23 Fam. Plan. Persp. 148, 151 (1992). At the same time, there is no evidence that forcing school personnel to disclose confidential information is correlated with positive familial communication or outcomes. Am. Acad. of Pediatrics, Comm. on Adolescence, *The Adolescent Right to Confidential Care When Considering Abortion*, 97 Pediatrics 746 (1996). In fact, research strongly indicates the opposite is true: minors whose

14

parents found out about the minor's pregnancy from a third party were two to four times more likely to face adverse consequences. Stanley K. Henshaw & Kathryn Kost, *Parental Involvement in Minors' Abortion Decisions*, 24 Fam. Plan. Persp. 196 (1992).

Longstanding public policy in states across the country and well-established evidence-based best practices demonstrate that, in limited circumstances, there are significant benefits to protecting student confidentiality, including fostering a supportive school environment that promotes student development and success, protecting students from harm, and maximizing the likelihood that students will share sensitive information with parents while avoiding the negative consequences that often result from compelled third-party disclosures. Protecting student confidentiality provides school personnel with the flexibility to work with students and support them to disclose private information to their parents. It may also help parents make more informed parenting decisions by learning from the expertise and experience of school personnel who have worked with numerous students facing these similar difficult circumstances. Mandating disclosure, however, may put students at risk of serious harms by deterring them from seeking any adult support and undermining their relationship with their parents.

**II.    Requiring school personnel to automatically disclose a student's request to use a different name or pronoun to their parent can**

**undermine a school district's compelling interest in the student's safety and wellbeing.**

For many of the same reasons that schools are required to maintain student confidentiality in the context of pregnancy and substance abuse, it is critical that schools also safeguard the confidentiality of students who disclose that they are, or may be, transgender to a teacher or other school staff. Just as some families may have a difficult time dealing with a young person's pregnancy or substance abuse, which requires sensitivity and caution on the part of school staff to whom students disclose confidential information about these issues, families may have a difficult time dealing with a young person who is or may be transgender. Unfortunately, transgender young people experience high levels of family rejection. Approximately one third of transgender youth are rejected by family after disclosing their transgender status. Sabra Katz-Wise, et al., *LGBT Youth and Family Acceptance*, 63 Pediatric Clinics of N. Am. 1011 (2016). The fear of rejection causes another third of transgender young people to keep that information from their families. *Id.*

The negative effects of family rejection are serious and well-documented. In the short-term, family rejection can result in verbal or physical abuse, homelessness, and attempts to change the child's sexual orientation or gender identity. Caitlyn Ryan, et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. of Homosexuality 159 (2018); Laura E. Durso & Gary J. Gates, *Serving Our Youth:*

*Findings from a National Survey of Services Providers Working with Lesbian, Gay, Bisexual and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless* (2012), *available at*, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Serving-Our-Youth-July-2012.pdf (last visited August 14, 2025). Family rejection also has significant long-term effects. LGBT youth who experience high levels of family rejection were over eight times more likely to have attempted suicide and youth who experience even moderately rejecting behaviors (*i.e.* parents responded to their child's gender identity with both supportive and rejecting behaviors) were twice as likely to have attempted suicide. Caitlyn Ryan, et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009). Those who had a highly rejecting family were also six times more likely to experience severe depression. *Id.*

Transgender young people also face challenges at school, which for many is not a safe place. Joseph G. Kosciw, et al., *2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 16 (2021) (finding over forty percent of LGBTQ students did not feel safe at school); *see also* Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School*

17

*Districts, 2017*, 68 MMWR 67 (2019), *available at*, http://dx.doi.org/10.15585/mmwr.mm6803a3 (last visited August 14, 2025); Human Rts. Campaign & Gender Spectrum, *Supporting and Caring for Our Gender Expansive Youth: Lessons from the Human Rights Campaign's Youth Survey* 10 (2014). More than forty percent of students surveyed for the National School Climate Survey reported hearing anti-transgender epithets or remarks either frequently or often, and more than half reported the same about negative remarks regarding gender-nonconformity. Kosciw, *2019 National School Climate Survey* at 22. Transgender students are often the targets of multiple forms of bullying and harassment, such as verbal harassment, relational aggression, and physical assault. Research has shown that without the support of teaching staff, transgender students were more likely to be the targets of bullying and other discriminatory behavior. Tiffany Jones, *Evidence Affirming School Supports for Australian Transgender and Gender Diverse Students*, 14 Sexual Health 412 (2017).

In contrast, research has shown that transgender youth benefit greatly from supportive school environments. For example, transgender students in schools or districts with policies that addressed the specific needs of transgender students were less likely to hear negative remarks about transgender people, less likely to miss school because they felt unsafe or uncomfortable, and reported experiencing less bullying and harassment. Kosciw, *2019 National School Climate Survey* at 69–79.

18

Those students also reported feeling a greater sense of belonging to the school community, which is correlated with improvements in academic motivation and achievement. *Id.* Students who reported being taught curriculum that was inclusive of LGBTQ people, or that had support from school personnel, also felt safer in school, had higher grades, and higher educational aspirations. *Id. See also* Jenifer K. McGuire, et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, 39 J. Youth Adolescence 1175 (2010) (finding trust in school personnel to be an important factor for academic success among transgender students); Katharine B. Parodi, et al., *Associations between school-related factors and mental health among transgender and gender diverse youth*, 90 J. of School Psychol. 135 (2022) (a greater sense of connectiveness to one's school is associated with lower rates of anxiety and depression among transgender students); Russell Toomey, et al., *Heteronormativity, school climates, and perceived safety for gender nonconforming peers*, 35 J. of Adolescence 187 (2012) (finding that schools with LGBTQ-inclusive curriculum and presence of student groups for LGBTQ students and allies were perceived by students to be safer); Kristie L. Seelman, et al., *School engagement among LGBTQ high school students: The roles of safe adults and gay–straight alliance characteristics*, 57 Children and Youth Services Review 19 (2015) (associating the number of "safe adults" in whom transgender students can confide with greater

connectiveness with their school, higher GPA, and a decrease in absences due to fear); Mollie McQuillan, et al., *Examining School Supports and Barriers to Improving the Health, Safety, and Academic Achievement of MMSD LGBTQ+ Students*, Madison, WI: Madison Education Partnership 26 (2021) (finding that schools with LGBTQ+-inclusivity training for staff had significantly fewer disciplinary problems than schools without such training programs).

The benefits of a positive and supportive school environment are not just academic. Being bullied and harassed less frequently at school is associated with better self-esteem and lower levels of depression. Kosciw, *2019 National School Climate Survey*, at 52–53. Even something as simple as referring to a transgender student by their chosen name and correct pronouns significantly decreases symptoms of severe depression. Stephen Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. of Adolescent Health 503 (2018); Amanda M. Pollitt, et al., *Predictors and Mental Health Benefits of Chosen Name Use Among Transgender Youth*, 53 Youth & Society 320 (2019) (finding that the use of chosen names at school predicted fewer depressive symptoms and greater self-esteem); L. Durwood, et al., *Social Support and Internalizing Psychopathology in Transgender Youth*, 50 J. of Youth and Adolescence 841-854 (2021) (concluding that greater school support of students' gender identities and other LGBTQ-

supportive policies is associated with less anxiety and depression in transgender children). Legislation that safeguards the confidentiality of a student's gender identity or gender exploration and promotes family involvement, like AB 1955, help foster a welcoming learning environment in schools throughout California.

Supportive legislation also provides schools an opportunity to facilitate positive communication between students and their parents. This includes being a resource for building family acceptance and support, which is a strong protective factor as a child moves into adolescence and adulthood. *See, e.g.*, Stephanie Budge, et al., *A grounded theory study of the development of trans youths' awareness of coping with gender identity*, 27 J. of Child Family Studies 3048 (2018); Sabra Katz-Wise, et al., *Family functioning and mental health of transgender and gender nonconforming youth in the Trans Teen and Family Narratives project*, 55 J. of Sex Research 582 (2018); Alida Bouris & Brandon Hill, *Exploring the mother-adolescent relationship as a promotive resource for sexual and gender minority youth*, 73 J. of Soc. Issues 618 (2017); L. Durwood, et al., *Social Support and Internalizing Psychopathology in Transgender Youth*, 50 J. of Youth and Adolescence 841-854 (2021); Lisa Simons, et al., *Parental support and mental health among transgender adolescents*, 53 J. of Adolescent Health 791 (2013).

In sum, AB 1955 is consistent with laws and policies addressing other sensitive issues, such as disclosures relating to substance abuse and pregnancy. AB

1955 furthers compelling governmental interests in promoting student wellbeing and protecting students from potentially serious harms. And it is firmly grounded in research and evidence-based best practices, including evidence that compelled disclosure of sensitive information is likely to undermine rather than support students' relationships with their parents.

### III.   Major educational professional associations caution against mandatory disclosure of gender identity in schools.

Major educational professional associations support legislation like AB1955 in order to protect the health and wellbeing of students and families. These associations have emphasized the need to support transgender and nonbinary students, to ensure that they have equal educational opportunities, and to avoid policies that single out these students by requiring automatic forced disclosure any time a student shares confidential information about their gender identity with a teacher or other school staff. For example, guidelines published by the National Education Association (NEA) highlight the importance of respecting a student's confidentiality and note that school personnel should not automatically disclose a student's gender identity to others—including other students, teachers, parents or guardians—unless the student has agreed to such disclosure. National Education Center, *Legal Guidance on Transgender Students' Rights*, available at: https://www.nea.org/sites/default/files/2020-

07/2018_Legal%20Guidance_Transgender%20Student%20Rights.pdf (last visited August 14, 2025).

Educational professional organizations also caution that policies mandating disclosure of such confidential information may violate state or federal privacy protections. The American School Counselor Association has stated that schools should employ "a student-centered approach that includes ongoing student and parent/guardian engagement (as appropriate) and school personnel with a legitimate educational interest per the Family Education Rights and Privacy Act (FERPA)." Am. Sch. Counselors Ass'n, *The School Counselor and Transgender and Nonbinary Youth* (2022), *available at* https://www.schoolcounselor.org/Standards-Positions/Position-Statements/ASCA-Position-Statements/The-School-Counselor-and-Transgender-Gender-noncon (last visited August 14, 2025). The guidance makes clear that "school officials should work collaboratively [with parents/guardians], directed by students' comfort about what and with whom to share their confidential information." *Id.*

The National Association of School Psychologists (NASP) has similarly cautioned that disclosure of a student's gender identity could lead to potential harm, despite any beneficent intent, and may violate privacy laws. National Association of School Psychologists, *Position Statement: Safe and Supportive Schools for Transgender and Gender Diverse Students* (2022). In keeping with best practices,

23

NASP urges school psychologists to "'respect the right of persons to choose for themselves whether to . . . shar[e] their sexual orientation or gender identity." *Id*.

## IV. School support of a student's requested name and pronouns does not constitute medical treatment.

Plaintiffs-Appellants contend that AB 1955 requires school administrators and staff to engage in medical treatment without parents' knowledge. Op. Br. at 40-41, 48-50. This characterization misunderstands both AB 1955 and what constitutes medical care. AB 1955 does not address medical care at all—it merely states that school personnel "shall not be *required* to disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law." Cal. Educ. Code § 220.3(a) (emphasis added). Far from addressing medical care, this section merely protects student information generally, and regardless of who that student is. Moreover, when school staff use a student's requested name and pronouns (regardless of what those are), they require no special training, skill, medication, or technology. *See Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 350 (1st Cir. 2025) (holding that school staff are not administering medical treatment by "using the Student's chosen name and pronouns—something people routinely do with one another, and which requires no special training, skill, medication, or technology"). Using a student's requested name and pronouns advances that student's focus on

schoolwork and supports their learning environment. It does not transform school support into medical treatments.

Schools regularly accommodate students' needs without becoming medical providers or providing students with medical care. Teachers might arrange for a student with mobility challenges to have a desk that works better for them, or help a student with vision difficulties by seating them closer to the board. While these students may receive medical care from doctors for their conditions, the school's accommodations are educational supports that help students learn. They are not transformed into medical treatment just because the accommodation relates to or even stems from a medical condition. Similarly, when teachers allow an anxious student to eat lunch in a quiet space or provide extra time for testing, these supportive actions help students succeed academically. Even if a doctor has recommended such accommodations, the teacher is not practicing medicine by providing them. Accepting Plaintiffs-Appellants' broad definition would transform any educationally supportive action by school staff into medical treatment, a result that defies both common sense and established medical standards.

In short, AB 1955 does not address medical care at all and schools that use students' preferred names and pronouns are not providing medical care. They are implementing pedagogically sound practices that allow all students to focus on their education and reach their potential.

## CONCLUSION

The district court correctly concluded Plaintiffs-Appellants failed to allege a violation of their constitutional rights. Amici respectfully urge this Court to affirm the dismissal of Plaintiffs-Appellants' complaint and denial of Plaintiffs-Appellants motion for preliminary injunction as moot.

Dated: August 20, 2025

Respectfully submitted,

 /s/ Amy Whelan

NATIONAL CENTER FOR
LGBTQ RIGHTS
Shannon Minter (CA Bar: 168907)
Amy Whelan (CA Bar: 215675)
1401 21st Street #11548
Sacramento, CA 95811
Telephone:  (415) 392-6257
Facsimile:   (415) 392-8442
awhelan@nclrights.org
sminter@nclrights.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(4) and 29(a)(5) because it contains 5,473 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: August 20, 2025

/s/ Amy Whelan
*Attorney for Amici Curiae*

27

## CERTIFICATE OF SERVICE

I certify that on August 20, 2025, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the CM/ECF system.

I further certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Amy Whelan

*Attorney for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-3826

I am the attorney or self-represented party.

**This brief contains** 5,473 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.

　☐ a party or parties are filing a single brief in response to multiple briefs.

　☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Amy Whelan **Date** 08/20/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/22*